James Odis **HENDRIX,** Grady Thomas Bobbitt, Melon Carroll, Donald R. Sceifers, James Blackburn, Plaintiffs,

v.

Gordon H. **FAULKNER,** Edward Jones, Jack Duckworth, Charles Adkins, Defendants.

Billie R. **ADAMS,** Plaintiff,

v.

Jack **DUCKWORTH,** J. F. Kozlowski, P. G. Youngblood, Bob Glaney, R. Shriner, Rodney Keith, Ronald Batchelor, Byron Glick, G. Wilkins, Defendants.

Bruce C. **WELLMAN,** Dwight Walker, Douglas Shackelford a/k/a Achebe H. Lateef, Raymond Hurt, Richard Colvin, Stewart Brooks, Plaintiffs,

v.

Gordon H. **FAULKNER,** Norman Hunt, Cloid L. Shuler, Dean Neitzke, Jack Duckworth, Edward Jones, Major Gothel D. Wilkins, Ronald Freake, M. D., Roger D. Saylors, M. D., Captain Eugene Koziatek, Sgt. Byron Glick, Lt. Robert McKee, Officer John M. Sharp, Lt. John Riggs, Officer Bill J. Kennedy, Lt. David G. Oden, Defendants.

Nos. S 76–187, S 77–35 and S. 79–32.

United States District Court,
N. D. Indiana,
South Bend Division.

Oct. 21, 1981.

William Marsh, Patricia Brown, Michael Milsap, Legal Services Program of Northern Indiana, Inc., Indianapolis, Ind., Edward L. Volk, Marsha Shatz, Newby, Lewis, Kaminiski & Jones, LaPorte, Ind., for plaintiffs.

Linley E. Pearson, Atty. Gen. of State of Ind., David A. Arthur, Sabra A. Weliever, Bruce L. Kamplain, Deputy Attys. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

SHARP, District Judge.

This action is a suit under 42 U.S.C. § 1983 challenging conditions of confinement at the Indiana State Prison (hereinafter I.S.P.) at Michigan City, Indiana. The I.S.P. is an all male maximum security correctional facility, which has been in existence at the present location approximately 120 years. Jurisdiction is conferred by 28 U.S.C. § 1343(3) and (4).

The Court has consolidated herein three actions, cause numbers S 76–187, S 77–35 and S 79–32, wherein the plaintiffs seek individual damages and injunctive and de-

claratory relief on behalf of all inmates confined at the I.S.P. A class certification is sought and will be dealt with herein. Specifically, plaintiffs ask that the Court find, upon consideration of the totality of the conditions at the I.S.P., that those conditions violate the Eighth and Fourteenth Amendments to the Constitution of the United States.

Plaintiffs in S 76–187 whose claims have not been dismissed or severed are James Odis Hendrix, Grady Thomas Bobbitt, Melon Carroll, Donald R. Sceifers, and James Blackburn. Each is an offender incarcerated at the Prison. Defendants in S 76–187 are Gordon Faulkner, Commissioner, Jack Duckworth, Warden, and Edward Jones, Director of Classification and Treatment at the Prison.

Plaintiff in S 77–35 is Billie R. Adams, who is an offender incarcerated at the Prison. Defendants in S 77–35 are Jack Duckworth, J. F. Kozlowski, P. G. Youngblood, Bob Glaney, R. Shriver, Rodney Keith, Ronald Batchelor, Byron Glick and G. Wilkins. J. F. Kozlowski is no longer employed at the Prison.

Plaintiffs in S 79–32 are Bruce Wellman, Dwight Walker, Douglas Shackelford a/k/a Achebe H. Lateef, Raymond Hurt, Richard Colvin and Stewart Brooks. Walker, Shackelford and Colvin are offenders incarcerated at the Prison. Wellman, Hurt and Brooks were previously incarcerated at the Prison. Defendants in S 79–32 are Gordon Faulkner, Norman Hunt, Cloid L. Shuler, Dean Nietzke, Jack Duckworth, Edward Jones, Major Gothel D. Wilkins, Ronald Freake, M.D., Roger D. Saylors, M.D., Captain Eugene Koziatek, Sgt. Byron Glick, Lt. Robert McKee, Officer John M. Sharp, Lt. John Riggs, Officer Bill J. Kennedy, and Lt. David G. Oden. Riggs is deceased. Saylors is no longer employed at the Prison and is not serving the Prison under contract. Kennedy is no longer employed at the Prison.

In cases of this kind, this Judge is every mindful of the limited right the federal courts have to adjudicate claims that arise from state prison confinement. Noted opinions have been handed down from every level of the federal court system that advise extreme caution in adjudicating claims that essentially involve the general administration of a state prison and do not reach, as they must, the level of constitutional violations. Justice Powell of the Supreme Court of the United States set forth the reason for this principle in striking and memorable language:

> "[T]he problems of prisons in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." *Procunier v. Martinez*, 416 U.S. 396 at 405, 94 S.Ct. 1800 at 1807, 40 L.Ed.2d 224 (1979).

The Supreme Court of the United States has continuously expressed its adherence to this doctrine of restraint from undue interference in the administration of state prisons unless federal constitutional violations and deprivation are clearly evident. The principle has been enunciated again and again with a variety in the language. The dominant thought remains clear. The most recent statement of this settled principle is contained in *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), stating that courts must bear in mind that their inquires "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Rhodes, supra*, at ——, 101 S.Ct. at 2401, citing *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979). Federal judges must be circumspect not to interfere without warrant and subject themselves to the suspicion that "it is the office of the good judge to enlarge his jurisdiction." 1 Works of Thomas Jefferson 121–22 (Federal ed. 1904).

This Judge has indicated from the beginning of this case to the present time, a complete and utter distaste for having to cross that Rubicon which separates the federal government from the state government and enter into the morass of the day to day operation of the prison.

### THE PLAINTIFF CLASS

Plaintiffs have moved the Court to determine that this action should be maintained as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

■ A threshold requirement for class certification is the existence of a class which requires representation. *Dolgow v. Anderson*, 43 F.R.D. 472, 491 (E.D.N.Y. 1968), summary judgment rev'd, 438 F.2d 825 (2d Cir. 1971); *Ridgeway v. International Brotherhood of Electrical Workers*, 74 F.R.D. 597, 602 (D.Ill.1977). The class, as well as its members, must be clearly defined and identified with particularity. *Williams v. Page*, 60 F.R.D. 29, 34 (N.D.Ill.1973); *Inmates of Lycoming County Prison v. Strode*, 79 F.R.D. 228, 231 (M.D.Pa.1978).

The proposed class consists of "those prisoners who are, or may be in the future, confined at the Indiana State Prison, Michigan City, Indiana, in the custody of the Indiana Department of Correction." This type of class has been described as "obviously definable and identifiable." *Inmates of Lycoming County Prison v. Strode, supra.* In this context, it has further been said that:

"The use of the class action form is a desirable and logical way to challenge prison conditions and it only makes sense to include future inmates. See *Santiago v. City of Philadelphia*, 72 F.R.D. 619 (E.D.Pa.1976); *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975); *Dillard v. Pitchess*, 399 F.Supp. 1225 (C.D.Cal. 1975)."

*Inmates of Lycoming County Prison v. Strode, supra.*

■ Each potential member of the class is not required to be identifiable, but mere-ly "circumscribed by some objective set of criteria." *Ridgeway v. I.B.E.W., supra; Carpenter v. Davis*, 424 F.2d 257 (5th Cir. 1970). Plaintiffs' definition of the class for which certification is now being sought clearly meets this requirement. See, generally, *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977–978 (7th Cir. 1977).

■ A second threshold requirement for class certification is that the representatives are members of that class. *Equal Employment Opportunity Comm. v. Whirlpool Corp.*, 80 F.R.D. 10, 14 (N.D.Ind.1978); *Inmates of Lycoming v. Strode, supra.* This prerequisite has been described as "the most fundamental requirement of Rule 23(a)." *E.E.O.C. v. Whirlpool Corp., supra.* The named plaintiffs here are prisoners who are confined at the Indiana State Prison, Michigan City, Indiana, in custody of the Indiana Department of Correction. Complaint at 2 and 4 (Pars. 1 and 7), and, therefore, these representatives are members of the proposed class.

A. *The class is so numerous that joinder of all members is impracticable.*

■ The proposed class consists of the current prisoner population at the Prison, numbering approximately 1900 persons. The class would also include all those persons who, in the future, are incarcerated at I.S.P., potentially hundreds or thousands of additional class members. It is appropriate to include future inmates in a class action challenging prison conditions. *Ahrens v. Thomas*, 570 F.2d 286, 288 (8th Cir. 1978); *Inmates of Lycoming County Prison v. Strode, supra*, at 231.

■ While numbers alone do not satisfy the numerosity requirement, they are a relevant consideration. In *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326 (7th Cir. 1969), it was held that 151 class members was a sufficient number to satisfy the requirement of F.R.Civ.P. 23(a)(1). Joinder of 1008 class members has also been held to be impracticable. *Hopson v. Schilling*, 418 F.Supp. 1223 at 1236–1237, as it has when the class included "hundreds of persons," *Ridgeway v. I.B.E.W., supra*, at

603. The inclusion within the class of persons who will, in the future, be incarcerated at I.S.P. makes the class even more numerous, and makes joinder of all class members totally impracticable. It has been said that "the term 'impracticable' within the meaning of Rule 23(a)(1) does not refer to impossibility but only to difficulty or inconvenience." *Vernon J. Rockler and Co. v. Graphic Enterprises, Inc.*, 52 F.R.D. 335, 339 (D.Minn.1971).

Both the size of the proposed class here and its fluid, indeterminable nature render joinder unwise, imprudent and impractical, the essential elements of impracticability. 3B *Moore's Federal Practice*, ¶ 23.05, pp. 271, 272 (1976); *Swanson v. American Consumer Industries, Inc., supra*, at 1333. Therefore, a class action is the procedural vehicle of choice in the present litigation.

B. *There exist questions of law and fact common to the class.*

The questions of law and fact common to the class in this action are:

Whether the conditions, practices, and policies of the Indiana Department of Correction and the I.S.P. deprive plaintiffs and the class of their right to be free from cruel and unusual punishment as guaranteed to them by the Eighth and the Fourteenth Amendments to the Constitution of the United States;

Whether the conditions, practices and policies of the Indiana Department of Correction and the I.S.P. deprive plaintiffs and the class of due process of law as guaranteed to them by the Fourteenth Amendment to the Constitution of the United States;

Whether the conditions, practices and policies of the Indiana Department of Correction and the I.S.P. deprive plaintiffs and the class of their right to free speech as guaranteed to them by the First and the Fourteenth Amendments to the Constitution of the United States; and

Whether the conditions, practices, and policies of the Indiana Department of Correction and the I.S.P. deprive plaintiffs and the class of their rights to educational and rehabilitative programs, as guaranteed to them by Article I § 18 of the Constitution of the State of Indiana and by I.C. 11–1–1.-1–26 and 11–1–1.1–27 of the laws of the State of Indiana.

A class action is particularly well-suited to this civil rights case alleging that certain conditions, practices, and procedures of defendants violate constitutional guarantees. *Newman v. Alabama*, 349 F.Supp. 278 (M.D. Ala.1972), *aff'd*, 503 F.2d 1320 (5th Cir. 1974), *cert. den.*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Bishop v. Stoneman*, 508 F.2d 1224 (2d Cir. 1974); *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl.1974). Courts have unhesitatingly certified classes when confronted with similar problems involving prisoners. *Jackson v. Bishop*, 404 F.2d 571 (8th Cir. 1968); *Johnson v. Rockefeller*, 58 F.R.D. 42 (S.D.N.Y.1973); *Washington v. Lee*, 263 F.Supp. 327 (M.D.Ala. 1966), *aff'd sub nom., Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Inmates of Attica Correctional Facility v. Rockefeller*, 453 F.2d 12 (2d Cir. 1971).

C. *The claims of the class representatives are typical of the claims of the class.*

The named plaintiffs have alleged deprivation of their statutory and constitutional rights by operation of challenged policies, practices and conditions of defendants. All of the named plaintiffs have an interest not only typical of but actually coextensive with that of the class. Each and every inmate of I.S.P. has an identical interest in seeing that the defendants are required to operate the I.S.P. so as not to deprive them of the rights guaranteed to them by the First, Eighth and Fourteenth Amendments to the Constitution of the United States. The claims of the representative parties and those of the class are based upon alleged violations of these same constitutional provisions.

D. *The class representative will fairly and adequately protect the interests of the class.*

The standard for adequacy of representatives under Rule 23(a)(4) is that the

representatives must be of such a character as to assure the vigorous protection of the action so that the absent class members' rights are certain to be protected. *Hohmann v. Packard Instrument Co.*, 399 F.2d 711 (7th Cir. 1968).

The first requirement is plainly met in this case. Named plaintiffs' interests in securing their statutory and constitutional rights is co-extensive with the similar interests of all class members. Secondly, the named plaintiffs have a vital personal stake in the outcome of the case so as to insure zealous pursuit of the action. *Rodriquez v. Swank*, 318 F.Supp. 289 (N.D.Ill.1970), *aff'd*, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).

■ The second element of adequate representation is that the named plaintiffs' counsel be sufficiently competent to conduct the proposed litigation. *Sullivan v. Chase Investment Services, Inc.*, 79 F.R.D. 246 (N.D.Cal.1978); *Jenson v. Continental Financial Corp.*, 404 F.Supp. 806 (D.Minn. 1975). Plaintiffs are represented by attorneys from Legal Services Organization of Indiana, Inc., and Legal Services Program of Northern Indiana, Inc., both being legal services programs which have extensive experience in prison law and in protecting the rights of group litigants. Legal Services Organization has adequate resources available to fully pursue this action. The attorneys who are counsel of record in this case are experienced in conducting litigation of this type. Thus, plaintiffs' counsel has the experience and the resources to protect and forward the interests of not only the named plaintiffs but also each member of the class.

**THE PRESENT CASE FALLS WITHIN THE CATEGORY OF CLASS ACTIONS IN WHICH THE PARTY OPPOSING THE CLASS HAS ACTED OR FAILED TO ACT ON GROUNDS GENERALLY APPLICABLE TO THE CLASS, THEREBY MAKING APPROPRIATE FINAL INJUNCTIVE AND DECLARATORY RELIEF WITH RESPECT TO THE CLASS AS A WHOLE.**

■ In addition to satisfying the requirements of Rule 23(a), the present actions falls within the criteria of Rule 23(b)(2). The *Notes of the Advisory Committee*, 39 F.R.D. 69, 102 (1976), suggest that subsection 23(b)(2) is uniquely suited to civil rights actions to redress constitutional deprivations of large classes of persons. See also, *Fujishima v. Board of Education*, 460 F.2d 1355, 1360 (7th Cir. 1972); *Inmates of Lycoming County Prison v. Strode, supra*, at 234; *Hopson v. Schilling, supra*, at 1237; *Dixon v. Quern*, 76 F.R.D. 617 (N.D.Ill. 1977). These are two elements which must be present for an action to fall within 23(b)(2): "the defendants' conduct or refusal to act must be 'generally applicable' to the class"; and, "final injunctive or corresponding declaratory relief must be requested for the class." *Kornbluh v. Stearns & Foster Co.*, 73 F.R.D. 307, 310. Both elements are met in the instant case.

■ As has been previously set out in this memorandum, all class members in this case are being subjected to the conditions, policies and practices about which the named plaintiffs complain. In that light, it is clear that class relief would be the appropriate vehicle for resolution of this action, since the conditions, policies and practices will continue to apply to those who do not come within the scope of any final order.

Since the constitutional violations complained of herein are based on practices, policies and conditions applicable to each and every member of the class, declaratory and injunctive relief with respect to the class as a whole may be appropriate. Therefore, the proposed class is certified pursuant to F.R.Civ.P. 23(a) and 23(b)(2).

**II.**

**INDIVIDUAL PLAINTIFFS' CLAIMS**

A. *Bruce Wellman*

Plaintiff Wellman was incarcerated at the I.S.P. from October 1976 to June 8, 1979. Approximately seven months of this period was spent outside the institution on court order. At the time of trial Wellman

was not an inmate at the I.S.P. Wellman's deposition was introduced into evidence and his claim is based on evidence found in that deposition.

Plaintiff Wellman first contends that he was denied due process before the Conduct Adjustment Board (hereinafter C.A.B.), when they denied his request to have witnesses appear on his behalf and refused him the lay advocate of his choice. Plaintiff Wellman had requested that Albert Cornell be permitted to represent him but the C.A.B. provided inmate Arthur Wilson as lay advocate.

The uncontradicted evidence is that Wellman appeared before the C.A.B. in December 1977 and asked that he be allowed to call three witnesses, all inmates. This request was denied without comment. Plaintiff Wellman contends this denial of his right to call witnesses violated procedural due process as required by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*Wolff, supra*, recognized that prison inmates are entitled to a degree of the protections afforded by the due process clause in prison disciplinary proceedings. Id. at 555–556, 94 S.Ct. at 2974. The Supreme Court stated therein:

> We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals. Ordinarily, the right to present evidence is basic to a fair hearing; but the unrestricted right to call witnesses from the prison population carries obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution. We should not be too ready to exercise oversight and put aside the judgment of prison administrators. It may be that an individual threatened with serious sanctions would normally be entitled to present witnesses and relevant documentary evidence; but here we must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence. Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases. *Wolff, supra*, at 565–566, 94 S.Ct. at 2979.

The Seventh Circuit Court of Appeals has addressed the limited right of inmates to call witnesses at disciplinary hearings. See *Hayes v. Walker*, 555 F.2d 625 (7th Cir. 1977) (hereinafter *Hayes I*). In *Hayes I*, the Court of Appeals held that the district court erroneously dismissed the witness denial portion of Hayes' complaint because the record before the court did not permit "even limited review" of the disciplinary committee's decision. The court stated:

> The Institutional Adjustment Committee offered in justification of its action only broad conclusory findings of possible hazard both to potential witnesses and to institutional security which applied to all of the proposed witnesses on plaintiff's list. There is no indication in the record that the Institutional Adjustment Committee examined each proposed witness for the relative benefit or danger in his testimony. Similarly, this court cannot determine whether the broad conclusion applicable to all of the witnesses was improper as to individual witnesses. Since the record is barren of support for these broad conclusions, we find that the case must be returned to the district court for a determination of whether the Institutional Adjustment Committee's decision was a proper exercise of discretion.

We are not requiring that a statement of reasons be given to support the denial of a request for witnesses. *We hold only that some support for the denial of a request for witnesses appear in the record. Hayes I, supra,* at 630 (emphasis added)

The Court of Appeals in *Hayes I* reversed and remanded the cause to the district court to determine if the complete administrative record justified the decision not to call witnesses. At trial the district court heard testimony from the Institutional Adjustment Committee members as to their basis for reaching their decision on Hayes' request for witnesses. This testimony formed the basis for the district court's decision that the Committee's denial of Hayes' request for witnesses was a proper exercise of discretion.

The Court of Appeals, however, reversed this decision in *Hayes v. Thompson,* 637 F.2d 483 (7th Cir. 1980) (hereinafter *Hayes II.*) The court stated:

Although it may be relevant to other issues in this case, it is clear that under *Hayes I* this subsequent testimony may not be considered in reviewing the Committee's decision. *The requirement of support in the administrative record is central to the effectiveness of judicial review in insuring that a prisoner has not be subjected to arbitrary action by prison officials.* If subsequent testimony is allowed to substitute for support in the record, the Court can no longer assure itself that the Committee made a reasoned, well-founded decision. Such posthoc rationalizations are to be viewed with suspicion, and are not a proper basis for meaningful judicial review. *Support in the administrative record is necessary to protect the prisoner from arbitrary official action, and is a minimum requirement of* due process. *Hayes II, supra,* at 488. (emphasis added)

The Court then concluded that the broad conclusory findings of the Committee in denying the request for witnesses were not adequate to allow judicial review. Therefore, the denial constituted an abridgement of Hayes' due process rights.

Here the conclusions must be the same. There is no evidence that plaintiff Wellman's proposed witnesses were examined individually for the relative danger or benefit of their testimony. Nor is there any support in the record for the denial of Wellman's request for witnesses. There is only a blank denial, barren of any rationale for support. This record provides no basis for meaningful judicial review so as to insure that a prisoner is protected from arbitrary government action. *Hayes II, supra,* at 488; *Bono v. Saxbe,* 620 F.2d 609, 619 (7th Cir. 1980). Therefore, the Court must conclude that the denial of Wellman's request for witnesses violated his due process rights.

This circuit in *Bono, supra,* at 619, approved the district court's order which required the hearing officer to document his reasons for not calling witnesses or introducing documentary information. The district court required in *Bono v. Saxbe,* 462 F.Supp. 146 (E.D.Ill.1978), that:

An inmate will be permitted to have witnesses appear and to present documentary evidence, provided that calling of witnesses or disclosure of documentary evidence would not jeopardize or threaten institutional security or individual safety, and further provided that the witnesses are available at the institution where the hearing is being conducted. The evidence must be material and relevant to the issue . . . Where a witness is not available within the institution, nor permitted to appear, the inmate may submit a written statement by that witness. The hearing administrator shall, upon the inmate's request, postpone the hearing to permit the obtaining of written statements. Repetitive witnesses need not be called. Reasons for declining to permit a witness or documentation shall be documented. Id., at 150.

The circuit court further explained in *Hayes II* that the prison disciplinary committee must examine each proposed witness for the relative benefit or danger of his testimony. *Hayes II, supra,* at 486.

The defendants shall comply with these aforementioned guidelines enunciated by the Court of Appeals in regard to an inmate's right to call witnesses at a disciplinary hearing. Further, the conduct report at issue here shall be stricken from plaintiff Wellman's institutional packet regardless of where he is incarcerated.

█ Plaintiff Wellman secondly complains that he was denied the lay assistant of his choice at the disciplinary hearing. The Supreme Court in *Wolff, supra,* 418 U.S. at 570, 94 S.Ct. at 2981, stated that: [an inmate], "should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff". Plaintiff Wellman has not criticized the ability of the lay advocate provided him in any way. Rather, he complains of not getting the advocate of his choice. This does not rise to a constitutional level because the C.A.B. fully complied with the requirements of *Wolff* in regard to lay assistance. This allegation is therefore without merit.

Plaintiff Wellman's third complaint is that in January 1978 he broke a tooth on a rock in the beans at the prison dining hall. Wellman allegedly asked to see the dentist a number of times but was told by an unnamed source that lockup people did not go to the hospital and to put aspirin in the tooth. Then nine months after the injury Wellman claims to have paid an inmate clerk three boxes of cigarettes for an appointment with the dentist. He saw the dentist immediately. This evidence was elicited by the defendant's own attorney and stands uncontradicted.

█ However, plaintiff Wellman's proof on this issue lacks a critical element. There is no identified actor in this chain of events, neither guard, nor doctor or dentist, nor prison administrator, nor inmate. Plaintiff Wellman here seeks damages. A defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established in order for liability to arise under 42 U.S.C. § 1983. *Stringer v. Rowe,* 616 F.2d 993, 1000–1001 (7th Cir.

1980); *Adams v. Pate,* 445 F.2d 105, 108 (7th Cir. 1971). Nor is this a situation where a pro se pleading is being considered. See, *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Duncan v. Duckworth,* 644 F.2d 653 (7th Cir. 1981). Plaintiff Wellman was represented by able trial counsel who had named 17 defendants at the time of trial. Not one of those defendants is even mentioned in Wellman's testimony; in fact, no individual is ever named or described.

█ The trial of a lawsuit is the main event, the arena where the evidence must be put on. This Court heard one hundred and eleven witnesses and not one testified as to who the participants were in this scenario. The claim, if true, may state a claim under *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but plaintiff Wellman, with able counsel, has failed to put on any proof showing that any of the defendants were in any way personally responsible for the delay in his treatment. Therefore, the defendant has failed to prove his claimed denial of medical treatment and it is accordingly dismissed.

█ Finally, the prison officials contend they acted in good faith on a belief that their actions conformed to the procedural requirements of *Wolff, supra,* and they should therefore be immune from damages. The Supreme Court has recognized a qualified good-faith immunity for state prison officials acting within the scope of their official responsibilities when damages are sought for constitutional violations under 42 U.S.C. § 1983. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). *Accord, Knell v. Bensinger,* 522 F.2d 720 (7th Cir. 1975). In *Navarette,* a state prisoner brought a § 1983 action against prison officials charging wrongful interference with his outgoing mail, a violation of his First Amendment rights. The Supreme Court held that the qualified immunity it had outlined for school officials in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), was applicable to state prison officials as well. The test enunciated in *Navarette* consists of two parts:

Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to [the prison officials] if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.

\* \* \* \* \* \*

[T]he second branch of the *Wood v. Strickland* standard ... would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." *Navarette*, 434 U.S. at 562, 566, 98 S.Ct. at 862, *quoted in Chapman v. Pickett*, 586 F.2d 22, 25 (7th Cir. 1978).

It is this two-pronged test which we apply here.

This denial of witnesses occurred in December 1977. The *Wolff* decision provided only that a request for witnesses may be denied if it will be unduly hazardous to institutional safety or correctional goals. *Wolff, supra*, 418 U.S. at 565, 94 S.Ct. at 2979. Not until this circuit decided *Hayes II* in December 1980 and *Bono v. Saxbe* in April 1980 was it "clearly established" that due process required documented support in the administrative record for a decision not to call witnesses. Thus, these defendants could not have reasonably known that *Wolff* could be read to require an administrative record more specific than the reasons enumerated in the *Wolff* decision. Therefore, the defendants are immune from damages for their denial of the witness request.

### B. *Dwight Walker*

Plaintiff Walker has been incarcerated at the I.S.P. for seven years. He has raised two separate individual claims for damages. First, plaintiff Walker contends that excessive force was used to effectuate a strip search of his person, and second, that during his incarceration he was placed in segregation units without any notice as to why he was being locked up.

In December 1978 plaintiff Walker was summoned to testify in a criminal matter in Pulaski County, Indiana. Captain Koziatek informed Walker that he would have to be strip searched before leaving the prison. Walker refused to be strip searched and was warned he would have a conduct report if he did not comply. Walker still refused to submit to the search. On his return to the prison Walker was taken to I.D.U. lockup unit by Lt. Oden. Walker was then asked to step out of his clothes for a strip search and he did so. Lt. Oden then ordered Walker to stick his finger in his mouth, lift his genitals, and bend over and spread his buttocks for a visual rectal inspection. Walker refused to submit to this portion of the search. Lt. Oden then grabbed Walker around his neck and Officer Kennedy grabbed Walker's arm and twisted it up behind his back in an attempt to bend Walker over to subject him to the visual cavity search. Plaintiff Walker contends that Sergeant Riggs (deceased at the time of trial) rammed him with his knees in this altercation. Lt. Oden testified that Sgt. Riggs was about six feet away from Walker making the visual examination of the rectal area. It is extremely convenient that the person alleged to have used the most force, Sgt. Riggs, is unable to testify on his own behalf. Nor is this claim supported by any witness other than the plaintiff. For those reasons this Court discredits this allegation against Sgt. Riggs that he struck Walker with his knee. Plaintiff Walker further contends that the force employed was so excessive as to cause him personal injury. The uncontradicted facts establish that all inmates when returning from outside the institution are strip searched.

■ The Supreme Court of the United States addressed the issue of strip searching inmates with the visual inspection of body cavities in *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1978). The court recognized that these searches were necessary not only to discover but also deter the smuggling of weapons, drugs, and

other contraband into a prison. In *Wolfish*, the court concluded that strip searches, including the exposure of body cavities for visual inspection, did not violate the Fourth Amendment prohibition against unreasonable searches. *Id.*, at 558, 99 S.Ct., at 1884. However, the court went on to say that the searches must be conducted in a reasonable manner. Reasonableness under the Fourth Amendment requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. *Wolfish, supra*, at 558, 99 S.Ct., at 1884.

The evidence here indicates that the smuggling of contraband is a serious problem in this institution, just as it is in other correctional facilities. See, e. g., *Daughtery v. Harris*, 476 F.2d 292 (10th Cir.), *cert. den.*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91 (1973). The Supreme Court, in balancing this institutional interest in security against the privacy interest of the inmates, determined that such a search was constitutional.

The question here is whether the force used to administer this search was so excessive as to become actionable under § 1983. See *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), cert. den. sub nom., *Employee-Officer John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973). *Johnson, supra*, clearly establishes that prison officials violate due process upon making an unprovoked attack on a pretrial detainee. *Id.*, at 1033; *Lock v. Jenkins*, 641 F.2d 488, 495 (7th Cir. 1981). Judge Friendly, speaking for the court in *Johnson*, provided this structure for analysis:

> Although "the least touching of another in anger is a battery," [citation omitted], it is not a violation of a constitutional right actionable under 42 U.S.C. § 1983. The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. *Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.* In determining

whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. *Johnson, supra*, at 1033. [emphasis added]

The Seventh Circuit has applied this same analytic framework to the treatment of convicted persons which thus invoked the Eighth Amendment rather than the Due Process Clause. *Stringer v. Rowe*, 616 F.2d 993, 998–999 (7th Cir. 1980); *Lock, supra*, at 496, n.13. In order to establish a violation of the Eighth Amendment, a plaintiff must show that prison officials intentionally inflicted excessive or grossly severe punishment on him or knowingly maintained conditions so harsh as to shock the general conscience. *Stringer, supra*, at 998; *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 719–2 (7th Cir. 1973), *cert. den. sub nom. Gutierrez v. Dept. of Public Safety*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974). The essential question then becomes whether this use of a force constituted cruel and unusual punishment. *Stringer, supra*, at 999; see also, *Meredith v. Arizona*, 523 F.2d 481 (9th Cir. 1975).

This Court is well aware of the demanding and often dangerous position of prison guards in the institutional society. Here the guards, when faced with a recalcitrant inmate, applied physical force. They laid hands on plaintiff Walker but there is no claim of the use of gas, mace, fists, or clubs. In this situation where Walker had been outside the institution, possibly unsupervised at times, the strip search becomes a necessity. To allow the inmate to thwart the rectal inspection by mere refusal would be to provide a conduit for contraband. Legion are the cases in which inmates have attempted to smuggle contraband into an institution by concealing it in body cavities. See, e. g., *United States v. Ferraro*, 590 F.2d 335 (6th Cir. 1978); *United States v.*

*Park,* 521 F.2d 1381 (9th Cir. 1975). Here the officers applied only enough force to bend Walker over to view his rectal area. This was a good faith effort to maintain institutional security. And although Walker claims he was injured, his testimony is conflicting. At one point he complains of a back injury and at another it is a neck injury. However, on January 3, 1981 he registered no complaint about his back or neck, instead he complained of his thumb. Accordingly, his hand was x-rayed on January 5, 1981 and shown to be normal. In light of these considerations the Court must find that the force used in conducting this involuntary visual rectal inspection was not excessive. It was not so severe or excessive as to shock the conscience in violation of the Eight Amendment. In fact, it was reasonable under the circumstances. Therefore, this claim is without merit.

▇ Plaintiff Walker's second claim is that he was locked up in segregation on several occasions without any notice as to why he was being locked up. Walker testified he had been locked up without a hearing in March or April of 1975, and periodically through the years of 1977, 1978 and 1979. His contention is that he never received notice within 24 hours as to why he was locked up. Further, plaintiff Walker alleges he was denied the right to consult with his lay advocate in January 1979 until the day of the hearing. Walker also contends Acting C.A.B. Chairman Penfold gave him 60 days in lockup after he was found not guilty of all charges because "he had to be guilty of something". (R. 139). Unfortunately, Mr. Penfold is not a defendant in any of these consolidated actions. Finally, plaintiff Walker contends he was put on administrative segregation status on April 4, 1978 without any notice as to the reason for it. And, he was subsequently released from A.S. without signing a conduct contract.

This Court is aware that inmates often feel they are moved about by hidden forces beyond their control. However, to establish liability for any of these alleged procedural due process violations evidence which at least implicates any defendant is required. That evidence is lacking here. There is only general uncorroborated testimony that these lockups occurred. Yet no specific actor is ever named as responsible. This portion of plaintiff Walker's claim suffers the same failure of specific proof as plaintiff Wellman's allegation of denial of medical treatment. The Court refers to and incorporates by reference that analysis here. There is no evidence identifying any of the named defendants as the actor responsible for any part of the alleged violation. Therefore, these allegations must fail for lack of proof under *Adams v. Pate, supra,* at 108.

C. *Achebe Habib Lateef*

▇ Plaintiff Lateef is currently an inmate at the I.S.P. and was first incarcerated there on September 5, 1975. He was assigned to a job in the I.S.P. library in 1975 and was employed there continuously until June 27, 1980. The library was considered to be a desirable place to work. On June 27, 1980 plaintiff Lateef was transferred from the I.S.P. to the Indiana Reformatory. This was the first in a series of four institutional transfers for Lateef in a four month period. Plaintiff Lateef contends that this series of transfers were solely for the purpose of personal harassment.

Plaintiff Lateef was transferred to the Indiana Reformatory on June 27, 1980. On that date he received a notice from the Director of Classification informing him that effective immediately he was being transferred to the reformatory where he would enter the general population. The notice stated that this was an administrative transfer in Lateef's best interest as well as that of the institution and that this was not a disciplinary transfer. Lateef was confined at the Indiana Reformatory from June 27, 1980 until August 12, 1980 at which time he was transferred to the Indiana Department of Correction's Reception and Diagnostic Center.

At the Reception and Diagnostic Center plaintiff Lateef was interviewed by a psychologist on one occasion for about an hour

and the classification director a number of times. Lateef did not undergo any tests. On September 3, 1980, after approximately 21 days at the Reception and Diagnostic Center, plaintiff Lateef was transferred back to the Indiana Reformatory where he was assigned to the general population. Then on October 29, 1980 Lateef was returned to the I.S.P. and assigned to the N.S.B. lockup unit.

Plaintiff Lateef contends that this series of transfers were for the purpose of harassment and retaliation. As a result of these transfers Lateef alleges as damages that his contacts outside the prison have been disrupted, that he lost property, including clothing and books, and that he developed assorted medical conditions.

On November 17, 1980, plaintiff Lateef was advised by the I.S.P. Classification Committee that unless he signed a behavior modification contract he would be placed on indefinite administrative segregation and confined to a lockup unit. Lateef, (Tr. 70). At the hearing of the Classification Committee on November 17, 1980, the committee gave plaintiff Lateef several reasons why he was being assigned to administrative segregation. The contract which was proposed to plaintiff Lateef would have required that he work in the soap shop for approximately a year, he not receive a conduct report for 12 months, he be denied evening recreation for a period of six months, and other miscellaneous restrictions. The job in the soap shop which was required by the behavior modification contract was not as desirable a job as plaintiff Lateef held in the prison library prior to his transfer to the Indiana Reformatory and plaintiff Lateef considered it to be a form of punishment.

At this meeting of the Classification Committee on November 17, 1980, plaintiff Lateef was presented with a memorandum from the Director of Classification outlining the reasons why he believed a behavior contract was appropriate. This document referred to Lateef's involvement in the takeover of C cell house in April 1980, which included the taking of hostages and his involvement with the planning of a work stoppage while at the Indiana Reformatory. This later incident was the stated reason for Lateef's transfer back to the I.S.P. Based on this past conduct, the Director of Classification determined that Lateef's behavior needed modification and recommended this contract in population. Plaintiff Lateef refused this contract and has remained in N.S.B. lockup or administrative segregation. On N.S.B. lockup Lateef is confined to his cell 22 hours a day and allowed out two hours a day for recreation in the walkway in front of the cells.

The Executive Director of Adult Authority, Indiana Department of Corrections, Mr. Schuler, testified that he was aware of the reasons for the transfers of plaintiff Lateef. This testimony essentially expands the written reasons provided to Lateef, particularly in regard to the takeover of C cell house and the work stoppage at the Indiana Reformatory. Additionally, Mr. Schuler was briefed in regard to the previous conduct of Lateef while incarcerated prior to these transfers. Further, Mr. Schuler received a report from the Reception and Diagnostic Center after Lateef's evaluation, that there was no assistance they could provide there. And finally, Schuler testified that no prisoner had ever been sent to the Diagnostic Center to punish or harass him.

The threshold question regarding Lateef's complaint must be whether these transfers between institutions within the same state infringed a liberty interest protected by the Due Process Clause. In *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court considered the conditions that must be present for a prisoner to be entitled to a hearing before his transfer from one state prison to another prison within the same state. The court "held in *Meachum v. Fano*, that no due process liberty interest of a duly convicted prison inmate is infringed when he is transferred ..., whether with or without a hearing, absent some right or justifiable exception rooted in state law that he will

not be transferred except for misbehavior or upon occurrence of other specified events." *Montanye, supra*, at 243, 96 S.Ct. at 2547. In adopting this standard the Seventh Circuit Court of Appeals has recognized that a prisoner may have due process rights as a result of entitlements created by prison regulations and by official policies or practices. *Arsberry v. Sielaff*, 586 F.2d 37, 47 (7th Cir. 1978); see also, *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980); *Anthony v. Wilkinson*, 637 F.2d 1130 (7th Cir. 1980).

Critical in this analysis is plaintiff Lateef's claim that these transfers were punitive in nature. This is important because *Wolff v. McDonnell, supra,* is undisturbed by *Meachum* and *Montanye*, and disciplinary measures which represent a change in conditions of confinement give rise to procedural due process requirements. Thus, if Lateef could establish that his transfer was disciplinary, he has stated a valid claim. *Chavis v. Rowe*, 643 F.2d 1281, 1290 (7th Cir. 1981); *Durso v. Rowe*, 579 F.2d 1365, 1369 (7th Cir. 1978), *cert. den.*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). However, there is no evidence of that in this case. The transfers to other institutions were not followed by any disciplinary punishment or loss of good time. Rather, the transfers appear to be the result of confrontations between Lateef and individuals in the institutions in which he was incarcerated. The Executive Director of the Adult Authority testified that it was their approach to remove such individuals from the scene of the confrontation to a neutral environment to better enable them to adjust to their confinement. He further testified that this was one of the principal reasons behind Lateef's transfer and that these transfers were not disciplinary in nature. This testimony is fully supported by the record of Lateef's involvement in the takeover and hostage seizure of C cell house at the I.S.P. Nor does the Indiana Code restrict prison officials' decisions to transfer an inmate from one institution to another in any way. This Court can find no statutory or regulatory creation of a right for a prisoner to serve in any particular institu-

tion or be entitled to a hearing of any kind prior to a transfer to another institution. Therefore, plaintiff Lateef's claim is without merit and is hereby denied.

Plaintiff Lateef also alleges that he lost a laundry bag full of clothing and personal items which he last saw in the hand of defendant Officer Bill Kennedy. After losing this property on December 15, 1977, Lateef filed a grievance with respect to this lost property but contends he has not received a response to the grievance nor been compensated for his lost property. This property is alleged to consist of clothing, personal pictures, a picture album, a watch, and a pair of eyeglasses. The essence of this claim is that plaintiff Lateef has been deprived of his property without due process of law. This evidence stands uncontradicted.

The Supreme Court has recently addressed this identical issue in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), citing with approval *Bonner v. Coughlin*, 517 F.2d 311 (7th Cir. 1975), mod. en banc, 545 F.2d 565 (1976), *cert. den.*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). In *Parratt* an inmate of a Nebraska prison ordered by mail certain hobby materials. After being delivered to the prison, the packages containing the materials were lost when the normal procedure for receipt of mail packages was not followed. Parratt brought a § 1983 action against the prison officials to recover the value of the hobby materials, claiming that the officials had negligently lost the materials and thereby deprived him of property without due process of law in violation of the Fourteenth Amendment. The value of the items in *Parratt* was $23.50.

Accordingly, the initial inquiry in *Parratt* and here must focus on two elements to a § 1983 action: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.

It is unquestionable that the alleged conduct by the corrections officer in this case satisfies the "under color of law" requirement. *Parratt, supra*, at 1913. Officer Kennedy was a state employee in a position of considerable authority. Nor is it contended otherwise. The inquiry must therefore turn to the second requirement.

The claim here refers to no other right, privilege or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment. Unquestionably, Lateef's claim satisfies three prerequisites of a valid due process claim: the defendant acted under color of state law; the previously listed items fall within the definition of property; and the alleged loss amounted to a deprivation. However, the Supreme Court held in *Parratt* that standing alone these three elements do not establish a violation of the Fourteenth Amendment. *Parratt, supra*, at 1913. The court reasoned as follows:

Although he has been deprived of property under color of state law, the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure. There is no contention that the procedures themselves are inadequate nor is there any contention that it was practicable for the State to provide a predeprivation hearing. Moreover, the State of Nebraska has provided respondent with the means by which he can receive redress for the deprivation. The State provides a remedy to persons who believe they have suffered a tortious loss at the hands of the State. See Neb.Rev.Stat. § 81–8,209 *et seq.* (Reissue 1976). Through this tort claims procedure the state hears and pays claims of prisoners housed in its penal institutions. This procedure was in existence at the time of the loss here in question but respondent did not use it. It is argued that the State does not adequately protect the respondent's interests because it provides only for an action against the State as opposed to its individual employees, it contains no provisions for punitive damages, and there is no right to a trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process.

This analysis cited above is the proper manner to approach a case such as this. Here a guard took the plaintiff's personal property and while we do not know what happened to it, we know that it was not properly preserved for Lateef. Likewise, the State of Indiana provides a remedy to redress property loss or damage inflicted by a state officer through the Indiana Tort Claims Act, I.C. 34–4–16.5–1 et seq. This act became effective February 19, 1974 and was therefore in effect when plaintiff Lateef's loss occurred. It may reasonably be concluded, therefore, that the existence of an adequate state remedy for property damage inflicted by a state officer avoids the conclusion that there has been any constitutional deprivation of property without the due process of law within the meaning of the Fourteenth Amendment. *Parratt, supra*, at 1916. For the foregoing reasons this claim is denied.

D. *Raymond Hurt*

Plaintiff Hurt was incarcerated at the I.S.P. from 1973 until November 1980, except for approximately six months in 1974 when he was on parole. Plaintiff Hurt did not personally testify in this action, the evidence of his claims is based solely on his deposition which was admitted into evidence. Hurt was confined to N.S.B. and I.D.U. lockup units from 1976 to April 1979. He complained that in 1976 and prior to then he received food with roaches in it. No more specific evidence was provided and no foreign objects had been found in his food since 1976. There is no allegation of

personal injury stemming from this evidence. It will be further considered herein with the food services.

Plaintiff Hurt contends that approximately $300.00 worth of his personal property was lost in April 1979. The specific items included a radio, books, and clothing. However, no defendant is named in this allegation so it must fail for lack of proof under *Adams v. Pate, supra,* and the Court refers to and incorporates here the same analysis as previously applied to Plaintiff Wellman's claim for denial of medical treatment. Further, the Court refers to and incorporates here the analysis under *Parratt, supra,* as previously applied to plaintiff Lateef's claim for lost personal property. In light of those aforementioned cases, this claim is denied.

Next Hurt alleges that he was denied his medication for asthma and had a difficult time obtaining that same medication in the lockup units. Hurt testified that he asked Dr. Saylors and Lt. Oden for his medication and was informed one time that the Warden had instructed them not to give out any medication in the lockup units. No date was ever established for these events. Dr. Mai, one of the staff physicians at the I.S.P., testified that sometimes there had been a delay in receiving supplies but that it had never interfered with the activity of the hospital. Mr. Freake, the Hospital Administrator, also testified that there was some delay in receiving medical supplies on orders of over $200.00 because they required approval of the Purchasing Department in Indianapolis. However, during these delays any shortages were filled by Memorial Hospital without delay. Finally, the Warden testified that he has not attempted to influence the medical staff in the administration of any medication to any particular inmate, and, that he has never overruled a prescription.

In *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain', *Gregg v.*

*Georgia,* 428 U.S. 153, at 173, 96 S.Ct. 2909, at 2925, 49 L.Ed.2d 859 (joint opinion), proscribed by the Eighth Amendment." "This is true," said the Court, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.,* 429 U.S. at 104–105, 97 S.Ct. at 291. This standard is two-pronged. It requires deliberate indifference on the part of prison officials and it requires the prisoners medical needs to be serious. *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980); *West v. Keve,* 571 F.2d 158, 161 (3d Cir. 1978). A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977). Traditionally, a plaintiff must show not only that the defendant was callously indifferent to his medical needs, but that those needs were serious, and that the failure to treat them resulted in personal injury. *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1081 (3d Cir. 1976).

Here plaintiff Hurt alleges only that he was denied his medication on one occasion and that he had difficulty obtaining it on other occasions. Giving the plaintiff all favorable inferences this one denial may constitute deliberate indifference but the evidence of this situation fails to support the requisite gravity. It is not every injury or illness that invokes the constitutional protection, only those that are serious and have that effect. *Hampton, supra,* at 1081. Due to this failure of proof on the second prong of the test, this claim must be denied.

Plaintiff Hurt next alleges that on one occasion he appeared by the C.A.B. and asked for witnesses and a lay advocate. He was told he could have them and the case was continued. However, before the next hearing date on this matter, plaintiff Hurt received a six month disciplinary action in

the mail. This was prior to Hurt's opportunity to appear with assistance and present evidence. Inmate Brooks, on Hurt's request, appealed this to an Indiana State Court which resulted in the C.A.B. dismissing the charge altogether.

Plaintiff has not alleged that any of the defendants were involved in this incident or when it occurred. Nor has any damage been alleged. In fact, by Hurt's own admission the alleged wrong has already been remedied by a state tribunal. Therefore, this claim is without merit and is accordingly denied.

Plaintiff Hurt next complains that in August 1979 he received one item of legal mail which had been opened outside of his presence. Further evidence indicated that mail is delivered five days a week and is delivered to inmates by 2:30 o'clock P.M., except for heavy days when first class mail is given priority. No mail is censored and only non-legal mail is opened to inspect for contraband. Non-legal mail is opened by the clerk outside of the presence of the inmate. If legal mail is suspected of having contraband in it, it is opened in the presence of the inmate. Legal mail is from time to time opened by accident due to the volume of the mail or the failure of the sender to clearly mark it as legal mail. On those occasions the legal mail is usually hand delivered to the inmate and he is told it was opened by mistake. The testimony of plaintiff Walker bears this out.

The Supreme Court of the United States first addressed the issue of censorship and regulation of inmate mail in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In *Procunier, supra*, the court found that prison mail regulations providing for censorship were properly invalidated by the district court since they authorized prison officials and employees to apply their own personal prejudices and opinions as standards. Then in *Wolff v. McDonnell, supra*, the court held that mail between an attorney and a client, who was an inmate, was protected by the Sixth Amendment and could not be read by the prison officials. Further, if such legal mail is suspected of containing contraband that mail must be opened in the presence of the inmate. 418 U.S. at 577, 94 S.Ct. at 2985. The court also stated that "by acceding to a rule whereby the inmate is present when mail from attorneys is inspected [the petitioners] have done all, and perhaps even more, than the Constitution requires." *Id.*

The mail regulations as developed here fully comply with these standards. What the plaintiff contends and the defendants concede is that through inadvertence or negligence legal mail is opened on occasion. However, the official in charge of the mail delivery, in that situation, takes the added precaution of individual delivery and explanation to the inmate to assure the confidentiality of the mail in question. This is a salutary practice which insures confidentiality and avoids misunderstanding. At worst, Hurt's claim of receiving opened legal mail indicates negligence on the part of prison officials or employees. There is no evidence in the entire case to indicate a pattern or practice of opening or interfering with the delivery of legal mail. Therefore, this claim does not rise to a constitutional level and it is accordingly denied.

Plaintiff Hurt next alleges that he was sitting quietly in his cell on I.D.U. writing a letter when Officer Konkey sprayed mace in his face. The prisoners on the cell block were creating a disturbance at that time but Hurt contends he was not involved. Subsequently an inmate nurse on the unit came to Hurt's cell and put something in his eyes, presumably to counteract the mace.

The testimony of Officer Konkey paints quite a different picture of the incident involving plaintiff Hurt. According to his testimony Hurt was upstairs in his cell yelling, screaming and disrupting the other inmates. Hurt was asked to be quiet several times and refused. Later the same day, while Officer Konkey was walking past Hurt's cell, Hurt threw a glass jar through the bars which shattered and cut Konkey on the hand. Konkey continued to pass out medication and when finished came back to talk to Hurt. When Konkey returned to Hurt's cell, Hurt threw another glass jar

through the bars at which time Konkey used mace on Hurt. Konkey did not use any more mace on Hurt. That concluded the evidence in regard to this incident in 1976.

Next on May 3, 1977 plaintiff Hurt alleges he was beaten three times. At approximately noon Hurt testified he was in the shower area when Officers Morris and Wysong destroyed his commissary items. When he asked the officers why they did this, Morris allegedly took out his handcuffs and ordered Hurt into his cell. Hurt contends he believed Morris was going to hit him, so he swung first and hit Wysong in the face. Then, according to Hurt, Morris and Wysong both took out their handcuffs and chased him to the end of the range. Hurt alleges he was caught, knocked down, and beaten with fists and handcuffs. After this scuffle he was again ordered to go into his cell, and this time complied.

Then approximately five minutes later, according to Hurt, Captain Koziatek, Bachelor, Lt. McKee and several other officers came to his cell and ordered him out, stating that they were taking him to lockup. Hurt's hands were handcuffed behind his back, and he alleges that Captain Koziatek slammed him into the wall face first. Then when they got on the I.D.U. elevator Hurt alleges Captain Koziatek told him he would kill him if he hit one of his officers again and kicked his legs out from under him and hit him on the back of the head with handcuffs. Once at I.D.U. Hurt alleges Koziatek said he would kill him if he didn't get his hair cut. Hurt responded that he wouldn't get his hair cut because it was against his religion based upon his Cherokee Indian ancestry. Koziatek allegedly replied that he would get it cut and took Hurt to his cell and started hitting and punching him. Hurt then asked Captain Bachelor to go to the doctor because his chest and head hurt. Hurt was then escorted to the hospital by Officer Sharp, hands still cuffed behind his back, and received x-rays. Hurt was then taken back to I.D.U.

On his arrival at I.D.U. Hurt alleges there was a barber chair sitting there, an inmate barber, and five or six officers including Lt. McKee and Officer Sharp. An unidentified person allegedly told Hurt he was going to get a haircut. Hurt again refused. Officer McKee then allegedly grabbed Hurt's arm and Hurt kicked Officers Sharp and McKee. Then according to Hurt, three or four people grabbed him and slammed him into the chair. All this time Hurt alleges there were officers twisting his legs and arms and beating him so that he passed out. Hurt's hair was cut. Afterwards, Hurt alleges he was taken to his cell, thrown on the floor on his face and was beaten on his back and kidneys while the officers supposedly removed the handcuffs from him. After the handcuffs were removed, Hurt was left in his cell. Hurt contends he could hardly walk for the next two or three days. Individuals allegedly involved in the barber chair incident include Koziatek, Glick, Swiger, Sharp and McKee, and two other officers Hurt did not know. This testimony was elicited at the deposition by defense counsel.

Captain Koziatek, a principal actor in this scenario, testified in person at the trial of this cause. It was his testimony that Hurt's hair was below the shoulders in length which was in violation of the Department of Correction's policy. The written policy at that time was that the hair not hang lower than the top of or touch around the collar. Wearing the hair up in braids or other fashion was acceptable so long as it was sanitary. Hurt's hair was in an unsanitary condition, matted, tangled, and unwashed. Koziatek also testified that he had never kicked the legs out from under any inmate in the elevator going up to I.D.U. Finally, Koziatek testified that he had not assaulted Hurt or ever threatened to kill him, or threaten him in any way. Officer Sharp also testified that he was present at the time Hurt received his haircut and that Hurt had to be physically held in the chair. Sharp remembered Hurt kicking one of the officers present but had no memory of Hurt being hit or punched in any way. Officer Swiger was also present at the haircut, and testified essentially that Hurt was unwilling to have his hair cut, had to be physically

restrained, but did not see Hurt hit anybody, or anyone hit Hurt.

Plaintiff Hurt, by counsel, has stated this is not a challenge to this hair length regulation, rather it is a challenge to the procedure used in the involuntary cutting of Hurt's hair. Plaintiff Hurt contends that the amount of force used was so excessive as to be actionable under *Johnson v. Glick, supra.*

This is a situation where an inmate insisted on having hair which was maintained so as to violate the prison regulations. The record shows that Hurt was asked and cautioned to have his hair cut, and written up several times because the fashion in which he maintained it violated prison regulations. Unfortunately for all concerned plaintiff Hurt refused to comply. Plaintiff Hurt did not testify in person at this trial. Officers Konkey, Koziatek, Sharp and Swiger did testify in person about these incidents and their demeanor and bearing causes this Court to credit their testimony.

█ In *Lock v. Jenkins, supra,* the Seventh Circuit Court of Appeals adopted the position that "only in rare circumstances would it be appropriate for tear gas to be used to control inmates already confined in their cells." *Id.,* at 496. The amount of gas used was reasonable and it was needed under the circumstances to restore order. Under *Johnson v. Glick, supra,* standards, as previously enunciated in regard to plaintiff Walker, Officer Konkey's use of mace on Hurt was a reasonable application of force used in a good faith effort to restore discipline. There is no showing that this was excessive or severe in the Eighth Amendment sense. The Court must conclude that this was one of the rare instances when the use of gas against a person locked in a cell was justified.

█ In regard to the series of events which culminated in plaintiff Hurt receiving a haircut, the Court notes that neither Officer Morris or Wysong, who allegedly beat Hurt severely, are named as defendants in this case. Therefore, their conduct becomes extraneous because there is no al-legation or evidence that any named defendant should have known of, knew of, or directed their conduct. The absence of these alleged principal actors as defendants casts doubt on the veracity of plaintiff Hurt's story. Officer Koziatek is a named defendant and is accused by Hurt of numerous acts of brutality. However, witnesses at the scene do not recall this alleged abuse by Koziatek, and the officer denies it ever occurred. Also, plaintiff Hurt failed to answer the question as to whether he suffered any cuts or abrasions from these alleged beatings with metal handcuffs. There is an obvious lack of documentation of any injuries which would be concurrent with the alleged severity of these assaults. Therefore, this Court must accept Captain Koziatek's version of these events. While other assaults are alleged no individuals are named as the perpetrators. These claims suffer from a failure to prove a defendant's direct personal responsibility and are therefore without merit. See *Stringer, supra; Adams v. Pate, supra.*

In regard to the actual giving of the haircut, the allegations of excessive force by unidentified officers are without proof, and must fail for that reason. The Court is sure this was an unpleasant incident for all involved. However, the force used throughout this incident was not so excessive or severe so as to shock the conscience in violation of the Eighth Amendment. *Stringer, supra.* In light of all the foregoing, the Court must find that none of plaintiff Hurt's claims rise to the level of a constitutional violation. They are, therefore, dismissed.

### E.  *Richard Colvin*

Plaintiff Colvin has been incarcerated at the I.S.P. from December 1974 to the present time except for the period of September 1979 to November 1980, during which time he was at another institution within the Department of Correction. Colvin lived in C Cellhouse from December 1974 through September 1979, and has lived in D Cellhouse since his return to I.S.P. on November 4, 1980. There are two principal

issues raised by plaintiff Colvin, the first being a medical complaint and the second a dietary complaint.

■ Plaintiff Colvin first contends that he has a back problem which requires a backboard. While at the I.S.P. the plaintiff contends that he has had a backboard approximately four and one-half years. Plaintiff also had a backboard while he was located at the Westville Correctional Center. He further alleges that his backboard was prescribed by a physician and that since his return to the I.S.P. he has been denied the use of a backboard. Colvin further testified that he was told by Dr. Mai, a prison physician that a backboard was not necessary. The Medical Services Audit Review Committee also considered this request for a backboard and decided that it was unnecessary.

Under *Estelle v. Gamble, supra,* as previously discussed in regard to plaintiff Hurt, a plaintiff must show deliberate indifference to a serious medical need. The evidence here fails on both points. Dr. Mai and the Medical Services Audit Review Committee considered this request for a backboard and found it unnecessary. Nor is there any showing of the requisite gravity. Rather, this is a disagreement between the patient and the doctor over the course of treatment. Here the doctor simply did not feel a backboard was necessary. Such disagreement does not rise to a constitutional level. Therefore, this claim is accordingly dismissed.

■ Plaintiff Colvin's second complaint is that he has difficulty obtaining a pork-free diet. Colvin is of the Moslem faith which prohibits the eating of pork. The dietician who testified on behalf of the plaintiff found that pork or pork products were used generally about three times a week. It was her conclusion that those persons not eating pork would not be getting any proteins at their mealtimes. The Food Service Director of the Department of Correction, Mr. Prill, testified that he makes 12 or 13 trips a year to the I.S.P. to examine the food services. Master menus are prepared by his office and the nutrition-

al values calculated for them. Then, if a substitution occurs on any particular menu at any institution that as served menu is sent to Prill's office to determine the nutritional values.

Prill also testified that he was aware Moslems could not eat pork and that it was his opinion that Moslems still received adequate nutrition from the foods served. According to the National Research Council on dietary allowances a male person need only receive 56 grams of protein per day. According to Prill, the average diet at the I.S.P. contained 100 grams of protein per day, subtracting the 41 to 45 grams in the average pork serving left 55 grams of protein in that day's diet. Pork is only served three times a week and on those days the inmates are allowed to receive extra portions of vegetables.

In order to establish an Eighth Amendment violation, plaintiffs must show either that the actions of the defendant intentionally inflicted excessive or grossly severe punishment upon them or conditions so harsh as to shock the conscience were maintained. *LaBatt v. Twomey,* 513 F.2d 641 (7th Cir. 1975). There can be no doubt that the Constitution requires that diet be adequate to maintain the health of the inmates. *Campbell v. Cauthron,* 623 F.2d 503, 508 (8th Cir. 1980). However, this is not a case such as *Holt v. Sarver,* 300 F.Supp. 825, 832 (E.D.Ark.1969), where the prisoners were receiving fewer that 1000 calories a day and their meals consisted primarily of 4-inch squares of "grue". Rather, this is a situation where reasonable accommodations have been made to insure that those inmates of the Moslem faith receive adequate nutrition without eating pork. The evidence shows that without eating the pork on those occasions when it is served an inmate still receives the recommended minimum allowance of protein for the day and is allowed to have additional helpings of another item. This complaint in regard to the dietary practice does not rise to a constitutional level and is therefore dismissed.

### F. *Stewart Brooks*

Plaintiff Brooks was incarcerated at the I.S.P. from September 24, 1975 to February 28, 1979. On July 27, 1977, Brooks injured his hand in an altercation with another prisoner. The medical treatment he received is the basis of one of his complaints. Brooks' second complaint arises out of the procedures employed by the Conduct Adjustment Board in regard to the selection of lay advocates.

■ On July 27, 1977 when Brooks injured his hand he was taken to the prison hospital. At the hospital an x-ray was taken of the injured hand and a prisoner taped four tongue depressors on the hand. Brooks was then set back to his cell with Tylenol capsules for pain. The next day the hand was swollen and painful so Brooks was returned to the prison hospital. Brooks saw the same prisoner again, an inmate named Archie Burr, who put a cast on the hand without any supervision. Burr testified he was instructed to put a cast on Brooks' hand by the written order of physician's assistant Kasprzak. Kasprzak is not named herein as a defendant. Burr further testified that though this was the first time he had ever put a cast on, it was a common practice for prisoner nurses to apply casts to other inmates. Brooks complains that the bones were improperly aligned by this cast which caused the little finger of his hand to heal sticking out to the side. Approximately six months after the injury occurred Brooks was taken to see a bone specialist who told him the hand had healed improperly and would require surgery to be reset. Since leaving the prison Brooks has not sought further treatment of his hand. The plaintiff's witness Dr. Shansky, testified that under no circumstances would it be appropriate for an untrained prisoner to set a fracture by placing a cast.

This Court is acutely sympathetic to the apparent medical mistreatment suffered by plaintiff Brooks. It would appear to state a claim under *Estelle v. Gamble, supra.* However, Brooks fails to allege that any defendant was involved with, or had knowledge of this course of treatment ordered by physician's assistant Kasprzak. There is no evidence to implicate Hospital Administrator Freake or Warden Duckworth or any other named defendant. Plaintiff Brooks has failed to prove any defendant's direct personal responsibility for the claimed deprivation as required by *Adams v. Pate, supra.* Therefore, this claim must be and is dismissed.

■ Plaintiff Brooks second allegation is in regard to a January 1978 appearance before the C.A.B. Brooks was given a list of four prisoners' names from which to select a lay advocate to represent him. Brooks informed the screening officer Richard Day, that he did not want any of those four, that there was an inmate in population whom he wanted to represent him. The prison rule at that time was that anyone in population was eligible to serve as a lay advocate. Day indicated on the report that Brooks did not want a lay advocate since he had refused the four offered. Brooks appeared at the hearing without representation and the C.A.B. chairman inquired about this. Brooks explained the prior events and Day denied that it happened. After the hearing Brooks attempted to discuss the matter with Day. Day ordered Brooks to be quiet and wrote him up for refusing a direct order for which Brooks got 60 days in lockup.

The procedure of providing a list of inmates versed in the procedures of the C.A.B. is one which finds its origin in *Wolff v. McDonnell, supra.* The Supreme Court stated in *Wolff* that an inmate "should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." *Id.* at 570, 94 S.Ct. at 2982. The C.A.B. fully complied with this procedure by supplying a list of inmate lay assistants designated by the staff. This provided Brooks the requisite opportunity to secure assistance which he chose to forgo. However, the C.A.B. having heard Brooks' explanation allowed him to submit written evidence on the merits of his claim after the hearing. This procedure

followed by the C.A.B. did not violate plaintiff Brooks' due process rights. It was the conduct of Officer Day that interfered with Brooks' access to a lay assistant. However, Officer Day is not a defendant in this case so this claim suffers from the now familiar infirmity under *Adams v. Pate, supra*, at 108, of failure to establish a defendant's direct personal responsibility for the claimed deprivation. Therefore, this claim must be dismissed.

## G. *Billie R. Adams*

Plaintiff Adams, the sole plaintiff in S 77–35, has been an inmate at the I.S.P. since October 1972 to the present. From April 1975 to July 1978 Adams was subjected to a series of lockups on segregation. It is these lockups he complains of and some lost personal property and a C.A.B. procedure regarding the calling of witnesses.

█ Property belonging to Plaintiff Adams and registered with the I.S.P. was seized during a shakedown on January 28, 1977. The property seized included a television, a guitar, leather tools and supplies, stereo headphone, three pair of shoes, smoking pipes, a hot pot, and jewelry. This property was never returned. The property was allegedly seized by ten unnamed officers.

Next in September 1979, plaintiff Adams contends that two purses, and five or six billfolds belonging to him were confiscated by prison officials from the car of Dr. Higgins, the I.S.P. dentist. Adams had been given permission by Assistant Warden Cohen to have Dr. Higgins take the leather goods to a church display and sell them. These items were confiscated when Dr. Higgins' car was searched in connection with a suspicion that it was bringing contraband into the institution. Plaintiff Adams sought the return of his leather goods for over a year at which time Assistant Warden Cohen ordered their return. One purse was returned to Adams but he was informed by Investigator Penefold that the rest of it had come up missing.

The Court incorporates here by reference the prior lost property analysis made in regard to plaintiff Lateef. The Supreme Court in *Parratt v. Taylor, supra*, stated the inquiry must focus on two elements of a § 1983 action: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States. Here, these claims are deficient in both respects. First, no individual is ever named as responsible for the seizure of any of this property. No defendant is even implicated in the actual taking which resulted in the loss. Second, the State of Indiana provides an adequate state remedy, the Indiana Tort Claims Act, I.C. 34–4–16.5–1 et seq., for property lost by a state officer. The availability of this remedy avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment. However, this Court notes with chagrin the regularity of such lost property claims and hopes the prison administration would address the situation. In light of the foregoing, this claim does not rise to a constitutional level and is dismissed.

█ When plaintiff Adams was locked up on January 28, 1977 he was charged with possession of 14 marijuana cigarettes and $90.00 of United States currency which was found in a common area of his dormitory housing about 60 men. The locker in which the contraband was found was shared by Adams with two other inmates for the storage of property. Those two inmates did not receive conduct reports.

At the hearing before the C.A.B. on this charge Adams requested the testimony of four inmate witnesses, Olsterhouse, Ware, Smith and Fetters. Ware and Olsterhouse were the two who shared this area with Adams and they testified at the hearing. Olsterhouse testified that ten different inmates used the cabinet where the contraband was found for the storage of leather goods and that the cabinet did not have a lock on it. The C.A.B. refused to hear

testimony from inmates Smith and Fetters. Plaintiff Adams contends Smith and Fetters would have testified that they and others frequently used the cabinet and that area. Adams also requested that the officer who wrote the conduct report testify at the hearing. The C.A.B. refused to call Officer Keith to testify. This hearing before the C.A.B. was concluded on February 3, 1977. Adams was found guilty of possession of contraband and sentenced to six months on I.D.U. disciplinary lockup. He served five months and 22 days of that sentence.

The Court refers to, and incorporates by reference here, the prior analysis of an inmate's right to call witnesses under *Wolff v. McDonnell, supra,* and its progeny, as discussed in regard to plaintiff Wellman. The testimony of inmates Smith and Fetters, according to what plaintiff Adams contends they would have said, would have been cumulative on the point that this area and cabinet were used by a number of inmates. That fact was established by the testimony of inmate Olsterhouse. The denial of the request to call the officer who wrote the conduct report was premised on a policy of not calling the officers to testify at the hearings. The basis of this policy being to avoid an additional confrontation between the staff member and the person that is being reported. The rationale of the C.A.B. in denying the requests for these witnesses is drawn directly from *Wolff, supra,* at 565–566, 94 S.Ct. at 2979. The testimony of the two other inmates would have been repetitive and the calling of the officer would have created an unnecessary confrontation. This procedure did not violate plaintiff Adams' limited procedural due process right to call witnesses. Therefore, this claim is dismissed.

Plaintiff Adams finally contends that he was subjected to a series of lockups which failed to conform to procedural due process requirements.

In April 1975 plaintiff Adams was confined to I.D.U., a lockup unit at the I.S.P., for a period of 11 days for "investigation." When plaintiff Adams was locked up in I.D.U. in April 1975, he was not told the reason he was being locked up, he was not given a conduct report and he was not given a hearing in connection with the lockup.

From August 1, 1975 until August 11, 1975, Adams was confined to I.D.U. lockup unit for "investigation." He was not given any reason for his confinement to I.D.U. on August 1, 1975, nor was he given a hearing of any kind in connection with the lockup and he was never told why he was released.

Adams was again confined to I.D.U. from August 22, 1975 to August 27, 1975 for "investigation." In connection with the lockup on August 22, 1975, no disciplinary charges were filed against Adams, and he did not at any time receive a hearing connected with the confinement.

Adams was again confined to I.D.U. for investigation on October 15, 1975 and was confined at the N.S.B. disciplinary lockup unit until October 31, 1975. When Adams was locked up on October 15, 1975, he was told only that it was for "investigation," and was given no other reason for the lockup.

About ten days after being locked up, Adams was given a conduct report charging him with possession of marijuana because two seeds and some flakes of marijuana were found in an envelope belonging to Adams in the electric shop where he was employed. At a hearing before the C.A.B. in connection with the charge of possession of marijuana, the charge was dismissed. Adams then submitted to the chairman of the C.A.B. a request that the charge of possession of marijuana which had been dismissed be expunged from his packet. Sgt. Kozlowski advised Adams that the dismissed charge would not be removed from his packet and some time later, Adams' counselor told him that it was still there. At the time Adams testified in the trial of this action on January 6, 1981, the charge of possession of marijuana which had been dismissed by the C.A.B. in October of 1975 still appeared in his packet. On February 4, 1981, Warden Duckworth removed from the packet of Adams the conduct report

charging him with possession of marijuana which had been dismissed by the C.A.B. in October 1975.

Adams was again locked up on I.D.U. on April 8, 1976 and was confined on I.D.U. until June 6, 1976. Adams was told only that he was being held for investigation and was not given any other reason for his confinement until he was given a conduct report about three weeks after he had been locked up on I.D.U. on April 8, 1976. The conduct report charged Adams with violation of institutional rules because a package mailed to him from Tandy Leather Co. in Florida contained marijuana. Following the filing of the conduct report, Adams was given a hearing on the charges and they were dismissed.

Adams was again locked up on January 28, 1977 pursuant to a conduct report. The lockup on January 28, 1977 was the seventh time Adams had been locked up in a disciplinary isolation unit in a period of 21 months but this was the first occasion on which he had received a conduct report prior to the time he was locked up. Prior to the lockup on January 28, 1977 Adams had never been found by the C.A.B. to have violated the rules of the institution. Here Adams received a hearing before the C.A.B. on the charge of possession of contraband and was sentenced to six months on I.D.U. disciplinary lockup.

Adams was again locked up for investigation on June 29, 1978, for a period of 13 days in B Seclusion. At the time he was locked up Adams was not served with a conduct report and was told that he was being locked up for investigation. During the time he was locked up Adams was served with a conduct report charging him with possession of narcotic paraphernalia, specifically an alligator clip. The alligator clip was found in a box of junk in Adams' cell by officers who were cleaning out his cell following Adams' lockup for investigation on June 29, 1978. The possession of the alligator clip was not discovered until after Adams was locked up. At no time did Adams receive a hearing in connection with the lockup of June 19, 1978, and the conduct report was ultimately dismissed.

In only one of these instances were disciplinary charges filed against plaintiff Adams. On every other occasion Adams was locked up for investigation he was not given any reason for his confinement, he was not given any kind of hearing in connection with the lockup, nor was he told why he was being released. Each of these six incidents set forth a violation of *Wolff v. McDonnell, supra*. Specifically, plaintiff Adams was not given any reason for his lockup or a hearing. Adams seeks damages for this confinement without the benefit of due process.

However, as disturbing as it is to the Court, plaintiff Adams has failed to name or even implicate one of the defendants as being responsible for these deprivations. Adams testimony reveals a series of lockups but never names an actor as responsible. Rather, Adams contends only that this was a pattern of harassment perpetrated upon him by the defendants and institution.

The defendants contend only that no inmate has been locked up on a general charge of investigation since mid-1980. This would coincide with the decision of the Seventh Circuit Court of Appeals in *Sargeant v. Jenkins*, 631 F.2d 734, an unpublished order which this Court took judicial notice of during this trial. In *Sargeant*, this Court granted summary judgment for the defendants at the district court level. The Seventh Circuit then held that segregation due to "investigation" provided insufficient notice of the reason why the inmate was being locked up. The Court of Appeals went on to note that the prison rules provided the precise safeguards that were missing from the actual practice. The Seventh Circuit declined, however, to order a mandatory injunction requiring the defendants to follow their procedure but did put them on notice that their practice was unconstitutional. Further, the Court held that the defendants were immune from personal liability under *Procunier v. Navarette, supra*.

These incidents here all occurred prior to this Seventh Circuit ruling. The *Sargeant*

opinion expressly intended to put an end to the complained of practice prospectively. It was not intended to be retroactive. The defendants contend that their current practice comports with the guidance of *Sargeant* and the plaintiffs do not contest that. This failure by some unnamed persons to give plaintiff Adams sufficient notice of the reason for his segregation occurred within the time frame of the *Sargeant* case and has been remedied by that decision. In regard to the remaining allegations of due process violations those claims must fail due to a failure to prove that any defendant was personally responsible for the claimed deprivation of a constitutional right. *Stringer, supra,* at 1000–1001; *Adams v. Pate, supra,* at 107. Therefore, this claim is dismissed.

The individual claims of the following plaintiffs all relate to the delivery of medical services: James Odis Hendrix; Mellon Carroll; Grady Thomas Bobbitt; and James Edwin Blackburn. These claims will be considered in conjunction with the analysis of the prison medical services.

The individual claim of plaintiff Donald Ray Sciefers goes to the condition of the cells in which he has been housed. This evidence will be considered in conjunction with the analysis of the prison physical plant.

### III.

The Prison: An Overview

The I.S.P. is a maximum security penitentiary for male felons over the age of thirty. The original legislative authority for its construction was passed in 1859. The prison is enclosed by a forty foot wall which encompasses twenty-four acres of land. Enclosed are the housing units, industrial shops, prisoners' dining facilities, infirmary, chapel, and other related facilities including a six acre recreation area. The inmate population at the time of trial was approximately 1900, by the time of oral argument it was approaching 2000.

Inmates in the general population are housed in A, B, C, and D and I Cell Houses.

Newly arrived inmates are housed in the Admission and Orientation Unit (A & O). Inmates in disciplinary segregation are housed in the New Service Building (N.S.B.), B Cell House Seclusion, D Cell House Detention Unit, I Cell House Detention Unit (I.D.U.), and in (A & O). Inmates in protective custody are housed in A & O and in a ward in the infirmary. Inmates on administrative segregation are housed in N.S.B. Inmates on self-lockup are housed in I.D.U. and A & O. The individual plaintiffs in this action have been housed at different times in the various cell houses as well as the detention units. Additionally, all members of the class are all housed in units of the prison.

Cells in A, B, C, and D Cell Houses are 40 to 48 square feet in size. Cells in I Cell House are 56 square feet in size. Cells in A & O are 38 square feet in size. Inmates housed at A & O are confined there 23 and one-half hours per day. Inmates confined to N.S.B. lockup unit, the I.D.U. lockup unit and B Cell House Seclusion are in their cells 23 and one-half hours a day. Inmates on administrative segregation are in their cells 22 hours a day.

### IV.

The Experts

Mr. Joseph G. Cannon.

Mr. Cannon called as plaintiffs' first expert witness is presently employed as a Professor at the University of Missouri-St. Louis. He received his B.S. degree in Social Administration with specialization in corrections from Ohio State University in 1950 and his Master of Social Work degree with specialization in Correctional Administration from the same university in 1956.

Mr. Cannon has worked in the Illinois Department of Correction, the Minnesota Department of Correction, and the Maryland Department of Correction. It must be noted that he was in charge of Adult Correctional Institutions for the State of Minnesota and left that position to become the Warden of the Illinois State Penitentiary. His experience in corrections is extensive.

Mr. Cannon toured the facilities of the Indiana State Prison on March 21, 1980. During the tour, he interviewed inmates, staff and administrators of I.S.P. He has testified as an expert witness in prison conditions cases in United States District Courts in the districts of West Virginia, Rhode Island, Wisconsin, and Massachusetts over the past ten years.

The following are his opinions and observations regarding the conditions of confinement at I.S.P.:

General references have already been made relative to the extreme conditions of the physical plant. The interest here is to focus on specific conditions that deserve special mention.

The lack of hot water in the cell houses is unconscionable and unjust treatment of the prisoners, in his opinion. The word is out among the population that in some cell houses hot water taps may be secured for a price. This situation can only ferment trouble.

Another aspect of the physical plant that needs attention is the dried food that he found on the front of several cells in Cell House I, detention unit. It appeared that food had been splashed on the cell fronts when meals were served to men in their cells. While it is understandable that this might occur during the serving of trays and that some of the spillage may be caused by the prisoners, it is the responsibility of the administration to see that the housing units are maintained.

The kitchen and dining room were visited for two meals and an observation of procedures. Supervision was lacking. The staff that were present in the kitchen tended to stand around and talk to each other. Cannon observed a serving line and noticed that some prisoners were receiving two and three pork chops while others received one or none, even though requests were made for additional servings. Calling the matter to the attention of one of the staff in the kitchen Cannon was informed that it didn't happen. During his two visits to the kitchen and dining rooms the serving lines were not being properly supervised.

In the kitchen, large containers of food were uncovered and sitting under broken windows where something could fall into them.

Cannon found the educational program understaffed, undersupervised and underattended among other apparent areas of difficulty. Cannon visited the school on two occasions.

In an academic classroom area designed to accommodate at least 100 students, Cannon found 18 men involved in classroom activities the first day and 22 the second day. He also found small groups of completely unsupervised prisoners in small secluded offices that had the windows covered or painted over in order to avoid proper supervision by an officer or teacher. The academic area of the school and especially those secluded offices were not being properly supervised and thus were potentially dangerous areas for most prisoners. One reason the school fails to attract more students is this lack of supervision.

In a population of 1600 there will be 500 functional illiterates. When Cannon inquired regarding the number of classes that were available to deal with this problem, he was told that there were two classes and that they met only in the mornings. A high percentage (80 to 90%) of the illiterate population have the potential and capacity to achieve educationally at the high school and college level, if given the opportunity. The men in this prison are not being given the opportunity and are forced to live in an atmosphere that discourages such potential. This contributes to the propensity toward future criminal behavior.

The recreation program with its 5 P.M. to 9 P.M. nightly, year round, yard activity is very commendable. Cannon stated this was the first prison that he had worked in or visited that has had this degree of yard availability. Cannon visited the yard area and field house during his first visit and again found supervision to be inadequate. It was a rainy evening and even with the rain some men were in the open yard area while most were in the field house. Cannon

circulated through the field house among some two to three hundred men. He only found three officers and this is an inadequate number in such a situation.

During a tour of the industrial shops, Cannon was impressed with the potential for on-the-job training, especially in the machine shop and to a lesser degree the auto tag shop.

During Cannon's two visits to the shops, he found much idleness and little productive activity. Again he was impressed with the potential for meaningful production and training but at the same time frustrated with the lack of interest and concern for this potential on behalf of those responsible.

This concluded the testimony of Dr. Cannon.

Dr. Herbert T. Wood.

Dr. Wood, called as plaintiffs' expert witness, presently serves as Chief of the Bureau of Occupational and Institutional Hygiene for the District of Columbia Government. He has a Bachelor's Degree in Chemical Engineering, magna cum laude, Catholic University of America, 1961, and his Doctorate in Physical Chemistry from the University of Wisconsin in 1965.

Dr. Wood has been a consultant for the United States Department of Justice inspecting the vocational industrial areas of state reformatories for occupational safety and health hazards since 1978. His further consultations and publications in this area are too numerous to mention. Suffice it to say that he is eminently qualified to give his opinion.

The following are his opinions and observations:

At each working area an interview was conducted with someone (usually the foreman) to ascertain the number of inmates working the area, the processes involved in accomplishing the tasks assigned to this area, the tools and equipment in use, and the period of time the inmates were in the area. The equipment was inspected and, if necessary, ventilation and/or noise measurements taken during the operation. In the event that glues, solvents, lacquers, paints, etc., were being used, the types and usage rates were also ascertained.

The occupational environment in each area was examined and compared with the requirements of the Occupational Safety and Health Standards (29 CFR § 1910).

In the Tailor Shop cloth in bolts is cut (using templates for patterns) and then sewn into clothing for use in state institutions. The sewing is done on industrial sewing machines. Most of these machines had unguarded belts (1910.219) in which the operator could catch his fingers. The electric wiring was in disrepair with junction boxes uncovered, wire nuts exposed, etc., (1910.308). This could easily cause sparks which could lead to a serious fire or an electric shock to the workers.

All of the laundry in the institution, exclusive of the hospital linen and officers' uniforms, is done in the laundry shop. The clothes are sorted, washed, extracted, dried, and folded in this building. The operation is well designed and organized. One fan, however, had unguarded blades which could injure someone who happened to be struck (1910.219).

The workers in the Auto and Motorcycle Tag Shop are presently working a ten hour shift preparing for the new licensing year. The metal for the tags is taken off a large reel, washed, rinsed, laminated and cut to the correct size. The cutter produced a noise level of 89–92dB(A). For a normal six hour shift these noise levels would not be a problem. However, for a ten hour shift ear plugs or muffs are necessary (1910.95). The plates are then pressed in a rimming machine which puts a groove completely around the plate. This machine produced a noise level of 98dB(A). Exposure to this noise level should not be allowed more than three hours (1910.95) unless ear muffs or plugs are used. The plates are then embossed with the numbers. Four machines are used for this purpose. Two of them, embosser numbers 1 and 2 produced noise levels (92dB(A)) which would necessitate the use of ear plugs or muffs if the work continued for more than six hours (1910.95). Also, it was observed that all of

the embossing machines had been rewired and the new wires (and wire nuts) were outside of the conduit (1910.308). This is extremely hazardous since the operator's hands are very close to the wires and, in addition, extremely flammable solvents are used in the dip tanks nearby. A spark would create a fire hazard.

The tags are dipped in a special coating material to provide extra life to the tags. This material, a 3 M product with the trade name Reflecto-Lite, is contained in an enclosed dip tank through which the plates are carried on racks. The solvents used for this material are extremely toxic and flammable but the ventilation system contained within the dip tank enclosure was removing the vapors adequately.

Also in this area small dog tags are made using a machine to stamp out the metal tags and a second machine to punch the numbers on the tag. The noise levels produced by these operations were such that no hazard exists.

Metal lockers are made starting with sheet metal and going through the processes of shearing, bending, spot welding, grinding, and painting. There was no noise hazard. The metal shearer was foot operated and there were signs warning the operator to keep his hands free.

The painting was done in the open in front of a spray paint booth. The reason given for not using the booth was that the wheeled truck used to carry the lockers would not fit into the booth (the lockers themselves do). The ventilation of the booth was adequate and the painter used a spray mask. While this mask removes the pigment of the paint from the air it does not remove the toxic solvents and is thus inadequate for this job, particularly since the vapors are not being removed from the air (1910.1000), (1910.133). Dr. Wood believed a correct respirator and a truck small enough to enter the booth should be purchased.

The Solvent Room contains the paints and flammable and toxic solvents used in the tag shop operations. In addition, it contains a covered strip tank for the racks used to dip the auto tags. The room had three deficiencies: First, the light switch was inside (1910.309). If there was a build-up of vapors in the room and the switch arced while the light was turned on an explosion would result; Second, the room was sloppy and could be the cause of a tripping injury (1910.141). Finally, because of the large amount of liquid present a door sill is needed (1910.106).

In the Sign Shop, which is located above the tag shop, road signs are made using the silk screen process. Unopened cans of paint and thinner are kept in a caged area in the shop and opened cans in a metal cabinet in the room. This cabinet, however, does not meet OSHA requirements for fire safety (1910.309) and a correct cabinet should be used.

The silk screens are cleaned on a vertical board on a trough. Naphtha is used as the cleaning agent and sprayed on the screens mounted in the trough. The spent naphtha collects in the troughs and flows into a storage tank and then is pumped to the spray gun and is used again. Naphtha is a very flammable (1910.106) and toxic (1910.1000) liquid. There is no local ventilation to prevent the vapors of the naphtha from entering the room. The operator of the cleaning unit wears the same mask as is used on the first floor and thus is unprotected from the vapors of the naphtha. A local ventilation system should be installed and the proper organic cartridge respirator used.

The floor of this shop is in an extreme state of disrepair. Metal plates, some overlapping, cover portions of the floor. In some cases the plates are loose and are tripping hazards (1910.141). They should be repaired.

The Machine Shop is primarily a support facility for the tag shop. The male and female parts of dies are made as well as working parts of the machine. A good number of the lathes and drills do not have guards on the power belts (1910.219). Some welding is done in the shop but no local ventilation is provided (1910.252).

The Soap Factory is a large two story building where bulk soap is manufactured in large kettles, powered soap (and detergents) are blended, and other housekeeping products (waxes, strippers, etc.) are produced and packaged. The area was quite clean considering the type of operation being carried out.

The same respirator that is used in the painting areas is used in the dusty areas of this operation. This mask is not designed for this type of operation and the proper respirator should be used (1910.133).

The hood over the blending pit had adequate draw for this type of operation when used in conjunction with a respirator for the operator.

In the dry cleaning operation clothing is dry cleaned using perchloroethylene as the cleaning fluid. Approximately three gallons of this material is used per week. The perchloroethylene is stored in a 55-gallon drum in the room and transferred to the washer by an open bucket. This is an incorrect procedure because of the toxicity of perchloroethylene (1910.1000) and its ability to injure the skin if it comes in contact with it. Special containers for the transfer of toxic materials of this type are available commercially.

The wiring in this area is in disrepair and one junction box did not have a cover (1910.308). Also, two sewing machines did not have guards on the power belts (1910.-219).

The Power Plant is an extremely clean and well kept up operation. In the shop in the basement the machine does not have a guard on the belt (1910.219).

The Store House handles the loading and unloading of dry goods. There were no violations in this well run operation.

The Industrial Warehouse building is in serious disrepair and its use for the storage of the amount of toxic (1910.1000) and flammable (1910.106) materials (naphtha, toluene, xylene, paints, etc.) is ill advised. The roof leaks making the floor slick increasing the chance of a spill of these materials with the resulting potential for poisoning and fire. The firefighting system in the building does not meet the standards for this type of storage (1910.159).

The Welding Shop has a number of booths along two walls and in a row in the middle of the shop. Approximately half of the booths had no curtains to prevent the welding arcs from being visible throughout the shop (1910.252). Although a local exhaust system was installed, it provided essentially no ventilation at the site of the welding (1910.252). Several of the exhaust ducts were not connected. This shop should not be used for welding until the curtains are installed and the local ventilation system is repaired.

In the Auto Body Shop the surfaces of cars are repaired. Dents are pounded out and tears are filled in with plastic filler, the surfaces sanded and then painted. The filler has a toxic solvent (the can was labelled "vapor harmful") and the worker should use a respirator or be provided with local ventilation to eliminate the vapors (1910.-133). At present neither is provided.

A paint spray booth is provided in the shop but it does not have adequate ventilation (1910.107). Two types of respirators were available for the workers, one correct (an MSA cartridge type) and one incorrect (a sponge type). This latter mask should not be used since it stops the paint pigment but not the toxic solvents.

In the Electronics Shop there was one fan with unguarded blades (1910.219). The shop was quite clean and well ordered.

The Auto Service Shop, although somewhat messy, was in good shape. The tailpipe exhaust system had an adequate ventilation rate. There were some wiring irregularities (1910.308). One of the fire extinguishers was missing (1910.157).

The Maintenance Shops employ between 100 and 110 inmates, the Maintenance Shops serve mainly as places where the inmate workers receive their job assignments for maintenance projects throughout the institution. Some work, however, is done in the shops.

The Steel Shop is basically a metal working shop. Some welding is done in the shop and no local ventilation is supplied (1910.-252).

The Carpentry Shop contains several table saws without guards (1910.219). In addition, none of them had local ventilation systems to prevent the sawdust from entering the air (1910.1000).

In the Sanitation Shop pesticides and insecticides are stored for use in the institution. Respirators are available for use of the inmate workers.

Maintenance also maintains an Air Conditioning Shop, an Electric Shop, a Supply Shop, and Plumbing Shop. There were no deficiencies in these shops.

In the Paint Shop one room is set aside as a spray booth with the fans set in the wall. This design is incorrect since the motors are in the path of the exhausted air and thus exposed to the flammable solvents (1910.-107). This area should not be used for spray painting until this deficiency is corrected.

This concluded the testimony of Dr. Wood.

Mr. John P. Conrad.

Mr. Conrad, called as plaintiffs' third expert witness, presently serves as the Principal Program Officer, for the American Justice Institute. He received his B.A. in political science from the University of California and his A.M. in social service administration from the University of Chicago.

Mr. Conrad started in corrections as a parole officer with the California Youth Authority. He then moved to San Quentin Prison as senior sociologist for five years. He next worked for the California Department of Correction's staff from where he moved to the United States Bureau of Prisons as Chief of Research. He has been engaged in research for the Law Enforcement Assistance Administration since 1969 and his selected list of publications is quite extensive. Mr. Conrad's experience in corrections is extremely extensive. He stated preliminarily an opinion shared by this Court, that the staff was doing the best they could with meager resources.

Mr. Conrad toured the facilities of the Indiana State Prison on May 19 and 20, 1980. During the tour, he interviewed inmates, staff and administrators of the prison. The following are his opinions and observations regarding the conditions of confinement at the Indiana State Prison:

In regard to the staff Mr. Conrad made the following observations. New correctional officers earn about $11,000.00 per year, or about $917.00 a month. He would judge, from comments made to him by various members of the staff, that for a family man without a working wife, this salary must be insufficient. The significance of this situation is that correctional officers will be recruited from men and women whose basic qualifications as to intelligence and education will be minimal. Many will accept employment temporarily. Mr. Conrad was told that the turnover rate for correctional officers is about thirty per cent per year. It will be difficult to retain the best recruits, and the development of supervisory staff will depend on making the best of what is available from an unsatisfactory basic pool of employees. Under the circumstances, the staff training program assumes great importance. There is a one-week training course for new officers, and no program for supervisory personnel. I regard this aspect of the staff situation as most unsatisfactory and urgently in need of correction.

In regard to disciplinary procedures the present situation is unsatisfactory in structure and general policy. Under the provisions of the present regulations, rule infractions of a major nature are heard by a Conduct Adjustment Board consisting of a sergeant, a correctional officer and a treatment counselor. The qualifications and training of the personnel assigned to the Conduct Adjustment Boards do not appear to have been given serious attention in the past. Mr. Conrad was puzzled as to the low status of the personnel assigned to this crucial function. In most prisons that he has any familiarity with, assignments to these functions are generally reserved for rela-

tively senior personnel. He was told that under the new regulations, the chairman of the board will be a captain, but that custodial staff will dominate the board. He believes this is unsound, neither the reality nor the appearance of impartiality will be maintained under such circumstances. Mr. Conrad believed consideration should be given to adoption of the Minnesota system of independent hearing officers, preparation of the charges by legally trained personnel and defense representation by persons chosen by inmates under charges.

The various classes of segregation were confusing. What seems clear is that a man going into segregation for any reason will probably not be released to the general population during his stay at Michigan City. Many of the men in Administrative Segregation (the most serious chronic disciplinary problems) claimed to have been locked up for periods in excess of a year—some for as long as three years. While some of the offenses admitted to him by these prisoners were very serious, there seemed to be no program to modify their behavior other than the service of a long sentence in secluded idleness. Mr. Conrad recommended that all persons in Administrative Segregation or the Seclusion units should be assigned a counselor for intensive contacts. Sentences to these units should be indeterminate, with provision for parole controls to allow for trial returns to the general population. It simply is not acceptable to require protracted sentences under these conditions with no provision for programmed release. Further, the educational and recreational staffs should give special attention to the need for programs for those men who must be detained for periods of time in excess of a week. There should be encouragement to participate in cell courses, and in daily yard exercise. This recommendation should be readily feasible; there are four correctional officers on duty in these units during the daylight hours.

There were 46 prisoners in protective custody at the time of the visit. While this is not an unusually large number of prisoners so confined, it is unsatisfactory to find that no program is provided for them. Much

more could and should be done to assure that these men are properly programmed. Many could be assigned to work programs during the day, or to school, remaining in protective control only at night. It was not clear to Mr. Conrad that sufficient investigation of the situations of the men under protection had preceded their assignment.

This is a difficult problem to manage in any prison. It must be kept in mind that under the present protective custody plan, very few inmates once assigned to such a unit can ever return to the general population. The basic principle should be to take every step possible to provide alternatives to inmates requesting protection.

At the Education Department, about 300 prisoners are enrolled in academic and vocational training program. About 140 are on all day assignment to vocational training; the rest are part time students. Because the work program, to be discussed in the next section, is so inadequate, it would be desirable to expand the education program to the greatest extent consistent with quality in the program offerings. There appeared to be some unused space in the education unit; it should be put to use as rapidly as possible. Mr. Conrad does not recommend mandatory assignment to educational program under any circumstances.

The main prison industry is the license and sign plant, to which 207 men are assigned. Payment is meager with a maximum daily rate of $1.10 for skilled workers. Equipment appears to be adequate. Mr. Conrad was told that there is a waiting list for assignment and that turnover is low. The work day is about five hours, the pace was leisurely. A fairly typical tag plant; not a bad place to get away from the rest of the prison, but hardly comparable to conditions in an efficient factory—which one would like to see these men returning to when released.

There really isn't enough work to go around. The food manager told Mr. Conrad that he employed 150 men in the mess hall where 100 would be more than enough. The consequence is that many of the work-

ers in the mess hall are working at assignments that could not possibly keep them busy for as much as an hour a day. There seemed to be a large number of cell tenders, men whose assignment is to sweep up and mop the cell houses. The number of men who are not in full time lockup but officially idle is about 50, not an impressive fraction of the total population. This is mostly an idle prison, inhabited by criminals with long sentences. There are over 450 lifers from the old statutes, and a considerable number of men under the new law who are serving very long terms—some adding up to more than 100 years. The combination of semi-idleness and protracted incarceration is dangerous to both staff and prisoners. It should be a matter of high priority to create a program of heightened activity, consisting of more work and more education.

A classification system is useful only where there are programs for which prisoners can be classified. It is effective only if staff are available to interpret it to program staff and to inmates. At Michigan City there are ten classification counselors for the whole population—an average of at least 180 inmates per counselor. Further, these counselors are occupied doing board reports and maintaining minimal records. Counselors are unable to maintain regular systematic contacts with their caseload. A functional caseload per counselor would be sixty, with counselors handling inmates in segregation and protective custody at somewhat lower levels than sixty.

In the area of mental health professions, an institution this size, with this population requires one full time board certified psychiatrist, two clinical psychiatrists, and the same number of psychiatrist social workers to meet the inmates mental health needs. Currently, none of these positions exist with the exception of a vacant position for a psychiatrist.

This concluded the testimony of Mr. Conrad.

Mrs. Louise E. Goggans.

Mrs. Goggans, called as plaintiffs' fourth expert witness, is currently employed as the Director of Nutrition Services at Wishard Memorial Hospital in Indianapolis, Indiana. She received her A.B. degree in Home Economics from Indiana University in 1956, did a dietetic internship at Hines V.A. Hospital, Hines, Illinois and received her M.S. degree in Nutrition Education from the same university in 1969.

Mrs. Goggans has worked as a staff dietician since 1957 at no less than six hospitals. She has over twenty years experience as a dietician. Mrs. Goggans is also a member of the American Dietetic Association, the Indiana Dietetic Association, the Central District Dietetic Association, Indiana Public Health Association.

On Friday, August 1, 1980, Mrs. Goggans made an inspection of the food service facilities at the Indiana State Prison, Michigan City, Indiana. During the aforementioned inspection, she interviewed inmates, staff and administrators of the Indiana State Prison. The following are her observations and conclusions regarding the food service provided at the Indiana State Prison:

The inspection began by proceeding to the prisoners' Dining Room (PDR) and kitchen. The food service facility is a single large building which sits somewhat in the middle of the prison complex inside the walls. There is a service line on each side of the dining room with the conveyor and dish room in the middle of the room. The kitchen consists of a ramp area containing six large steam-jacketed kettles, a bank of deep fat fryers, a bank of grills, a bakery preparation area, two large rotary ovens, large walk-in coolers and a walk-in freezer, and an area for special diet preparation. Above the kitchen is the food service supervisor's office.

The breakfast menu for the day was: fresh oranges, cream of rice cereal with raisins, boiled eggs, toast, jelly, milk, coffee. The breakfast cook was preparing the cereal and eggs when Mrs. Goggans arrived, which was approximately 5:00 o'clock A.M. After preparing them, they were placed in large stainless steel containers and taken to the serving line for breakfast.

Meal service began at 5:45 o'clock A.M. and the prison workers ate their breakfast first. Mrs. Goggans was never told exactly how many prisoners worked on each shift, but was told by both Mr. Jasper, the food service director, and the supervisor, Jim, that the total number of workers was 105, and the number of civilian supervisors was 18. Mr. Jasper said the shifts and working times were determined each day by the menu preparation and his own discretion.

When the prisoners were fed, they received adequate portions and Mrs. Goggans was told that the only items served that were rationed were meat and fresh fruit. The prison workers were attired in regular prison garb (blue denim shirt and blue jeans) or white shirt and white pants. All the workers had some type of covering on the heads, e. g., hairnet, hankerchief or cap. They also used either cotton or plastic gloves while they served the food.

There was a special diet line set up for the diabetic patients but Mrs. Goggans did not observe anyone who was served from this line either at breakfast or at lunch. The diabetic menu is written for an 1800 calorie diet and Mr. Jasper said they adjust the diet up to 2500 calories or down to 1200 calories according to the doctor's orders.

During the breakfast hour Mrs. Goggans went to the I.D.U. detention unit and observed the breakfast service there. The food was transported on a hot cart and the coffee in a large stainless steel thermos. The prisoners there received the same food except they also got two slices of bread in addition to toast. Patients in the hospital were also served from a hot cart. There were only 13 patients in the hospital, and one of them was in isolation.

After breakfast, Mrs. Goggans observed the dinner preparation. The "ramp cook" was making a white sauce for the escalloped potatoes. The potatoes were dehydrated sliced potatoes which had been rehydrated early that morning. The coleslaw consisted of coarsely chopped cabbage mixed with salad dressing. The baker was preparing chocolate cake with chocolate icing. Fish was deep-fried about 9:45 o'clock

A.M. The fish was a prefabricated product that tasted good while it was hot. A tartar sauce had been prepared to accompany the fish. The coleslaw, which was very coarsely chopped, had no seasoning, was not a very good product. The potatoes were not cooked long enough and were tough and chewy. The creamy style corn was canned and had been heated with oleomargarine added for seasoning so it was adequate. The chocolate cake had extra eggs and flour added to give it a better texture, so it was very good and had an excellent texture.

Mrs. Goggans asked Mr. Jasper about:

a. Recipes for food preparation:

He told her that they were kept in his file and he used them for training of the cooks. However, she did not see any of them. He also said that each time a product was prepared, it was prepared differently to add more variety to the meals. To her, this would defeat the purpose of having standardized recipes if the product was going to be prepared a different way each time it was cooked.

b. The amount of money spent per diem per man:

That amount is one dollar ninety-one cents ($1.91).

c. Who does the training of cooks and supervisors:

Mr. Jasper takes personal responsibility for the training of the personnel. The early supervisor, Jim, who stated that he had been on the job for about three years, did not appear to have much knowledge about food preparation. Mrs. Goggans observed him telling the employees in the kitchen to put out their cigarets a number of times.

The present area where the trash and garbage is stored is located outside the kitchen and dining room in the rear of the building. The area was dirty, smelly and fly-infested. A new area is supposedly being constructed inside the kitchen for this purpose. Mrs. Conrad questioned the feasibility of locating the area inside the kitchen considering the condition of the present area. It would possibly cause problems with dirt, odor and insects.

The other areas that Mrs. Goggans visited were the general store, butcher shop, and storage for the commissary. In the commissary, the correctional sergeant in charge stated that aside from tobacco, the food items are the fastest selling items in the commissary.

Just before preparing to leave, a group of inmate workers asked if they could speak with Mrs. Goggans. There were about 12 prisoners in the group who indicated that they had some complaints about the food service that they wished to share. They told her the following things.

a. Normally, no one employed in the kitchen or dining room wore gloves or hats, that these items were passed out to them and other preparations made because of the notice the prison officials had of her intended inspection.

b. Most of the prisoner workers refused to eat the baked goods and advised their friends to do the same because one of the bakers had been treated twice for hepatitis and once for gonorrhea and used his hands in icing the cakes and in handling the baked products.

c. The baked goods were usually baked a day ahead and were stale by the time they were served.

d. Prison employees had been working on cleaning up the kitchen for three weeks prior to her visit.

e. Their most adamant complaint was that the quality of the food was so poor and no real effort was made to improve it in spite of their consistent complaints. No seasoning is used in food preparation except salt and oleo. Mrs. Goggans did not see any evidence of spices or flavoring, even though Mr. Jasper told her that the cooks used many varieties.

A great deal of preparation apparently was made for this visit. Even though the floors had been recently scrubbed and mopped, there was an observable accumulation of old dirt on the floors.

The serving of special diets is inadequate. A prisoner prepares the food. Since there is no dietician or other qualified person there to supervise or check his work, the diets could not be accurate. Mr. Jasper indicated that the 1800 calorie diet could be raised to 2500 calories or lowered to 1200 calories if needed, but there was only one written diet and that was an 1800 calorie diet, and to make these adjustments would require someone who had been trained to handle special diets.

Even though the food is adequate in quantity, the preparation is poor so the end product is often undesirable and probably leads to excess waste. If trained personnel is available, it would seem practical to allow them to use their talents and skills to make the food more appetizing. Manpower does not seem to be a problem, since there appears to be plenty of people working in the kitchen.

For those inmates who do not eat pork, perhaps for religious reasons, their diet would be deficient since there are no substitutes offered on the menu. Here again, the services of a qualified dietician could be used to adequately adjust the menu with substitutes for these inmates.

The menus provided Mrs. Goggans were checked for accuracy and adequacy according to RDA (recommended dietary allowances). The diabetic menu was inaccurate on four of the seven days. Cookies were on the diabetic menu for breakfast on Tuesdays and normally sweets are not served to diabetics.

| Nutrients | Days of the week below RDA |
| --- | --- |
| Calories | Sunday, Tuesday, Thursday |
| Vitamin A | Sunday, Wednesday, Friday, Saturday |
| Vitamin D | Every day (no fortification) |
| Vitamin C | Sunday, Tuesday, Saturday |
| Thiamine | Tuesday |
| Riboflavin | None |
| Niacin | Tuesday, Thursday, Saturday |
| Calcium | Wednesday and Thursday |
| Phosphorous | None |
| Magnesium | Every day |
| Protein | None |

The inadequacies of the above listed nutrients, would leave the diet deficient of the recommended daily allowances and therefore making the menu inadequate. These calculations were made prior to visiting the institution based on a standard serving rather than what was actually served.

This concluded the testimony of Mrs. Goggans.

## Dr. Ronald M. Shansky, M.D.

Dr. Shansky, called as plaintiffs; fifth expert witness, is currently employed by Cook County Hospital as an attending physician and is the Medical Director of the Uptown Peoples Health Center. He received his B.S. degree from the University of Wisconsin in 1967 and his Doctor of Medicine from the Medical College of Wisconsin in 1971. He subsequently received his Master of Public Health from the University of Illinois School of Public Health in 1975. Dr. Shansky is a licensed physician in the State of Illinois and is board certified by the American Board of Internal Medicine.

Dr. Shansky's medical experience is very wide. Most notable, however, is his service as the staff physician at the Metropolitan Correctional Center of Chicago, his appointment by United States District Court Judge J. Foreman to advise on health conditions at Menard State Prison in 1976, and his position as medical consultant to the United States Department of Justice Civil Rights Division. Additionally, Dr. Shansky has inspected the medical facilities in 14 prisons in eight different states.

On July 18 and 19, 1980, Dr. Shansky inspected the medical facilities at the I.S.P. This inspection consisted of review of the physical facilities, interviews with correctional and medical staff, interviews with inmates, and review of medical records and documents. Dr. Shansky also went through the medical facility on January 12, 1981, prior to his testimony. The following are his opinions and observations regarding the medical facilities and services at the I.S.P.:

The leadership of the medical services program belongs to Dr. Ronald Freake, a non-physician. He has clearly attempted to improve the organization of the medical services by developing a policy and procedure manual and protocols for medical care. Physician assistants have been hired, a medical audit review committee has been established and efforts have been made to give some of the staff cardio-pulmonary resuscitation training. Many of the staff, the physician extenders in particular, seemed extremely dedicated, concerned and committed to a decent standard of care for the inmates. They work under extremely trying conditions. In addition, plans are underway to develop a unit dose system for the pharmacy. Policies do include an entrance history and physical exam on all inmates. Finally, various specialists from the community are used and dental services are available. Despite the encouraging signs noted by the above-described phenomena, serious deficiencies still exist resulting in potential threat to the health and well being of the inmate population.

## STAFFING

Physician staffing consisted of Doctors Mai, Gallinatti and Dang. Their responsibilities included daily sick call for the general population, infirmary rounds, supervision of medical technicians and physician assistants, segregation sick call, performance of medical procedures, review of laboratory, ancillary services reports, and functioning on committees as designated. In addition, they are expected to be on call for emergencies at nights and on weekends. From discussions with staff and review of records, the physician staffing has been deficient for quite some time. Supervision of the physician assistants and medical technicians was extremely deficient. In addition, both inmates, correctional staff and health services staff indicated that at least one and possibly two of the physicians had difficulty understanding the patients and were unintelligible themselves to the patients because they are foreign medical graduates. Since doctor/patient communication is the basis of the doctor/patient relationship, deficiencies in this area may result in serious jeopardy to the well being of the patients. Three full time physicians, as the total physician staff, does not appear to be adequate. In addition, the positions must be filled with individuals who take full responsibility for the care of the patients. The significant shortage in physician staffing results in inefficient primary care functions and may also result, therefore, in inappropriate

use of specialists. A very serious result of this physician shortage is the inadequate supervision for all personnel functioning under the supervision of these physicians.

Physician assistant staffing consisted of Mr. Baker and Mr. Pitcher and there was one nurse practitioner, Ms. Case. Ms. Case was responsible for supervising the medical technicians. The physician assistants were responsible for performing sick call duties, triaging inmates to the medical technicians and physicians and performing various medical procedures under the supervision of a physician. In addition to seeing patients from the general population at sick call, physician assistants could admit patients to the infirmary when indicated. The physician assistants were also on call for emergencies. This number (3) of primary care extenders is also insufficient and results in overwork and delegation of functions to medical technicians which are beyond the capability of the medical technicians.

There were five medical technicians whose major responsibilities were sick call, the infirmary whenever they were able to get there, and medication distribution. It was agreed by all staff that this number of medical technicians was also insufficient and resulted in officers distributing medications on the tiers and in the work areas. From the medical records and from inmates and staff, it was consistently reported that inmates did not get their medications. No record is kept as to whether the inmate received his medications. When the officer doesn't give the medication, he writes "R". This does not differentiate refusal from unavailable. Only medical personnel should be involved in the distribution of medications.

There is only one laboratory technician and this resulted in inmates working in the laboratory and thus having access to laboratory results.

A correctional officer was responsible for the medical records area. This is totally unacceptable. A full time medical records librarian and several clerk typists are necessary to staff an adequate medical records library.

No physical therapy staff were present. At least one part time and possibly full time physical therapy person should be present.

Dr. Freake indicated that dentists were providing a total of 96 hours of dental services. He also indicated that this resulted in up to two weeks delay for routine and sometimes urgent dental services. This is woefully inadequate and results in significant delays, discomfort and pain for inmates at the institution. In addition, by and large, dental services were restricted to extractions and fillings. Thus, frequently salvageable teeth may in fact be lost. Current population requires at least three full time dentists.

There appeared to be no physician medical director. This has resulted in medical policies developed without physician input and labeled as administrative (see administrative memos Nos. 4, 5 and 10). In addition, overall medical responsibility is vaguely defined. Finally, this results in poor physician extender and medical technician supervision. The infirmary had one RN during the days and this was the sole source of staffing for an area that maintained roughly 10½ inpatient census on the average. An infirmary such as this, should have at least one RN on each shift round the clock, seven days a week.

Finally, the mental health services available are glaringly deficient in terms of staffing. There were no full time psychiatrists. There was a group of psychiatrists who saw six to eight inmates for parole evaluations on Saturdays, and two to four other inmates. There was no ongoing therapy provided by psychiatrists or psychologists on an individual basis. There was minimal psychologic evaluation done and supervision of psychotropic medication usage was inadequate. Despite repeated reports to the responsible officials, there has been little, if any, improvement in recruiting and hiring of staff despite these deficiencies and, in fact, in some areas recently the staffing has been reduced.

## INTAKE POLICY

As of June 23, 1977, it was the policy of the institution to perform "physical exams where needed as well as a screening battery of tests on all new arrivals." All new lifers and parole violators were to receive physical examinations and the same battery of tests, plus a VDRL. (See June 23, 1977 memo). Although there was general compliance with this policy, a record review indicated instances where examinations were not done and no notation was made in the record as to the reason for the exception from this requirement (D. Brandon). In addition, significant findings were apparently overlooked and not pursued (E. Watts, D. Brandon). These are examples of inadequate physician supervision.

## PERIODIC EXAMINATIONS

There are no policies regarding periodic examinations on inmates and none appear to be carried out. Thus, inmates entering before June 1977 may not have had a complete history and physical exam and inmates with chronic diseases may not have had a complete examination for many years. Patients with chronic diseases may be overlooked and their conditions progressively deteriorate. Also, elderly inmates may develop conditions that go undetected until the problem is irremediable.

## SICK CALL—GENERAL POPULATION

Inmates housed in the general population may receive medical assistance during non-emergency circumstances by signing up at the desk of the tier officer. It is the responsibility of this officer to communicate the list to the medical area where each morning the physician assistant triages the list and decides who should be seen by a medical technician and who will be seen by the physician assistant or by the physician. Both medical staff and inmates indicate that there are problems with inmates getting to the sick call area. The system allows for custody interference without any accountability. Inmates indicate that they don't get passes to the medical service when custody indicates the inmate refused to go. No record of inmate refusal is kept. In addition, many inmates indicate they sign up and they are not called because their names never get to the medical service. Finally, inmates are supposed to indicate to the officer the nature of their medical problem requiring medical attention. This is clearly an invasion of inmate medical privacy.

Inasmuch as medical technicians have rarely completed an approved physical diagnosis course, this is an inappropriate utilization of them. They should not be involved in providing direct medical services which include the potential for diagnosis and treatment. Their involvement should include the taking of vital signs and dressing changes under the supervision of a physician or a physician assistant. It appears that by default they may have been given inappropriate responsibilities. This could seriously jeopardize the well being of inmates. From statements of both the physicians and physician assistants, the only supervision of the physician assistant is if he or she asks a question. Both indicated that they infrequently interact with regard to clinical problems. Inadequate physician supervision of physician assistants is a very serious problem within correctional institutions. Inmates do not have the same option as individuals in the free world have in terms of contacting a physician at any time, i. e., through an emergency room, clinic, or private office. Therefore, the functioning of mid-levels in the prison setting is not analogous to the general role of mid-levels outside the corrections system. Although a physician assistant is trained in physical diagnosis, it is critical that they have good onsite supervision. In addition, this is the only way that they can learn and continually grow in their roles. Mid-levels are regularly diagnosing and prescribing in this institution without adequate supervision. This puts them in the position of practicing medicine without a license. This gravely serious situation has occurred despite repeated requests to prison officials for more supervision. A review of the record demonstrates that this chronic lack of attention to medical supervision has resulted in potential and real harm to inmates.

Finally, once seen by the provider, therapy is regularly not initiated for two to four days because of delays in getting the prescriptions processed. Staff indicated that not infrequently specific kinds of therapy such as antibiotics or analgesics were not in supply and this resulted in long delays. This is again a problem for which correctional officials have been long aware and unwilling or unable to solve.

## SICK CALL—SEGREGATION

According to Dr. Freake, once weekly a physician makes rounds on the segregation units taking notes as he passes by the cells and then sending passes for those needing more detailed evaluation. This frequency of physician contact to segregated patients is grossly inadequate. On the other days a physician extender or medical technician makes rounds walking past cells, making a record of the particular complaints presumably for presentation to a physician. In addition, staff indicate movement to medical service is routinely obstructed due to correctional staff problems. Medical staff indicated that movement of inmates for medical reasons was always subject to the convenience of corrections. This lack of access to the physicians coupled with the delay in initiation of prescribed therapies results in significant potentials for conditions which may, on the one hand, be easily treated, deteriorating until they become much more serious medical problems. It is well known that inmates who are on segregated confinement and thus have less exercise as well as activities then inmates within the general population, are prone to far more frequent symptom manifestation. Therefore, rather than having less access to medical services, these are the inmates that are most in need of access to medical services.

## PHARMACY AND DISTRIBUTION OF MEDICATION

The pharmacy was under the supervision of a part time pharmacist. Plans were being developed to dispence all medication from Westville. However, medical staff indicated that the current system was woefully deficient and were dubious that the severe problem of delays in medications ordered getting to inmates would be alleviated by the transfer of responsibilities to Westville. In fact, some thought that the current problem may be exacerbated when the plan to initiate medications at Westville become a reality.

The current system consists of a provider writing a prescription and this prescription being taken to the pharmacy. At the pharmacy, three clerks, who have been trained on the job, put up the medicines. It is not clear that a pharmacist directly supervises these activities all the time. In fact, this appears unlikely. This is particularly true since the pharmacist was responsible for maintaining inventories and ordering supplies in addition to supervising these activities. Once the prescription was filled, it was transmitted to the correctional officers for distribution to the inmates. All staff indicated this system was woefully inadequate as it interjected an untrained correctional officer into routine medical procedures. This problem with resultant complaints from inmates and medical staff has been brought to the attention of prison officials for many years. In summary, we have a system where improperly supervised personnel prescribed medications to be filled by other personnel who may not be adequately supervised. This medication is then distributed by untrained personnel. This only multiplies potential hazards to inmates. Medical staff were unaware of a formulary committee to set policies and procedures in this area and were not informed as to the function of a state-wide formulary committee. In addition, no patient profile was maintained to preclude the distribution of medications that might conflict. This deficiency is all the more important in view of the poor supervision at all levels of the health care interaction.

From administrative memoranda Nos. 4, 5, and 10, this institution has tolerated unprecedented intrusion into medical policymaking by the correctional hierarchy. In addition, these medical policies appear to emanate primarily from a collaboration of correctional and administrative staff with-

out significant physician input. The vacuum created by inadequately physician input for many years, appears to have resulted in correctional intrusion into this area. This is an extremely dangerous precedent. Correctional officers have neither the medical knowledge, skills nor sensitivities to be involved in medical policy-making.

## FOOD SERVICES

Dr. Shansky's review of the food services revealed that, although a professional food services manager was in charge, there was no consultation from a dietician at the prison level. Thus, the only special diet available was the 1800 calorie diabetic diet which was also low salt. Twenty-two inmates were on these diabetic diets.

## EMERGENCY RESPONSE

The current system utilizes medical technicians as the onsite medical personnel in off hour shifts. The system is based on an inmate yelling to attract an officer's attention. The officer then calls the captain who notifies the medical technician, who notifies the physician or physician assistant. The physician or physician assistant then calls the ambulance. Once the ambulance is called, it takes from 10 to 20 minutes for the ambulance to arrive and another six minutes for it to leave the correctional institution to get to the hospital. All indicated that inadequate numbers of the technicians and corrections staff onsite were trained in cardiopulmonary resuscitation. Given the cumbersome system outlined, this could easily result in unnecessary deaths. In addition, officers, as a group, have not been adequately sensitized to emergency procedures. Indeed, they have not been sensitized to medical problems in general. This results in long delays before the inadequately trained medical personnel who are onsite, i. e., the medical technicians, are finally notified.

## INFIRMARY

The infirmary, for which Dr. Freake is requesting limited Joint Commission on Accreditation of Hospitals accreditation, was staffed by one RN on the day shift. No other staff were regularly assigned to this area, even though the average census in this area was 10.5 patients. Medical staff indicated to us that patients in that area, not infrequently, had conditions which deteriorated as a result of the poor attention. A facility such as this, should have an RN on each shift, in addition to other nursing staff. Infirmary medical records indicate that contrary to written policy (Medical Services Policy: Patient Conduct/Inpatients), patients have been discharged from the infirmary to physician assistants. In addition, the medical supervision by the physicians has not been adequate and their progress notes are often infrequent (Brewer).

The second floor of the hospital was being used for the housing of 67 inmates in five to eight rooms. These inmates were on safekeeping segregation status. The housing of these inmates in close proximity to the infirmary, which presumably has more susceptible people in it, runs the risk of spreading significant infection.

## LABORATORY

The laboratory was understaffed and thus utilized two inmate technicians. This results in inmates having access to private medical information of other inmates. All agreed that this was totally unacceptable. The laboratory seemed to have ample space and a competent technician was in charge.

## STAFF MEETINGS

Medical staff indicated there were a dearth of meetings where cases or problems were discussed. Many staff indicated a lack of clear-cut goals or directions and felt this contributed to poor morale and high staff turnover. Staff indicated that the major goal of medical administration was to confirm the medical services to correctional needs.

## PHYSICAL FACILITY—HOUSING

From correctional staff and inmates and Dr. Shansky's own direct observation, several of the tiers were filthy. In particular, in C Cell House, a large pile of garbage and half-eaten food lay in a corner. The officer who escorted us, informed us that this was an every day occurrence. He stated that both rats and roaches were very visible

despite monthly spraying to prevent roaches. This problem and its attendant health hazards for spread of contagion has been well-known to correctional officials for many years.

## INSERVICE TRAINING

Medical staff indicate despite the repeated requests to officials, there is minimal formal inservice training for mid-levels or physicians. No formal set of lectures has been developed. In addition, there is no morning report where problems that have arisen during the previous day are discussed and responses evaluated. This leads to poor followup, poor morale and is a reflection of inadequate medical supervision. This problem increases the potential for patient care error.

## MEDICAL RECORDS

This area was supervised by a correctional officer who had no medical records training. This is clearly unjustifiable. Ms. Brown, the correctional officer, was unaware of routine medical records filing procedure. In addition, she stated she believed "most inmates received passes so they could run around." This attitude potentially jeopardizes her performance of her critical job. The medical records I reviewed were frequently deficient in basic organization. Pages were out of chronological order and lab work was mingled with progress notes. Progress notes didn't indicate the title of the person writing the notes. Test results were present without any reference to them in the notes or apparent awareness by the individual writing the note that the lab work was in the chart. Out-guides were not used by the medical records staff, thus making more difficult the locating of charts. The medical record jackets were old, worn, and lacked a color coding, thus, increasing the possibility of misfiling of the records and unavailability of crucial medical information. Dr. Shansky had been told that prison officials have been aware of the serious deficiencies in the medical records area for quite some time. They apparently again have been either unable or unwilling to solve these serious problems.

## INDIVIDUAL PATIENT RECORDS

*Mr. Ernest Brewer*: A 55 year old male who is an extremely brittle diabetic and therefore on split dosage insulin both in an A.M. and a P.M. dose. Mr. Brewer is supposed to receive 60 units of Lente insulin plus five units of regular insulin every morning, and 70 units of Lente insulin plus seven units of regular insulin every P.M. These are extremely high doses, an indication of the severity of his diabetes. An indication of the inconsistency of the medical care Mr. Brewer has received can be seen by the charting in June and July 1980. June 14, 15 and 16, Mr. Brewer only received his morning dose; June 28, only the morning dose; July 5, only the A.M. dose; July 6, the A.M. dosage was also given in the P.M.; July 10, only the A.M. dose was given; July 11, nothing was given; July 12, only the P.M. dose was given. Thus, between the morning of July 10 and the evening of July 12, Mr. Brewer did not receive four straight doses of insulin. Dr. Shansky mentioned in passing that Mr. Brewer was seen by the medical audit committee many times, but his problems were never adequately addressed. Mr. Brewer first came to the medical service in 1975 and indicated that he had an eight to ten year history of a tremor. He was started on medication and a neurology consultation was ordered in July 1976. This consultation was never carried out. On April 14, 1977, Mr. Brewer complained of substernal chest pain. He was seen by a non-physician. An EKG was ordered but was not noted. He was not seen by a physician until April 20, six days later. On June 3, 1977, a physician saw him and made the diagnosis of familial tremor and requested a trial of high dose Inderal be started. June 14, a PA notes that the Inderal had already been tried in the past. On November 9, 1977, Mr. Brewer was noted again to have chest pain, was seen by a physician assistant and Dr. Saylor and digitalis, a heart medication, was recommended. On June 29, 1978, he was put on digitalis again. In December 1978, he was no longer on digitalis even though on November 14, 1978 he was seen and the diagnosis of early congestive heart failure was made. This

was made by a physician assistant, he was not seen by a physician and he was put on digitalis again. After December 20, 1978 he was no longer on the heart pill. An undated note, between May 24, 1979 and July 16, 1979, indicates Mr. Brewer had sharp substernal chest pain, had a blood pressure of 170/102 which is extremely elevated and a pulse of 110, which is extremely rapid. No EKG was done and no physician saw the patient. On October 28, 1979 he complained of swelling of the legs. On November 16, 1979 he was noted again to have swelling of the legs and was put on two water pills and a blood pressure pill by Dr. Mai. By December 12, 1979 swelling of the legs was noted again. February 5, 1980, his kidney function tests were noted to be normal. On March 24, 1980 he was again noted to have swelling, but no evaluation or diagnosis was done. On February 18, 1980 he was noted to have an elevated calcium on the lab slip. No note of this was made; no followup was done. He was seen by psychiatry on April 12, 1980 by a Dr. Kim, who states the chart was not there and who also noted reevaluation with chart is necessary. This was never done. During the spring and early summer of 1980, Mr. Brewer was seen many times primarily by the physician extenders. Despite the fact that his legs were swelling and despite the fact that he had a clear-cut prior history of congestive heart failure, no weights were recorded, no EKG was done, and a note was written indicating that Mr. Brewer had been seen ten times and didn't take care of himself. Although the diagnosis was clearly made previously of congestive heart failure, because of the poor supervision of the medical services, it wasn't even considered that time. From that period, to give an example, on June 21, 1980, swelling in the lower extremities was noted, blood pressure was 140/90 and the pulse again was rapid. Note indicates unable to reach Dr. Dang. Ms. Case, nurse practitioner, was contacted and she ordered a diuretic and for the patient to elevate his feet. Blood tests were ordered. The patient was then not seen until June 28 when Dr. Mai ordered a water pill and indicates the patient was to be reevaluated on sick call. He was not seen then until five days later.

An indication of the confusion as to the charting of the records, is seen when on May 10, 1980, the A.M. dose was charted, the P.M. dose was charted, but the notes say Mr. Brewer did not receive his A.M. dose. No insulin was charted on May 11, 1980. By May 12, 1980, the note says patient feels weak and shaky, only a late dose given. The blood sugar was 251. Beginning on June 13, 1980, the patient complained of swelling in his legs. Mr. Brewer was clearly at high risk for the cardiovascular complications of diabetes, has had inconsistent and inadequate treatment due primarily to an abysmally poor record system and poor supervision from the physicians of the other staff. The inability of the staff to diagnose Mr. Brewer's problem, even though it had occurred before, led to blame for the problem residing with Mr. Brewer. His inadequate treatment for his heart problem is, in itself, contributing to deterioration of his heart. All of this contributes to increasing his risks ultimately of a heart attack.

*Mr. Earl Watts*: A note on March 5, 1980 indicates patient has not gotten his meds as ordered. Pain persists. On March 3, 1980, Mr. Watts was seen by a physician assistant apparently without a physician and for what apparently was diagnosed as a urinary tract infection was given two separate antibiotics. This is also a very uncommon form of treatment for outpatient-acquired urinary tract infections. Mr. Watts had been originally seen in October 1977. At that time he was noted to have a positive TB test. A chest x-ray lordotic view was ordered. This was never done.

*Mr. Ronald Baurle*: A note from September 6, 1978, intake form: Dilantin 100 q. i. d. four times a day. Phenobarb 1 quarter grain, four times a day. In October 1978 the medication Dilantin which is an anticonvulsant, is listed as 375 milligrams four times a day, ordered continued. Since no Dilantin blood levels were obtained and no recording of the side effects of Dilantin were noted, and, in particular, since this is a

potentially toxic dose with potentially fatal complications, this indicates an extremely serious and hazardous danger to Mr. Baurle.

Dr. Shansky reviewed eight other inmates' medical records, all of which suffered similar criticism. This concluded the testimony of Dr. Shansky.

Mr. Cleon Foust

Mr. Foust is an attorney from Indiana who has had extensive contact with this correctional institution. He has been an attorney in private practice, a professor of Law at Drake University, an assistant Attorney General, and then Attorney General of Indiana. He left that position to teach at the Indiana University Law School at Indianapolis, and ultimately became the Dean of that Law School. Mr. Foust has been active in the Indiana Lawyers Commission for the last eight years.

The Indiana Lawyers Commission was organized statewide by a group of lawyers to study the Indiana Criminal Justice System with the goal of making recommendations to improve the penal system. The group started with the inspection of state correctional institutions. These inspections were conducted with the consent, and later, at the request of the Governor. Mr. Foust has visited the prison ten or twelve times in this period and inspected the medical facilities at least four times. The Indiana Lawyers Commission prepared and adopted a report of its findings at the I.S.P. which was sent to the Governor and the Department of Correction and made a part of this record.

The following are the opinions and observations made by the Indiana Lawyers Commission:

In regard to personnel, substantial additional funds are needed to attract qualified correction officers. At the current pay rates a guard receives less than a deputy sheriff is earning while the danger to the correction officer is greater. This rate of pay is insufficient to attract good correctional officers.

There also exists a need for increased psychiatric care at the I.S.P. To meet emergency psychiatric care the I.S.P. needs a full time psychiatrist on its staff. However, in today's market the personnel board's salary proposal for medical and psychiatric personnel is too low to attract qualified individuals. To secure a psychiatrist would require a salary of $70,000.00 or above.

There should also be a full time specialist in internal medicine on the staff at the I.S.P. The reason being that this person could then be the medical director of the institution and serve as a fulcrum for diagnosis and referral. Also, there should be no restriction with respect to medication which physicians could prescribe for inmates. Custodial or administrative interference with the physician's diagnosis and prescription of medication is unacceptable.

The Lawyers Commission, not having the expertise to pass on the quality of health service delivery at the I.S.P., hired a medical task force to visit the institution. That medical task force is the primary draftsman of these medical recommendations and they approved the final draft of the Lawyers Commission's report. This concluded the testimony of Mr. Foust.

Dr. Frank L. Rundle, M. D.

Dr. Rundle is a board certified psychiatrist, trained at the National Naval Medical Center, Bethesda, Maryland, and the Payne Whitney Clinic of Cornell Medical Center, New York City. He has worked as a psychiatrist in a variety of settings, including private office practice, a state mental hospital, county mental hospitals, a community mental health center, private community hospitals, drug addiction treatment programs, Methadone clinics and drug-free therapeutic communities, court clinics, and prisons. The latter is of special relevance and will be amplified.

December 1970 to May 1971 he was the Chief Psychiatrist at the California Training Facility at Soledad, California, a medium and maximum security prison of then about 2400 inmates. July 1972 to October 1974, he was with the Prison Health Services of the City of New York, for six months as the psychiatrist in charge of mental health programs in six institutions

on Rikers Island, and from January 1973 to October 1974, as Director of Psychiatry. In the latter position he was responsible for the mental health care of 8000 inmates in eleven separate institutions, there being an annual admission rate of about 80,000, with his department consisting of about 300 psychiatrists, nurses, psychologists, social workers, and paraprofessionals.

From 1973 to date, he has been involved as an expert in approximately 35 class action suits, most in Federal District Courts, involving issues of the psychological impact on prisoners of various aspects of prisons, issues of medical care, including psychiatric care in prisons, and issues concerning adequacy of staff and treatment programs in forensic psychiatric units and hospitals. He has been engaged as an expert in those areas by the Civil Rights Division of the United States Department of Justice in several major prison law suits, including *Battle v. Anderson, Newman v. Alabama, Stewart v. Rhodes, Ruiz v. Estelle,* and *U. S. A. v. Illinois.* He was consultant to the Special Legislative Committee on Medical Services in prisons of the State of Oklahoma. July 1976 to April 1978, he served as advisor to Judge Robert Ward of the United States District Court, Southern District of New York, in the implementation of a stipulated order and judgment in *Negron v. Ward.* This case involved the now defunct Mattewean State Hospital for the Criminally Insane and its replacement, the Central New York Psychiatric Center, with the latter being a psychiatric hospital for convicted inmates within the New York State Department of Corrections. He was involved as an expert in evaluating staff and treatment programs at the Forensic Units of the Fulton State Hospital in Missouri, South Florida State Hospital, and New Mexico State Hospital.

As a consequence of the above-described experience, Dr. Rundle is thoroughly familiar with prisons, the psychological impact of imprisonment, mental illness among prisoners, and the provision of mental health services within prisons and special forensic hospitals.

Dr. Rundle's opinion is based upon his review of the complaint herein, his discussion with Warden Duckworth, Dr. Clyde DeBerry, Chief Psychologist, Dr. Freake, Hospital Administrator, and interviews with about eighteen inmates. He also inspected the A and O Unit, I.D.U., N.S.B., and the Hospital unit. The following are his observations and opinions concerning the mental health facilities at the I.S.P.:

On the date of site visit, September 8 and 10, 1980, the total census of the Indiana State Prison was 1766. Of those 911 were Caucasian and 955 were Black. Four hundred seventy-two were "lifers"; that is, under a life sentence. Six persons were on death row under a death sentence. The assignment according to the various housing units was as follows: A & O, 54; B Cell House, 213; C Cell House, 384; D Cell House, 314; K Dormitory, 169; I.D.U. 82; B Seclusion, 18; N.S.B., 29; D Seclusion, 26; and those designated as Straight Idle, 8.

The Warden explained that due to a change in Indiana law, effective October 1, 1977, there was no longer a life sentence but only specific time sentences. It was estimated by Dr. DeBerry that 10 to 12 percent of the population, that is approximately 177 to 211 inmates, are considered to be psychotic and in need of regular psychiatric treatment.

It was explained that what had been the Norman Beatty Hospital under the Mental Hygiene Department had recently been transferred to the Department of Correction and was being developed as a medium security prison which would eventually have a capacity of 1200. It also includes a psychiatric unit with a capacity of 64, the current census believed to be about 50. It was explained that this unit is available to treat the most severely mentally ill; and although the details were not known, it was believed that much of the mental health treatment staff had remained on that unit when the administration was changed from Mental Hygiene to Correction. A transfer to that institution, now known as Westville, is usually initiated by a counselor or medi-

cal personnel who refer the person to Dr. DeBerry or to the consulting psychiatrist. In an emergency, a transfer can be arranged quickly within a matter of about six hours, since there is provision for emergency admission. All transfers to the psychiatric unit at Westville must go through the Director of Classification and Treatment of the Department of Correction.

On January 13, 1981 Dr. Rundle toured and examined the Department of Correction's Psychiatric Unit at Westville. He spoke with Dr. Constan, the sole psychiatrist, Mr. Diamond, the psychologist, Mr. Adkins, the deputy foreman and Mrs. Bohman, the director of nursing.

Westville is inadequate to solve the mental health needs of the inmates at the I.S.P. It solves the problem only for those inmates who are identified as ill and sent there for treatment. It does not solve the problem of inmates within the prison who require on-going evaluation and treatment. The capacity of the Westville unit as described by the staff is 80 inmates. This stretches the physical facilities in my opinion. The estimated number of inmates at the I.S.P. alone with psychotic illnesses is between 177 and 221. The total staff at the Westville Unit is 38 persons. Assuming a patient capacity of 80, that's less than one-half staff person per patient. From experience is similar units a staff to patient ration of about 2.5 to 1 is required to provide adequate treatment. "Staff" here would include psychiatrists, psychologists, and nurses, only medical people and not orderlies or medical technicians. There is currently only one psychiatrist and one psychologist at Westville. For a capacity of 80 patients there should be two full time psychiatrists, and at least two, possibly three, Ph.D. psychologists and four social workers, master's degree level. This is the level of staffing necessary to provide coverage of the unit 24 hours a day, seven days a week. Westville does not address the needs of inmates within the I.S.P. who need care.

While the staff that he talked with seemed devoted to doing a good job, the overall treatment provided at Westville is currently inadequate due to insufficient numbers of staff. For these reasons the Westville Unit is inadequate to serve the mental health needs of the inmates at the I.S.P.

There are inmates at the I.S.P. who are in need of mental health care but who do not require hospitalization at a unit such as Westville. My own experience and that of other psychiatrists who I know who have worked within a correctional setting, is that somewhere between 10 and 25 percent of the population has significant mental disorders that require treatment. I would apply this same estimate to the I.S.P.

One of the inmates interviewed, Donald Kaiser, had just returned from a ten weeks' stay on the Psychiatric Unit at Westville, five days prior to this visit. He explained that that was his eighth time in that treatment unit in 23 years and he described the unit, which is termed 7B. He related that there was a medical doctor and a psychiatrist available, and in addition, a psychologist and two social workers. He stated that the unit was staffed by nurses around the clock, and that at the time he was there, he believed the census was 55.

It was stated that the Indiana Prison Hospital had a small unit that could serve as a holding unit for severely mentally ill for short periods of time until transfer to the Westville institution could be arranged.

Dr. DeBerry, who is designated the Chief Psychologist, is the only full time trained mental health professional on the staff of the prison. In addition, under a contract arrangement, an organization called the Perry Psychiatric Group of Valparaiso provided the services of three psychiatrists on an as-arranged basis. In addition, there was another contract with a local psychiatrist, a Dr. Berkson. Dr. Freake, the hospital administrator, explained that these four psychiatrists had, in the past, been providing a total of 10 to 14 hours of service per week, but that at the present time, this amount of time was diminished, just how much was unclear. There was also a staff of 10 correctional counselors who are not considered part of the Mental Health Serv-

ices staff but rather of the Correctional staff. They are people at the Bachelor's level of training, some in the areas of human behavior, but most not.

Dr. DeBerry explained that for the past three years in the budget requests submitted, he had asked for additional staff. He believed that they needed a full time psychiatrist, which he said, he had tried to "beg, borrow, or steal," unsuccessfully. Apparently, a staff position exists for such a full time psychiatrist. He had also repeatedly requested three additional positions for full time clinical psychologists and three positions for full time social workers. Dr. DeBerry explained that on an average day, he had interviews for varying lengths of time with approximately 20 inmates. He was engaged in doing psychological testing and test reports, evaluations for the Parole Board, visits to the various housing units, providing some group therapy services, for most of one day, he was involved in evaluating new applicants for positions as correctional officers, etc.

It is clear that Dr. DeBerry and the consulting psychiatrists are not able to provide the services required by the more than 1700 men in this institution. The following examples, which came from interviews with inmates, will demonstrate some of the unmet needs:

1. Inmate Donald Kaiser, previously mentioned, was interviewed and explained that he had just returned from his eighth psychiatric hospitalization in what had been the Norman Beatty Hospital and is now the Westville Correctional Institution. He related that during his recent stay, he had been treated there with a tranquilizer Thorazine, and that when he returned to the prison, his medication was stopped, the explanation being that he could not be on medication when he returned to the prison.

Information from other inmates was that Mr. Kaiser, on the occasions when he became psychotic would exhibit such extreme deviant behavior as smearing feces. It is probable that he represents an example of a chronic schizophrenic process, with repeated remissions and exacerbations. Such persons are generally managed by an indefinite maintenance medication schedule with major tranquilizers and with regular visits to a psychiatrist to supervise this medication. These regular visits may be at wide intervals, such as perhaps three or six months, but they should be made regularly. Such regular followup service on a scheduled basis is not being provided and cannot be provided with the staff available at the present time.

2. Inmate Lonnie Deel was interviewed and he explained that he had been sent to the psychiatric unit at Westville about three years ago where he was treated with Thorazine, Stelazine, and group therapy sessions. He believed that he had been helped when he was there. He stated that he was currently receiving Thorazine and Stelazine, but that he was not being seen on a regular basis by a psychiatrist. He believed that he may have been seen about three months ago at which time, his medication dosage was increased because he was experiencing auditory hallucinations. This man also probably represents a chronic schizophrenic process which requires medication for an indefinite period and regular supervision by a psychiatrist. He is receiving the medication but, according to him, he is not being seen regularly for follow-up.

3. Jesse Jones, who was interviewed in his cell in the I.D.U., manifested symptoms of a psychotic illness in the schizophrenic group, namely, an associational thought disorder inappropriate effect, and grandiose delusions. According to him, he had never been to the Psychiatric Unit at Westville, that he had never been seen by Dr. DeBerry or one of the psychiatrists, and that he received no medications.

This man, who has symptoms of a severe mental illness, should be in a psychiatric hospital. It should be noted that in this case, and in others, the medical and psychiatric records were not available for inspection to verify their history.

4. Charles Clark was also seen in his cell in the I.D.U., he being what is termed a "self-lockup." He related that he had been sent to the Psychiatric Unit at Westville

and had returned from there about three months ago. He described experiencing what would be termed a paranoid state in which he believed that he was to be severely injured or killed. His symptoms had cleared rapidly when he was hospitalized and medicated, but since his return to the prison, he had been receiving no medication, and had not been seen by a psychiatrist. It is predictable that in many instances such as this in which there is the development of a paranoid delusional state, that a recurrence will occur. Such persons should be maintained for an extended period of time on tranquilizers and should be seen regularly by a psychiatrist.

5. Inmate James Bell was interviewed in his cell in the I.D.U., he also being currently a "self-lockup". Mr. Bell stated that he had been at the Westville Psychiatric Unit and had returned to the prison perhaps eight or nine months ago. He described developing an illness which included experiencing auditory hallucinations and paranoid delusions. He was treated at Westville with Prolixin injections with which his symptoms cleared. He stated that he had not received medication since he returned to the prison and had not been seen by a psychiatrist. He stated that he was beginning to again experience auditory hallucinations to a mild degree, stating, "I don't pay them much attention." He did not describe currently experiencing paranoid delusions.

This is another example of a man who experienced a severe psychotic illness which cleared with hospital care and medication and who should have been maintained on a major tranquilizer for an extended period of time with regular visits with a psychiatrist for supervision of this medication. He is beginning again to experience auditory hallucinations and it is very likely that he may go on to develop another full-blown psychotic episode. This could likely be prevented were he receiving maintenance medication and supervision.

The above are examples of some of the unmet needs of those with psychiatric disorders at the Indiana State Prison. Again, it is clear that with the present staff, it would be impossible to provide the necessary services even to those who are believed to be psychotic, the estimated number being between 177 and 211 inmates. Beyond that other services for those less severely ill could not be made available with present staff. However, I did not review the medical records of any inmate and relied solely on the representations of that inmate.

The physical characteristics of the cells in all the lockup units are approximately the same, and the conditions of confinement are also quite similar. The cells are small, estimated to be 35 to 40 square feet, with barred fronts which face from the center toward the wall of the units. They are poorly lighted with a single low-watt bulb; there is a sink with only cold water, a toilet without a seat, a steel bunk bed, and a stool, in some cases. In some of the cells there were two shelves across the back for storage of personal items.

The time spent locked in the cells, probably approaches 23 hours per day. The schedule calls for two one hour periods per week of outdoor exercise; however, inmates consistently stated that they usually were outside for one hour every two weeks. In some of the units, there was some time scheduled outside the cell which could be spent on the tier, but this was reportedly not always allowed as scheduled. Meals were served in the cells, a member of the medical staff was said to make rounds one time weekly, and that to be placed on sick call to go to the hospital to see the doctor, apparently was difficult.

It is detrimental to the mental health of any person to be maintained in the conditions which exist in these lockup units. The isolation from other people and the impossibility of engaging in normal human interrelationships and activities, the lack of outdoor exercise, and the oppressive restrictions, in general, may permanently impair one's social functioning. Clearly, anyone who is mentally ill will either be made worse by such conditions or his treatment will be made more difficult. Such isolation only turns one's attention in upon one's self and away from the outside world, and if the

inner world is a psychotic one, the separation from reality can only be aggravated.

It would be difficult to design a setting and a program which would more efficiently produce social cripples. Prisons, in general, impair the ability of those placed there to effectively adjust when returned to the outside world, but such impairment is predictably more severe in units such as these described.

## Recommendations

It should be noted that considering the need for psychiatric services cannot be done for an institution without considering the system of which it is a part. The only way that acceptable health care, including psychiatric care will develop within the prison system is if there is a centrally directed, funded, and planned system of health care for all institutions. Such central direction would require a full time medical director, with a full time psychiatrist on the staff, and various other professionals such as medical records librarian, dietician, nurse, etc. Such a coordinated system of health care does not exist within the Indiana Department of Correction.

Part of such a coordinated system of health care would include a prison hospital for general medical and surgical care and also a psychiatric in-patient unit. A psychiatric in-patient unit does exist, having been developed at the old Norman Beatty Hospital. It is definitely a positive that this in-patient psychiatric unit is being developed to serve the Department of Correction. However, it is clear that it will not be able to maintain in the hospital all those within the system who would need such care. The number of beds which would be required would depend on what mental health services would be available in the various institutions of the system. It has been pointed out that there is a need for systematic follow-up and continued psychiatric supervision for persons with major psychiatric illness. If such follow-up services are made available within the institutions, then the size of the psychiatric hospital required for this system would be smaller.

Specifically, for the Indiana State Prison, it is my opinion that the staff required to provide acceptable psychiatric and psychological services, under the present circumstances, would be the equivalent of two full time psychiatrists, three additional clinical psychologists, and three social workers who should be a Master's degree level of training. The salary range for a psychiatrist would have to be in the range of $70,000.00 a year, for a clinical psychologist, $45,000.00 a year, and for social workers approximately $25,000.00 a year. All of these professionals would have the previously mentioned level of educational training.

With that staff it would be possible to provide the systematic follow-up and supervision of those with major illnesses, estimated to constitute 10 to 12 percent of the population, and in addition, those inmates with less severe disorders who require treatment, this being an additional estimated 10 to 20 percent of the population.

This concluded the testimony of Dr. Rundle.

## Samuel W. Hoover

Mr. Hoover, called as plaintiffs' seventh expert witness, recently retired as the Director, Division of Preventive Health Services for the United States Public Health Service. He attended the University of Kansas where he received his B.A. in 1951 and the University of California at Berkley where he received his M.P.H. in Sanitary Science from the School of Public Health in 1961.

Mr. Hoover has been a sanitarian since 1951 when he was employed in that capacity by the State of Kansas. In 1962 he left Kansas to join the United States Public Health Service and he has served there as a sanitarian until his retirement. Mr. Hoover has received many awards of special recognition for outstanding service in his field throughout his career. He has also served honorably in the Army and the Reserves.

At the time of trial Mr. Hoover has inspected over 30 correctional institutions as a sanitation expert and filed reports regarding their condition. He inspected the I.S.P. during the period August 10–14, 1980. The

basis for his evaluation is *Standards for Health Services in Correctional Institutions*, prepared by the Jails and Prisons Task Force Program Development Board of the American Public Health Association, May 1976, particularly Chapter VI, *Environmental Health Concerns*. During his tour of the I.S.P. Mr. Hoover consulted with the Warden, the Physical Plant Director, the Food Service Supervisor, the Laundry Supervisor, the Sanitation Officer, the Supervisory Correctional Officer, and a number of line correctional officers. The following are his opinions and observations regarding the sanitary conditions at the I.S.P.:

A. GROUND AND STRUCTURES

Construction materials and maintenance were found to be deficient in many instances involving plumbing, electrical wiring, and leaks. In B, C, and D Cell Houses, N.S.B., I.D.U., A & O, the recreation area, and the laundry, there were 42 leaks of sewage, 86 separate water leaks, and 142 instances of exposed wiring. Some of these created a fire potential in the pipe chases or midways where exposed wiring and sewage leaks presented a combination potential for ignition of methane gas from the sewer leaks.

Fire protection is an institutional element of major significance involving detection, fire fighting or control, and evacuation plans and drills. None of the housing units has sprinkler systems nor had any fire drills been conducted for inmates. Ladders were used in D Cell House as a second exit in violation of the 1976 Life Safety Code of the National Fire Protection Association. Stairways should be installed from the upper floors. The distance from the furthest point of habitation to the exit in both B and D Cell Houses exceeds the maximum travel distance of 150 feet to an exit by 100 feet in some instances. All cell doors are key locked after 9:00 o'clock P.M. and the keys are returned to the control room of the guard hall. Thus, in the event of fire in a cell house each cell would have to be unlocked manually to release the inmate.

There are smoke detectors in the heating ducts of the buildings housing inmates. There is also a fire alarm in each cell house of the buzzer type.

B. UTILITIES

The I.S.P. water supply is obtained from Michigan City, Indiana. The prison maintains a 75,000 gallon overhead storage tank which provides about 55 p. s. i. of water pressure throughout the system. One water sample per month is submitted to the Indiana Health Department for bacteriological analysis.

In regard to the plumbing, there are multiple cross-connections in the buildings between the prison's drinking water and sewage systems. This creates a real and imminent threat of contamination of the drinking water. Should usage of potable water create a vacuum there would be a siphonage back from the sewage system. An incomplete survey found between five and six hundred such cross-connections. It appears certain that there are cross-connections between the drinking water and cell stools in all cell houses. The potable water supply should be protected by suitable backflow prevent devices such as vacuum breakers. Approximately another 100 water leaks were noted.

Also, very few of the cells have hot running water. Cold running water is available in the cells but hot water is essential for personal hygiene and sanitation.

In regard to solid wastes all refuse should be stored in clean, durable, leakproof, nonabsorbent containers, kept tightly covered and stored so as to be inaccessible to vermin. The kitchen garbage and trash cans were in an unscreened building without covers. Flies and other vermin were readily apparent. Trash was found in most midways and on the floors of cell houses.

All electrical wiring should conform to the Underwriters Code for materials, installation and workmanship. There were at least 60 additional instances of exposed electrical wiring, six of which were subject to water leaking on or near them.

The air quality, in terms of internal ventilation and design was adequate. No air pollution emissions of a problem nature were apparent or noted.

## C. SHELTER

Ventilation and temperature conditions in the I.S.P. can be an environmental health hazard during hot, humid, climatic conditions. The American Public Health Association recommends an interior building air change of 60 cubic feet per minute per inmate with one-third being outside air when the penal institution is subjected to hot, humid, climatic conditions. No area was found to meet this standard, and six out of ten areas tested had no detectable ventilation. Conversely, it must be assumed that adverse temperature conditions can also be present in the housing areas during cold weather, particularly with the temperature differential between the top and bottom cell ranges.

Lighting in the I.S.P. is very deficient relative to any past or present standard promulgated for adequate vision in the United States. The foot-candle levels of illumination for school classroom tasks, rather than areas, approved by the School Lighting Committee of the Illuminating Engineering Society, and which appeared in the 1959 Edition of the I.E.S. Lighting Handbook, pages 9–82, are as follows:

| Tasks | Foot-Candles on Tasks* |
|---|---|
| Reading Printed Material | 30 |
| Reading Pencil Writing | 70 |
| Drafting, Benchwork | 100** |
| Lip Reading, Chalkboards, Sewing | 150** |

*Minimum on task at any time

**Obtained with a combination of general lighting plus specialized supplementary lighting. These seeing tasks can involve the discrimination of fine detail for long periods of time under poor conditions of contract.

In the cells in B, C, and D Cell Houses, I.D.U., A & O, and Administrative Segregation the range of lighting was from three to fifteen foot-candles.

In regard to the size of cells, adequate space is necessary to reduce stress, carry out certain tasks, and contribute to comfort and mental health. Living space standards recommended for penal institutions and related type housing conditions include:

(a) The American Correctional Associations Manual of Standards for Adult Correctional Institutions (1977), provides for a minimum of 60 square feet per inmate for inmates kept in the cells ten hours or less a day and 80 square feet per inmate for those confined ten hours or more in the cell.

(b) The U. S. Department of Justice, Federal Correctional Task Force Draft Federal Standards for Correction (June 1978) adopts the same standards as the American Correctional Association.

(c) The National Clearinghouse for Criminal Justice Planning and Architecture (and, through it, the Law Enforcement Assistance Administration) requires 70 square feet per inmate.

(d) The National Advisory Commission on Criminal Justice Standards and Goals require 80 square feet per prisoner.

(e) The American Institute of Architects requires 70 square feet per prisoner.

(f) The National Sheriff's Association, Handbook on Jail Architecture, requires 70 square feet per prisoner.

(g) The U. S. Army and British Army Standards in the early 1950's was 60 square feet per soldier, the British Air Force Standard was then 60 square feet to 100 square feet depending on climate, and the German Army Standard in World War II was 64.8 square feet.

It is my opinion that single cells should provide a minimum of 60 square feet, 8 foot ceiling, and 500 cubic foot per person. Additionally, crowding impacts on the plumbing systems and reduces the effectiveness of the ventilation system which affects air movement and temperature regulation.

The following are the findings as to cell size:

| Location | ft²/Inmate | ft³/Inmate |
|---|---|---|
| C-Cell House L-Range Cell 18 | 54 | 387 |
| P-Range West Cell 80 | 54 | 387 |
| D-Cell House D-Seclusion Cell 34 | 56.4 | 390.8 |
| B-Building B-Seclusion Cell 35 | 52.8 | 369 |
| B-Building North H Range Cell 14 | 55 | 385 |
| New Service Building Administrative Segregation Cell 31 | 48.8 | 560.6 |

| Location | ft²/Inmate | ft³/Inmate |
|---|---|---|
| Administrative & Orientation Lower South B Cell 17 | 38.3 | 306 |
| Upper South B Cell 24 | 37.3 | 295.6 |
| Outdoor Recreation Area - A & O 40'8" x 43' less 5' x 30'11" 1594.00 ÷ 53 Inmates = 30.07 ft² | 30 | - |
| D-Cell Block D-Seclusion Cell 1W | 59.3 (2) | 474.4 (2) |
| General Medical Ward - 2 beds 19'6" x 22' | 214.5 | - |
| Psychiatric Strip Cells | 55.7 | 668 |

## D. SERVICES AND FACILITIES

The food service sanitation program was evaluated on the basis of standards in the Food Service Sanitation Manual, 1976 Recommendations of the Food and Drug Administration, United States Public Health Service. This manual is utilized by national, state and local health agencies in their regulatory supervision of food sanitation programs.

In the pot and pan washing area there was no measurement to determine if the sanitizing solution was being used in a quality sufficient to sanitize the utensils. Approximately 20 stainless steel pans were neither clean nor cleanable due to dents and poor repair. There was no fly-tight or effective screens and as a result flies were everywhere. Finally, the toilet serving the inmates in this area was dirty, cross-connected to the potable water, had no soap or towels and multiple water leaks. Also, the dishwashing room was unreasonably hot and in need of ventilation.

The serving line area was illuminated by only 10–15 foot-candles of light. The milk coolers were very dirty and in poor repair. There were also many roaches under the counter near a rat bait.

In the kitchen area food was stored directly on the floor and in non-food grade containers such as Rubbermaid garbage cans. The deep fat fryer hood had missing filters and was dirty. The fluorescent light fixtures had no protectors. There were also mice and rat droppings along the wall and in the storage room.

In the bakery the equipment was dirty but supposedly ready for reuse. Mice droppings were evident in numerous places. In the storage area sacks of rice had rodent gnaw-holes in them and droppings on them.

All of these pests are carriers of communicable diseases. A qualified pest control officer should be available and his records should show evidence of an organized control program. This infestation indicates a lack of proper sanitation and control.

The I.S.P. laundry facilities do not meet institutional laundry standards. The United States Public Health Service has made studies of time, temperatures and cycle requirements for institutional laundry to render it free of pathogenic organisms. This laundry did not meet those recommended temperatures and times. Individual inmates were washing their own laundry throughout the institution for fear of losing their clothing at the prison laundry. Finally, the same carts are used for dirty and clean laundry handling, creating a possibility of cross-over contamination.

In regard to recreational facilities, the cell houses have no indoor recreation area other than the corridors between the cells. The outdoor recreation area is large but equipment is extremely limited. The toilet and shower facilities are inadequate to serve the 400–600 inmates who use it on a daily basis. These shower facilities, five shower heads in all, serve as extended facilities for the cell houses whose shower fixture ratio is beyond any standard or realistic use potential.

In regard to inmate bedding, there was no recognizable methodology or facility for cleaning and sanitizing mattresses and pillows either after extended use, hospital use, or between reissue to other inmates. A random check of the condition of bedding materials found 20 dirty mattresses, many of which were torn, and nine dirty pillows. Sheets, pillowcases, and mattress covers

should be changed and laundered at least weekly and before being reissued. All bedding should be in good repair.

In regard to toilet and bathing facilities, the flush toilet and lavatory ratios for inmates are well within standards insofar as inmate housing areas are concerned. The lack of hot water plumbed into the lavatories must be reiterated. However, the major problem at I.S.P. with respect to toilet and bathing facilities has to do with the inadequacy of shower facilities in the dormitories. Proper sanitation requires shower facilities in the ration of one to fifteen inmates. The showers in the cell houses essentially serve only the cell house workers—about 30 inmates per week day, and 40–50 inmates per day on weekends. All others are expected to shower at their assigned work stations or at the recreation yard field house, which according to the yard's correctional officers, numbers approximately 600 inmates per day on weekdays and 800 inmates per day on weekends. But in cold, inclement weather, these inmates must shower in the cell house. The shower facilities in the field house are obviously overwhelmed at this time, and the cell house facilities such as those in A, C and D, would require 15½ hours of continuous operation throughout a day if only five minutes were allocated to each inmate.

| Location | Showers | Census |
|---|---|---|
| C-Cell House | 2 | 373 |
| D-Cell House | 2 | 321 |
| B-Seclusion | 1 | 19 |
| B-Building | 2 | 219 |
| N.S.B. | 3 | 40 |
| I.D.U. | 3 | 95 |
| A and O | (10) 6 operative | 53 |
| Laundry | 4 | 38 |
| Sanitation Department | 4 | ? |

There is an acute mal-distribution of shower facilities accessible to inmate housing, and it is of such limits as to create a public health problem.

In regard to the barber shop, the main barber shop is excellent from a sanitary standpoint, and would meet free world health standards. There is at least one additional barber shop in the I.S.P. which would not meet these standards, one is lo-

cated in the A and O Building. The barber chair was torn and not cleanable, and the hot water faucet to the lavatory was not operative. No barber tools could be located. According to information obtained from A and O inmates, the inmate barbers are not permitted to bring sanitizing solutions when they operate this barber shop.

This concluded the testimony of Mr. Hoover.

Dr. David Fogel

Dr. Fogel was called as a plaintiffs' expert in rebuttal. With all due respect to his very extensive experience in the field of corrections he simply reiterated what has gone before. That is only to say that his testimony need not be summarized here. On the witness stand he was smug, cocky and arrogant.

This concluded the testimony of Dr. Fogel.

Edward E. Prill

Mr. Prill, called as defendants' first expert witness, is currently the Food Service Director for the Indiana Department of Correction. That portion of Mr. Prill's testimony which was summarized in regard to plaintiff Colvin's claim is incorporated here by reference. The following are his observations and conclusions regarding the food service at the I.S.P.:

Both the proposed menus and the as-served menus are periodically checked for nutritional contents according to the United States Department of Agriculture Handbook No. 8. Those results are then compared to the National Resource Councils recommended dietary allowances based on the age range of 23 to 50 years old. The regular and dietetic meals both provide all of the recommended daily allowances of nutrients.

The milk served at the I.S.P. comes from the Indiana State Farm. It is fortified with vitamin D even though it is not marked on the containers.

This concluded the testimony of Mr. Prill.

Lyman W. Jasper

Mr. Jasper is currently employed as the Food Service Supervisor at the I.S.P. and has been so employed since at least 1978. The following are his observations and conclusions regarding the food service at the I.S.P.:

In the kitchen area there are seven steam kettles, four of which do not have covers. Those kettles are covered by an exhaust fan and hood which prevents foreign objects from falling into the kettles. The baking proof box in the kitchen had not been used for several years and was taken out in December 1980. Recently installed new equipment includes a rotary oven, a diet box, another grill, five food transportation carts which are capable of being plugged in to keep food at the proper temperature, and four steam table carts to keep food hot on the serving line. Steam table insert pans are usually purchased twice a year, 48 in a lot, at which time the dented and unrepairable ones are discarded. These pans receive rough treatment from the inmate staff necessitating their replacement. On the day of Mrs. Groggan's visit the deep fryer was not clean because the floor was under repair and the fryer could not be moved to the location where it was normally cleaned. There are also approximately 50 spices and seasonings available and in use in the kitchen. As a general rule, prisoners wear hair restraints and gloves in the kitchen area.

Food served to inmates in lockup units is transported in the heated food carts. One civilian food service employee goes with the carts to at least one of the lockups each day.

Pests are a problem in the kitchen area. However, electric bug lights have been installed which take care of the flying insects fairly well. There are some mice and roaches. The sanitation officer does spray and put out traps.

Any pork item on the menu has a "P" behind it and an explanation at the bottom of the menu designating that it is a pork item. There is no dietician at the prison. Responsibility for preparing the diet line meals lies with the shift supervisor.

This concluded the testimony of Mr. Jasper.

David H. Findlay

Mr. Findlay, called as defendants' second expert witness, is currently employed as an architect for an engineering and architectural firm in Valparaiso, Indiana. He is the project architect responsible for the design of a new industrial building and a new maintenance building which are currently under construction. The following are his opinions and observations in regard to this new construction:

The two new buildings contain approximately 46,000 square feet. The construction of these buildings is now past the footings stage. These buildings are designed so that inmates may be moved from existing cell houses into these new buildings as temporary dorms while the cell houses are being renovated. The occupancy of these buildings would be approximately 400 beds, dormitory style. The proposed completion date is May 1981. The funds have been appropriated by the state and are available. After the completion of these buildings, inmates are to be moved from C Cell House, which will then undergo renovation. However, our company has no part of the planned rehabilitation of C Cell House.

This concluded the testimony of Mr. Findlay.

Charles F. Lumm

Mr. Lumm, called as defendants' third expert, is currently employed as an engineer. He received his engineering degree from Purdue University in 1939 and has been involved in building construction ever since. He is a member of the American Society of Heating and Air Conditioning Engineers. He has provided design services to the I.S.P. pursuant to a contract to renovate the steam distribution system. The following are his opinions and observations in regard to that new construction and other ongoing projects:

The first project was a rehabilitation of the steam piping throughout the prison complex which was completed in December

1976. A great deal of new equipment was installed.

Design services were also provided for the rehabilitation of the heating and ventilation systems in A, B, C and D Cell Houses. The heating systems were changed and designed to provide air movement of 100 cubic feet of air per minute, thus providing a complete air change in a cell in less than four minutes. The actual rate of air exchange is unknown. Smoke detectors were then installed in these handling units in the duct work. If smoke is detected an alarm goes off at the guard station. These improvements were completed in December 1978.

Finally, in 1980 design services were also provided for the renovation of the plumbing in C Cell House. A survey was made of the plumbing conditions before this design was submitted. That survey concluded that the plumbing systems in the cell houses should be completely demolished and reinstalled. Bidding documents for the complete plumbing renovation of A, B, C, and D Cell Houses have been submitted. The C Cell House plumbing renovation contract is awarded and the money is available. The completion date is based on the availability of the cell house. C Cell House is the largest cell house with approximately 400 cells. The new fixtures in the cells will be a stainless steel combination unit including a water closet, a lavatory, a drinking fountain, and hot and cold water.

This concluded the testimony of Mr. Lumm.

Richard M. Otto

Mr. Otto, called as defendants' fourth expert witness, is currently employed as an engineer. He received his degree in electrical engineering from the University of Missouri in 1949 and has been engaged as an engineer since that time. He is a member of numerous professions organizations. He has provided design services for at least two major projects at the I.S.P. The one of particular interest is a design for rewiring C Cell House. The following are his observations and conclusions on that project:

The project of rewiring C Cell House has commenced but is currently at a standstill. The contractor cannot complete his work while the cells are occupied. There will be new periphery lighting around the exterior of the cells and it will have a dimmer control. Each cell will be completely rewired with new lighting, new power receptacles, and new switches. When the new lighting is installed there will be at least a 40 footcandle reading in every part of the cell which will go as high as 100 footcandles. This work could be completed within 60 to 90 days once the cells are available. The condition of the wiring that exists today is very poor.

This concluded the testimony of Mr. Otto.

John A. Banning

Mr. Banning is currently employed as a plumber and pipe fitter in South Bend, Indiana. He is familiar with the plumbing project that his employer is doing for the I.S.P. The following are his opinions and observations regarding those projects, in particular C Cell House.

O. J. Shoemaker, Inc., is currently involved in a project to install new plumbing in C Cell House. It requires the removal of all cold water waste and vent plumbing and the installation of new cold and hot water waste and vent plumbing. All of the current plumbing will be removed so there will be an all new plumbing system. The 398 fixtures are currently purchased and on the site now.

The new fixtures are one piece stainless steel with hot and cold water, fountain, and water closet. Each fixture includes flushometers and vacuum breakers to prevent siphonage into the potable water.

The estimated time required to complete the project is 150 to 180 calendar days. The contract has been awarded and the funds appropriated. The installation cannot be performed until the building is evacuated.

This concluded the testimony of Mr. Banning.

Fred Selke

Mr. Selke is currently employed at the I.S.P. as the physical plant director. He is

responsible for all structures and utilities of the institution. He has held the position since the Fall of 1972. The following are his observations and conclusions on the maintenance and condition of the I.S.P. physical plant:

There are currently 19 people employed on the maintenance staff, five of which are foremen. Approximately 150 inmates are assigned to work in the maintenance area. Once a maintenance request is received from an inmate, it is generally performed that same day. If the request is urgent due to the nature of the problem then it is repaired on an immediate emergency basis.

Water samples are regularly taken and tested for their sanitation. No report has ever indicated any contamination of potable drinking water. Nor has there ever been any type of an explosion in any midway due to the ignition of sewer gas. There are presently 70 shower areas throughout the institution with a total of 130 shower heads.

After the new heating system was installed in 1978 temperature report logs have been kept. There were problems with keeping the heat up in A, B, C, and D Cell Houses, I Cell House and I.D.U. Due to those problems new unit heaters have been installed. All areas within the institution now have an adequate supply of heat.

In the maintenance area there is a spray paint room. There is an exhaust fan in that area to vent the fumes and vapors. That fan has a three-quarter horse motor, which is of an explosion proof design. Whenever weather permits painting in this area is done outside.

The Indiana Occupational Safety and Health Administration and its federal counterpart have never conducted an inspection of the I.S.P.

All projects that deal with maintenance and renovations of buildings originate in this office. In 1980 the roof on NSB was replaced due to its condition. The roof on the industrial warehouse is being replaced but not yet completed. The new industrial and maintenance buildings should be completed in mid-1981.

Once the new industrial and maintenance buildings are completed they will be set up as a dormitory with cubicles for each individual. There will be partitions approximately five feet high, each equipped with an electrical outlet and an antenna outlet. Each of the buildings will have its own shower and restroom facility.

Construction and repair projects have been submitted to the State Budget Agency for consideration in the 1981–1983 biennial budget. Items which have been approved by that agency include the renovation of B and D Cell Houses in terms of new plumbing and rewiring; and steel stairs for the cell houses, the hospital, the sign shop, and the prisoner's dining room. These stair projects in A, B, and C Cell Houses will replace the current ladder system as a second means of egress from the upper ranges. The proposed design has been approved by the state fire inspector. Handrails will also be installed on the stairways in all major cell houses. New roofs have also been approved for I Cell House, the industrial complex, and the administration building. All of these projects still require approval and funding by the full legislature.

The most common complaint of a plumbing nature is plugged up stools. Most problems of that nature are intentionally caused because of the fact that rolls of toilet paper, clothing, and blankets are found in the pipes. This is more frequent in lockup units than in cell houses.

This concluded the testimony of Mr. Selke.

Robert J. Powitzky, Dr.

Dr. Powitzky, called as the defendants' fifth expert witness, is currently the Administrator of Psychological Services for the United States Bureau of Prisons. He is currently on temporary assignment to the Arkansas Department of Correction as Assistant Director of Health and Correctional Programs. His responsibilities include establishing and developing mental health programs for the State of Arkansas.

Dr. Powitzky received his B.A. in Psychology from Baylor University in 1969 and his Ph.D. in clinical psychology from the University of Texas in 1975. He has worked in a correctional setting since 1973. His position in the Federal Prison System is that of director of psychological services for the entire system, which contains over 100 Ph.D. level psychologists. He has toured approximately 46 jails and prisons, two of which are very similar to the I.S.P. in population and physical structure. Dr. Powitzky's publications in the field of corrections are extensive and he lectures regularly in that area. He toured the I.S.P. in a day and a half on January 6 and 7, 1981. The following are his observations and conclusions regarding the mental health delivery system at the I.S.P.:

The focus of this analysis is not on specific cases but rather on the capability of the system to provide mental health care. System components addressed include staffing, organization, written policies, screening, assessment, specialized treatment, referral procedures, population needs, and preventative treatment.

The Mental Health Services at the I.S.P. incorporates services of four other institutions, the Reception and Diagnostic Center (RDC); Westville Psychiatric Unit; the Indiana State Mental Hospital; and the local Memorial Hospital. The staff at the I.S.P. providing mental health services include a Psychologist, Dr. DeBerry, A Behavior Clinician (newly hired), and ten correctional counselors, each with a caseload of approximately 170 inmates. There are positions for a psychiatrist, a psychologist, and a Behavior Clinician which staff have not been able to fill due to recruitment problems. Part time consultants include a psychologist (16 hours a week) and a psychiatrist (2–4 hours a week).

Screening and assessment is first done at the RDC when inmates are first admitted to the Department of Correction. Psychological evaluations, histories and physical evaluations are performed on each inmate and compiled in a report. The packets randomly inspected had surprisingly thorough psychological or psychiatric reports. Some packets had both. Once an inmate arrives at the I.S.P., the Director of Classification reviews these reports and notifies the psychologist and counselors of past or present mental problems. Dr. DeBerry also receives a copy of the RDC report for his review. Mental health problems that surface during incarceration are observed and reported by all types of staff, other inmates, or the inmate himself. This screening and referral system was quite adequate.

Crisis interventions are crucially important functions for the I.S.P. mental health staff. If the counselor feels unable to handle the crisis, he may consult with Dr. DeBerry. Standard operating procedures for handling suicide attempts and precautions are being finalized into written form. Where possible inmates with more severe long term problems are referred to counseling groups conducted by a few of the counselors. Inmates who have an acute onset of mental illness will be housed in the hospital unit three bed ward or transferred to the maximum security ward at Memorial Hospital. Inmates who need more intensive care are transferred to Westville psychiatric unit. This unit is designed for 60 inmates with a current population of 67. They also treat approximately 20 inmates on an outpatient basis. Post-treatment deterioration is a problem because inmates stop taking their prescribed medications. This is a common problem in correction and community-based mental health systems.

Dr. DeBerry spends 15 hours a week screening staff applicants and certifying staff for handling firearms. Dr. DeBerry should be freed for more direct institutional services. Top priority is being given to filling the vacant mental health staff positions.

Everyone involved would agree more resources would be helpful but the services offered through the I.S.P. are similar to those offered in the community. The severely mentally ill inmate is identified and referred for adequate treatment. Considering the resources the system responds well to inmate needs. None of the inmates were

examined. The level of education of the particular counselors is unknown.

It is clear that mental health must have increased staffing and resources to be optimally effective. Given the current level of resources the priority should be to reorganize the staff to identify a sole mental health authority and organize the mental health services under that person. The current total population of the D.O.C. is approximately 7000 inmates.

This concluded the testimony of Dr. Powitzky.

Evan Constan, M.D.

Dr. Constan, called as defendants' sixth expert witness, is currently employed as the Director of the Westville Psychiatric Unit, staff psychiatrist. He received his medical degree from Salonika Medical School, Salonika, Greece, in 1952 and completed his post-graduate courses at New York University, Valley View Hospital, in 1956. Dr. Constan was the chairman of psychiatric training at the Psychiatric Institute in Cincinnati, Ohio from 1956 through 1968 and is licensed in the states of Indiana, Ohio, Maryland, and Virginia. He is a board eligible psychiatrist. The following are his observations and conclusions regarding the psychiatric care available to inmates:

The current staffing at the Westville Unit is two R.N.'s, 27 attendants, one psychiatrist, one psychologist, two social workers, two chaplains and two secretaries. The social workers are bachelor degree level. The staffing pattern ratio is approximately two patients to one staff person. Current staffing levels are adequate to provide appropriate psychiatric services.

The D.O.C. has established a referral system through which inmates of correctional facilities are seen by a member of the psychological or psychiatric services. An evaluation is done and the results reported to the central office which then places the individual in an institution. The workup includes a physical, social history, psychiatric evaluation, psychological interview, an activities treatment plan, a master treatment plan, and x-ray and lab tests. When the patient is transferred out to a facility a statement of his treatment plan and medication is sent with him.

The Westville Unit will soon be moved to a renovated area which will have the capacity to handle 80 inmates, housed in two dorms of 40 each. The staff will remain constant. Westville is the only psychiatric unit for the entire D.O.C. The current policy is not to return people who have been through the psychiatric unit at Westville to their sending institution. Class A felons are excepted from this policy and must return to their sending institution.

This concluded the testimony of Dr. Constan.

Ronald Freake

Mr. Freake is currently employed at the I.S.P. as the medical services administrator. He has held that position approximately five years. His educational background includes a degree in medical technology received in Australia in 1957, Fellowship of the Australian College of Biomedical Scientists in 1964, and Fellowship of the Australian Institute of Medical Technology in 1965. He has a master's degree level in microbiology with extensive work experience in hospital administration. The following are his observations and conclusions in regard to the medical facilities at the I.S.P.

Bacterial levels are checked in different parts of the institution on a weekly basis. During some plumbing repair there was an increase in bacterial levels but that decreased to normal levels when that work was completed. During the last five years there have been no outbreaks of food poisoning or enteric disorders. The bacterial levels are within normal safe limits.

Every inmate on arrive has a chest x-ray, a biochemical profile, a urinalysis, and a C.B.C. Food process workers have a lesser screen every six months. Civilian workers are screened every 12 months.

There have occurred shortages of medical technicians on the 4:00 P.M. to 12:00 P.M. shift. Since that occurred a contract has been negotiated with Memorial Hospital to

provide a medical technician on shifts when prison employees are not available. There is also an arrangement with Memorial Hospital to supply medical supplies on an interim basis when the prison runs out of an item. Those supplies are available within 30 minutes to an hour. There is no current records clerk as such in the infirmary. Negotiations are ongoing with Memorial Hospital to provide a consultant on medical records and a records clerk possibly five days a week. Currently a medical technician keeps the records.

There are two old EKG machines in the infirmary which do not work, and as of today, a brand new one. The new EKG machine was ordered approximately three months ago. There is an electric cauterizer in the infirmary but it is incomplete. Purchase bids are out now for a new electrosurgical unit. There is an operating room where minor surgery is performed. Any extensive surgery is sent to Memorial Hospital or Wishard Memorial Hospital in Indianapolis. The surgery conducted at the I.S.P. is done by a part-time consulting surgeon. Memorial Hospital has agreed to provide up to 16 beds in a maximum security ward as needed. The institution has its own ambulance that is always available.

There have been extensive capital expenditures made during the last two years. The new equipment includes an operating table, an emergency room trolley, a trauma kit, a fracture kit, an x-ray plant, and optometry equipment. The x-ray equipment is operated by personnel from Memorial Hospital five days a week. The optometry equipment is the same type of unit one would find in an optometrist's office outside of prison.

There are arrangements made with 16 different medical consultants to provide services. Two dentists provide full time coverage and two others work part time. Routine dental work is done inside the prison. There is currently a search on to hire a dental hygienist. The pharmacist is here two days a week and the pharmacist from Westville comes on those days which the regular pharmacist is not here. An inmate waiting for a partial set of dentures must wait approximately six months. A full set of dentures would get priority over a partial set. If an inmate requires physical therapy the doctor must arrange it at Memorial Hospital. There is not a physiotherapist available at the I.S.P. The present waiting time for x-ray tests at Memorial Hospital is approximately a week.

This concluded the testimony of Mr. Freake.

Clyde DeBerry

Dr. DeBerry, called as defendants' seventh expert witness, is currently employed at the I.S.P. as the chief psychologist. He received his B.S. degree in 1957 from North Carolina State College, his master's in psychology from Northern Arizona State University in 1963 and his Ph.D. from Oregon University in 1967. He is a licensed psychologist in the State of Indiana.

Dr. DeBerry has been on the staff at the I.S.P. since 1976 and his administrative, teaching, and research histories are all extensive. The following are his opinions and observations regarding the mental health needs and services provided at the I.S.P.

Based on prison records approximately one to two percent of the individuals at the I.S.P. have been diagnosed as psychotic and admitted to Westville. Contrary to what Dr. Rundle understood, 10 to 12 percent of this population have mental health problems, they are not all psychotic. There are group therapy sessions for sex offenders and inmates who have adjustment problems in the institution. I personally see approximately 150 inmates a month. Approximately 80 percent of my time is spent in counseling. Individual inmates who have been counseled include Donald Kiser, Lonnie Deel, Jesse Jones, Charles Clark, and James Bell.

Currently there is a grant from the Cummins Foundation to provide therapeutic and educational placement services for men on self-lockups. Full staffing would provide two behavior clinicians and one psychologist, each for 18 hours a week. There is also a stress and relaxation therapy group

run by an outside consultant two days a week. Finally there are psychotherapy groups run by a consulting psychiatrist.

The staff psychologist is also involved in interviewing and testing applicants for the correctional staff one day a week. Firearms certification for correction officers is also conducted by the staff psychologist. The staff psychologist also sits on the Medical Services Audit Committee when a psychological problem is involved. The Parole Board and Clemency Board also require psychological evaluations of inmate candidates.

Currently, it is up to the corrections officer dispensing the medication in the cellhouse to monitor the taking of medication. Often an inmate will tell the staff he no longer wants to take his medication. At that time the inmate is seen by someone to discuss the problem. This is the current monitoring policy for inmates receiving mental health care.

Desirable staffing levels would be at least one staff psychiatrist, two more psychologists, at least one social worker, and at least two behavioral clinicians. This level of staffing would be desirable but not essential to providing mental health care. The current level of staffing provides adequate mental health care.

This concluded the testimony of Dr. DeBerry.

Cloid L. Shuler

Mr. Shuler, called as defendants' eight expert witness, is currently employed as the Executive Director of the Adult Authority of the D.O.C. He is responsible for the management of six institutions within the D.O.C. He received his B.S. degree in education from Ball State in 1965 and a Master's degree in psychology with a concentration in criminal justice from Ball State in 1970.

Mr. Shuler's work within the D.O.C. started with a teaching position at the reformatory in 1965. From there he was promoted to Director of Training for the D.O.C. Then in 1969 he became regional director of the Criminal Justice Planning

Agency and he remained with the agency until returning to the D.O.C. in 1975 to assume his current position. He also currently teaches a class at Purdue University at Indianapolis in criminal justice management. The following are his observations and conclusions regarding the policies and procedures of the Indiana D.O.C., particularly in regard to the I.S.P. Any earlier partial summary of Mr. Shuler's remarks is now incorporated here by reference.

When a C.A.B. charge against an inmate is dismissed or a not guilty verdict entered, or reversed on appeal, the report should be expunged from the inmate's file. That is done according to written policy. This procedure was definitely in the 1980 disciplinary policy and may have been in the 1976 policy. If this procedure of expungement is not followed, the inmate may file a grievance through the grievance procedures. That would then bring it to the attention of the Warden. Each inmate receives a copy of the disciplinary handbook which contains the expungement policy. The handbook also states that an inmate may inspect his institutional packet.

Current policy allows for long disciplinary sentences of inmates for very serious offenses, such as homicide, escape or sexual assault. Such a sentence would be two years, plus or minus one year based on the particular charge and past behavior of the inmate. The person also receives a day off the sentence for each day he behaves himself while on lockup. These sentences are necessary for institutional security.

In October 1980, the Indiana Correction Code was implemented. It requires an inmate receive one-half hour per day out of his cell as a minimum. The D.O.C. is in compliance with that statute. This statute does not prohibit more than one-half hour per day out of cell. Time out of cell for a shower is counted as part of this one-half hour but telephone calls and visits are time in addition to this one-half hour. Potential security problems arise when too many inmates are out of their cells at one time. For example in April 1979, one of the cell blocks was taken over by a group of in-

mates who were out of their cells. Time out of cell has fluctuated up and down over periods of times.

The top staff of the D.O.C. has been involved with the Indiana General Assembly in preparation of the budget for the D.O.C. The Budget Committee's recommendations include 37 new staff positions including one psychologist, one behavioral clinician, four counselors, ten correctional officers, eight sergeants, and a dental hygienist. Recommendations for capital improvements include the complete renovation of the plumbing and electrical systems in B and D Cell Houses. This all must still be approved by the entire legislature. These recommendations are for the biennial budget of 1981–1983.

The capacity of the I.S.P. with one inmate per cell with the exception of I Cell House which has two inmates in a cell is approximately 1750 inmates. The I.S.P. is over its rated capacity as to number of inmates. A significant increase in the population of the D.O.C. is projected. It is possible that the new industrial and maintenance buildings currently under construction will become permanent dorms and thus not available for emptying the cell houses for renovation. However, the current plan is to use these buildings as temporary housing until all cell blocks are renovated.

This concluded the testimony of Mr. Shuler.

Glen Hastings, M.D.

Dr. Hastings, called as the defendants' ninth expert witness, is currently president of a consulting firm which designs and evaluates health care programs in jails and prisons.

Dr. Hastings received his Bachelor's degree from Kansas State University in 1958 and his M.D. from the University of Kansas in 1962. He then had an internship in internal medicine in 1963 and stayed on as a resident in internal medicine from 1963 to 1966, both at the University of Kansas Medical Center. From 1965 to 1969 he was an associate professor of preventative medicine at the University of Kansas. He next went to teach at the State University of New York. Then from 1973 to 1980 he was associate professor of medicine at the University of Miami and the director of ambulatory care at Jackson Memorial Hospital in Miami, Florida.

His experience in corrections began when he became the director of Dade County Prison Medical Services from July 1973 to July 1980. Since 1976 he has been a consultant on health care programs, primarily in jails and prisons. In this context he has been employed as a consultant to the Florida Department of Correction on three occasions in conjunction with federal court cases. He has also evaluated the health care programs for the Tennessee Department of Correction, a County Jail in Pender, Nebraska, Washington State Prison, and the health programs on the Commonwealth of Puerto Rico.

Dr. Hastings' list of publications are extensive. A number of his publications deal with the evaluation of health care programs both in and out of correctional settings.

Dr. Hastings visited and toured the I.S.P. on December 29th and 30th, 1980. He also toured the Westville Correctional Institution's Special Care Unit and Psychiatric unit on December 30th as well as the forensic ward at Memorial Hospital in Michigan City, Indiana on the same day. He read and incorporated information obtained from a large number of documents provided by the legal staff, various correctional staff members and health workers at the time of his visit.

Dr. Hastings reviewed approximately 30 medical records, ten of which were selected from the 15 interviews he conducted with inmates during his tour of the residential areas, confinement areas, dining and waste storage areas of the penitentiary.

In addition, he conducted interviews with the wardens of both the State Penitentiary and Westville Correctional Institution, the Assistant Warden for Programs at the State Penitentiary, and the Administrator of Health Services at the State Penitentiary. At the State Penitentiary, he interviewed the senior physician and the most

recently employed physician, a licensed practical nurse and one of the medical technicians, the food services supervisor, the officers in charge of each of the residential units in the facility, the inmate cook in charge of special diets, the correctional officer in charge of the garbage disposal area, both dentists and the staff psychologist and the correctional officer in charge of dental records. At Memorial Hospital, he interviewed the charge nurse in the locked forensic unit and one of the correctional officers on duty in the unit. At Westville Correctional Institution, in addition to the warden, he interviewed the Assistant Warden for Programs, the charge nurses and an LPN in each of the Psychiatric and Special Care units, the chief psychologist at the Psychiatric unit.

The following are his observations and conclusions regarding the delivery of medical services at the I.S.P.:

The correctional officers with whom we spoke seemed for the most part alert, interested in their jobs, and generally well informed about correctional procedures. They were less consistently informed about some of the health related matters relevant to institutionalized populations.

Although some of the younger officers had received introductory training in cardiopulmonary resuscitation (CPR) none with whom we spoke were currently certified in CPR. There is no plan for CPR training or recertification in the inservice training program for correctional officers.

Each of these matters should be included in some type of ongoing continuing education program for correctional staff members. All of the correctional officers who pass medication in the confinement areas have received 16 hours of formal inservice training in how to distribute medication dispensed by unit dose, and how to detect and refer inmates, in the event of adverse reactions to medications. This is one of the few correctional institutions visited in which correctional officers have received such training, despite the fact that some degree of medication distribution by correctional officers is ubiquitous in every correctional institution system I have visited.

In addition, however, the continuing education program for correctional officers should also include training and practice in the following areas:

Cardiopulmonary resuscitation,

Suicide prevention, and

Medical and psychiatric crisis.

The correctional administrators at Indiana State Prison were well informed about health matters. They had identified most of the major problems within the system and had for some time made vigorous efforts to correct most of them. The need for an onsite prison psychiatrist was well understood, and for the past two years vigorous recruiting efforts had been underway. They had been unsuccessful owing to an insufficient salary structure, the shortage of psychiatrists in the general area of Michigan City, and the ever present problems with recruitment of psychiatric personnel who are willing to work in a maximum security setting.

*Health Program: General Features*

Health services in Indiana's correctional institutions are the responsibility of each of the wardens of each of the institutions. Although attempts have been made in recent years to standardize the medical records format, and to systematize psychiatric referrals through the Department's central office, in Indianapolis, there is no statewide medical director and few centrally promulgated health program policies or standards. There is a coordinator of health services at the Department's central office in Indianapolis who is a trained health administrator. His principle responsibilities, as I understand them, are to advise the correctional administrators about health matters, to staff various committees such as the medical records committee which has been in the process of revising and standardizing the Department's medical records format for several years, and coordinating the referral of psychiatric patients among the various institutions.

While my general feeling is that there should be a health office with a medical

director at the Departmental level, in most state correctional programs, the absence of central medical leadership does not seem to have interfered with the quality of organization of the health services program at Indiana State Prison. This seems in large measure due to the sensitivity of the correctional administration about the medical services program and to the prison's health services administrator, whose doctoral training was in laboratory medicine. There is currently no medical director at Indiana State Penitentiary although the senior physician is performing most of the functioning of the medical director in an entirely satisfactory manner.

All three physician positions were filled at the time of my visit. One physician had been at work only one week. The position for the prison psychiatrist was vacant and had been vacant for the past two years. All of the nursing and physician's assistant positions were filled, and only five of the nine available medical technician positions were filled. The technical skills of the professional personnel interviewed were quite good, but there are problems (voiced by inmates) in communicating with the Vietnamese born physician staff.

The program's most serious and intractable problem is the recruitment and retention of qualified health providers within the salary limitations of the Indiana civil service system. It is recommended that there be an immediate review of the health personnel salary structures at Indiana State Prison, and that the salary ranges for physicians, physician's assistants, nurse practitioners, medical technicians, and other health providers, be increased to a level which is competitive with those in the community at large.

It was obvious that substantial improvements had been made in the organization and delivery of health services over the previous two years. Most of the components of the health services systems had been well thought out and implemented, while others were still in the developmental stage at the time of my visit. While the physical plant is somewhat awkward in its design, it is adequate in size and in reasonably good repair. The medical equipment, the equipment upkeep and the medical supplies are excellent.

The strengths of the program lie in the systematic organization of the health services component, the intelligent use of "midlevel" health care provides (e. g. physician's assistants and nurse practitioners) appropriate limitations of the role of medical technicians, the presence of an organized system of quality control and the excellence of the available supplies and equipment. The major outstanding problems are the absence of onsite psychiatric services, personnel recruitment and retention problems (owing in part to a grossly inadequate salary structure), and insufficiently well developed emergency procedures at the cell block level.

*Emergency Services*

All of the medical personnel except for the physician who had just been employed, all of the nursing personnel, and the medical technicians (MTA's) are currently certified for cardiopulmonary resuscitation. At night, one of the physicians is on call on the grounds of the prison compound.

The clinic is equipped with a Lifepact 5 defibrillator and cardiac monitor, mechanical ventilation equipment, suction apparatus, oxygen, cutdown trays and assorted intravenous fluids and emergency drugs in an organized emergency tray. None of the medications and equipment were beyond expiration dates. There is a currently dated and approved paramedic emergency kit in the control rooms of each of the residential areas. There is a new, well-equipped "pop top" ambulance at the center for evacuation purposes. I watched the evacuation of a 55 year old inmate with a myocardial infarction. He was evacuated with a cardiac monitor, IV fluids, and oxygen in place, with skill comparable to rescue units in the free world.

The only serious deficiencies in emergency are I found at the penitentiary were at the cell block level. There was no systematic plan for training and recertifying the correctional staff in CPR. The more

recently employed correctional officers had received introductory CPR training as a part of their preservice training program, but none had been made available to the older officers and there was no inservice training for CPR and no plan for periodic recertification of those already trained. CPR training for correctional officers is most important because in the event of life threatening emergency such as cardiac or respiratory arrest, ventricular fibrillation, or death by hanging, there is literally insufficient time to summon someone from the clinic in time to prevent death.

The Heart Association in most states will organize CPR training classes for institutional groups, such as correctional officers free of charge.

It is recommended that the Heart Association be contacted and that the entire correctional staff be trained in CPR. In addition five or six volunteer correctional officers should receive CPR instructor training at the Corrections Department's expense and these men should be responsible for recertifying the other officers each year.

Secondly, there has been no training and there is no plan for the prevention or management of suicide by hanging—the most common cause of death among younger inmates in most correctional systems. The booklet enclosed as Appendix A was for a time used at the Rikers Island facility in New York City to train correctional officers. It embodies the elements of suicide prevention. A systematic program for potential suicide detection and referral, and for suicide prevention, similar to that described should be developed at Indiana State Penitentiary and promulgated as part of the inservice training program for correctional officers. It is important that the correctional staff be trained in these matters for it is they who are in close 24 hour contact with the inmates and thereby it is they who have the potential to prevent suicide deaths.

Finally, there is a fire and smoke evacuation plan in each of the residential units, and the officers in charge of each of the units knew the procedures to be followed in the event of fire or smoke hazard. None of them could say, however, who would perform each of the tasks to be done in the event of an actual emergency. This, too, could easily be corrected by more detailed planning and inservice training in each of the residential units and it is my recommendation that this be done as part of the inservice training program for correctional officers.

*Sick Call and Access to Routine Care*

A sick call request slip is completed by each inmate wishing to attend sick call. All slips are collected between 8:00 and 8:30 o'clock A.M. and sent to the medical clinic. A physician's assistant orders the requests according to urgency, based upon the statement of the complaint. Requests for footpowder and other comfort items as well as medication refills are handled by delivering the requested material to the cell and those inmates requesting them are not reexamined unless they specifically ask to be seen. Inmates with new complaints which appear urgent or unusual are generally seen the same day while others are scheduled to be seen within the next three to four day period. A hospital pass is issued by the clinic staff for each inmate scheduled to be seen on each particular day.

Several inmates complained of having to send in several sick call requests before being sent for care. In part their complaint is due to the practice of scheduling non-urgent requests several days after they are received. In the past, however, there have been three other factors which have acted as barriers to sick call access.

For a time the practice of deleting "frivolous" or "trivial" complaints from the sick call list after they had reached the medical clinic had evolved. This practice has been stopped. It is my recommendation that the medical service administrator monitor the screening function each day and insure that it does not recur. Occasionally, owing to shortages of correctional officers, inmates with routine problems have not been taken to the clinic on the day scheduled. This serves as a barrier to care because there is currently no mechanism for rescheduling

patients who are called but do not arrive at the clinic on the appointed day. It is recommended that "no shows" be routinely rescheduled for sick call on the next following sick call day.

Finally, it is the practice to not schedule all sick call requests which do not list a reason for wanting to attend sick call. While the written reason is obviously valuable for prioritizing sick call requests, no request should be ignored, since there obviously are reasons for wanting to attend sick call which are of a sensitive or personal nature, and many inmates are not sufficiently literate to be able to phrase such requests euphemistically. It is therefore my recommendation that all requests to attend sick call be honored, no matter whether or not they are accompanied by a "reason." I suspect that those requests lacking a statement could be clarified as to the urgency of need by a quick telephone call to the control room officer.

The physical facilities in which sick call visits are conducted are attractive and the examination equipment is up to date and in good repair.

I observed sick call for approximately 45 minutes during one of the afternoons of my visit. Each patient was seen and examined for over a period of time of ten to 15 minutes. Relevant portions of the physical examinations were performed by the sick call physicians. When an examining table was needed, it was available, and there were partitions which could be drawn to insure privacy.

There did seem to be some degree of language barrier between some of the less articulate inmates and the Vietnamese physicians. It is my recommendation that some kind of formal classes in remedial conversational English be developed through one of the nearby educational institutions for the Vietnamese physicians staff.

*Hospital and Rehabilitative Domiciliary and Medical Specialty Services*

A full complement of medical specialists visit the facility on site at various times during each month. The varieties and frequency of such visits are adequate.

There is a large multibed infirmary on the second floor of the medical clinic. The facility is lightly staffed and is used for patients whose conditions are stable and do not require skilled nursing care. There were five patients housed in the infirmary on the day of my visit. Their conditions were similar to those which would have been managed in an outpatient setting in the free world.

Patients who require hospital or skilled nursing care are transferred to an 18 bed locked security ward at nearby Memorial Hospital, where they are admitted to the care of one of the community's private practicing physicians. The locked hospital ward is shared with the county jail and nearby Westville Correctional Institution. It is staffed round the clock with registered and licensed practical nurses, and is fully accredited by the Joint Commission on Hospital Accreditation, as part of the general hospital complex. Inmates who require intensive care, coronary care, or post-operative care are managed in the appropriate unit of the hospital and transferred to the prison ward when the condition permits.

I reviewed the hospital charts of all four patients housed in the locked ward on the day of my visit. There were brief admission notes on each of them. Complete histories and physical examinations had been dictated but not yet returned to the charts of the three most recent arrivals, all of whom had been admitted within the previous 48 hours. There are two multiple bedrooms in the locked ward with self-contained toilet and bath facilities and isolated ventilation, either of which are used when isolation is required.

I visited a "Special Care Unit" at nearby Westville Correctional Institution that is used to house inmates with disabling problems such as paraplegics, hemiplegics and blindness which require special rehabilitative services. The unit is staffed around the clock by registered nurses, all of whom have been both medical and psychiatric nursing experience, a part-time physician and a part-time physical therapist. The

unit is newly organized and as yet there is no specific rehabilitative program for the blind. Arrangements are being made to develop such a program in collaboration with the Indiana State Division for Blind Services.

The Special Care Unit is designed to accept inmates who need rehabilitative services throughout the Indiana correctional system. At present time there is no special rehabilitation equipment in the Special Care Unit. There is an abundance of rehabilitation equipment stored in a locked rehabilitation room at the State Penitentiary, where there is no physiotherapy staff. If budgetary considerations will not permit the purchase of necessary equipment within the next few months, it is recommended that the equipment now in place at the State Penitentiary be relocated in the Westville Correctional Institution Special Care Unit where it can be used.

In summary, inpatient services at the State Prison are provided according to the level of care needed by each inmate. Domiciliary and observational care similar to that provided in nursing homes in the free world is provided in the on-site infirmary. Acute hospital care is provided in the locked ward of a fully accredited community hospital under the direction of a free world physician. Rehabilitative services are provided in a unit specially designed for that purpose at Westville Correctional Institution. The "levels of care" principle is a concept used in the better free world hospitals both to promote efficiency and the quality of inpatient care. I believe it is a good system and I have no recommendation for change except for the procurement or transfer of rehabilitation equipment for use in the Westville Special Care Unit.

### Intake Screening

All of the 20 inmate records I reviewed contained suitable medical histories and physical examinations. Many often, however, were four to five years old. Nowhere in the record could I find a more recent complete examination. As well as one can determine for the written record of case, the admission workups which are performed

elsewhere at the Department's Reception Center seemed to be complete and thorough. A new history and physical examination format—recently introduced throughout the Department of Correction is quite comprehensive. Those we reviewed were completed in their entirety.

Upon arrival at the State Penitentiary, the records of all of the new admissions are reviewed by the senior physician and those containing abnormal findings or medications are reexamined. A locally generated health questionnaire is administered to every new State Penitentiary inmate and a laboratory workup consisting of a SMA–12, urine analysis, CBC, sickle cell screen and chest x-ray are obtained. Tuberculin skin test testing and VDRL are performed at the reception medical center before transfer to the Penitentiary.

The administrator of medical services told me that annual reexaminations are to be instituted this year and that they had not been conducted in the past because of shortages and rapid turnover of physician staff. I recommend that complete medical histories and physical examinations complete with tuberculin skin testing and any indicated lab work be performed at least biannually and that, if necessary, another physician's assistant or nurse practitioner's position be created if necessary, in order to make continuous periodic examinations possible.

### Psychiatric and Psychological Care

The most obvious serious deficiency in health care at Indiana State Prison is the absence of on-site psychiatric care. There has been an unsuccessful nationwide search for a psychiatrist willing to work at the prison for the past two years. It has been unsuccessful in my view because of the hopelessly low salary structure.

I recommend that the salary level for all health personnel be increased to a level which is competitive with those of the free world. This is of particular urgency in the case of the psychiatrist, for without an on-site psychiatrist there is no one qualified to evaluate and treat psychiatric emergencies

such as suicide and homicide candidates, or to follow patients who need to be maintained on long term psychotropic medications.

There is only one Ph.D. psychologist and two part-time behavioral clinicians at the prison. They are responsible not only for screening inmates thought to be disturbed, but also for performing forensic interviews and evaluations needed for classifications purposes, and for conducting individual and group therapy sessions. Obviously, the workload in a 1700 man maximum security facility is too great for one man, no matter how skilled. I recommend the addition of at least one additional psychologist to assist with the workload.

There is a cadre of ten correctional counselors whose duties as I understand them are essentially limited to social casework. They do not report to the psychologist or to the psychiatrist (when a psychiatrist was available), but report directly to the Director of Classification, and have little direct contact with the psychiatric or psychological personnel. The reason for this was not clear to me, but it would seem that the correctional counselors might be used for multiple purposes—among which could be screening for psychiatrically and psychologically disturbed inmates and assisting in the identification and referral of inmates with serious or emergent psychiatric problems, if they were made a part of the psychiatric/psychological team, and given appropriate preservice and inservice training.

I, therefore, recommend that serious consideration be given to reorganizing the psychiatric/psychological component of the health care program so as to incorporate all or part of the correctional counseling staff with a single trained health professional. If this is not possible, I recommend the creation of at least three new counselors positions within the psychiatric/psychological component.

Despite the shortage of psychiatric and psychological personnel, I did not find grossly disturbed inmates being housed in the confinement areas as I have found in many other maximum security facilities elsewhere in the country. I inferred from this that those inmates who are sufficiently disturbed to engender security problems must be rather consistently transferred to the psychological unit at nearby Westville Correctional Institution. As mentioned in an earlier section, one of the principle responsibilities of the Statewide Administrator of Health Service is to effect such transfers.

There is no alcohol or substance abuse programs at the prison. Such programs can generally be organized in cooperation with a local Alcoholics Anonymous Chapter, at little or no cost to the institution and it is my recommendation that this avenue be explored.

Grossly disturbed inmates are managed by transferring them to the 62 bed psychiatric unit at nearby Westville Correctional Institution, a 950 inmate medium security facility which houses both men and women. Westville Correctional Institution was until 18 months ago operated as a psychiatric hospital under the Indiana Department of Mental Health. Hence, it was designed as a psychiatric facility and is adequate for that purpose. There were 65 inmates in the psychiatric unit on the day of my visit. Another 18 were housed in the general population and were being followed as outpatients pending transfer back to their original institutions.

The staff consists of one full time psychiatrist, a full time psychologist, two psychiatric social workers, two full time recreational therapists, two behavioral clinicians, an around-the-clock staff of psychiatric nurses. Approximately 60 psychiatric aides are shared between the psychiatric unit and other medical units in the facility. The staffing component is identical to that which was in place when the facility was operated by the Department of Mental Health. The average length of patient stay was said to be around 30 to 45 days yet there were 72 admissions on the month prior to my visit.

The treatment program consists of psychotropic drug therapy, group and individual therapy, milieu therapy and recreational

therapy. Staff morale was high and it was the opinion of the professional staff members with whom I spoke that the quality and efficiency of care at the present time was somewhat better than when the facility was operated by the Department of Mental Health.

There is a clear need at the center for the development of a "chronic case unit" which might be organized as an outpatient service and would be used to manage long-term patients who are stable but who cannot be managed in a general prison population. There is no such unit at the present time. It is recommended that a chronic care program be organized at Westville to manage such patients and that it be additionally staffed with at least one full time psychiatrist, one Ph.D. psychologist, and several behavioral clinicians.

*Medical Records*

The medical records system at Indiana State Penitentiary has been in place essentially unchanged for many years and will require revision. The medical programs administrator discussed this problem with me and stated that modernization of the records systems was one of the next items on his agenda.

The recording of intake screening examinations is adequate. The recording of progress notes about patient visits is incomplete. All of the physician's notes made within the past year were intelligible. For the most part they were problem oriented. All contained sufficient information to permit the reviewer to follow the thinking of the physician about the treatment given. Notes made by several of the physician's assistants were also adequate, but those made by other mid-level providers and by the medical technicians were not.

Secondly, one of the major problems with followup cases at the penitentiary is that there is no mechanism at present for recalling patients for followup visits. When followup visits are required, it is left to the inmate to obtain followup by submitting a sick call request at the proper time. Obviously, some medically necessary visits do not seem sufficiently urgent to the inmate or they are forgotten and do not occur. I therefore recommend the creation of a suspense file as a part of the medical records system which would be used to automatically recall inmates to the clinic for important followup visits.

The record format is in the process of being changed and made uniform throughout the correctional system, so substantial change in the record format will have to await the recommendations of a special committee on medical records established at the Departmental level. There was essentially no organization found in some of the older records. Progress note, lab slips, consultation reports and hospital summaries were simply filed in chronological sequence as they occurred. Consultation hospital summaries and laboratory reports are for the most part separately filed in the most recent charts but this, too, is not always the case.

Finally, there is no checkout system for medical records. Although I was able to locate all of the ten inmate records I asked to see, several of them required searching in several different places. Good medical record keeping practices requires some type of checkout system for medical records and the use of a checkout card to be placed in the space occupied by the record before it is checked out. Neither of these are in place.

One of the major reasons why the records system is so underdeveloped is that there has been no one specifically responsible for organizing it and keeping it operational and up-to-date. There was one officer in charge of the records system on the date of my visit. She had been assigned to the task only two days earlier. There had been three different officers assigned to the area in the previous two months. None had had any type of preservice or inservice training in medical records keeping.

It is therefore my recommendation that a new job position be created for a medical records clerk and that the person filling that position be trained for the job by an experienced medical records administrator or technologist. It is my further recom-

mendation that consultation be obtained from an experienced medical records administrator or technologist in revising and modernizing the records system.

## Pharmacy

The system for dispensing and administering pharmaceutical drugs is in a state of transition at the present time. The prescriptions are delivered to the pharmacy and dispensed by unit dose by a pharmacy aide who works under the supervision of a registered pharmacist. Prescription drugs are delivered by unit dose each day to the confinement areas where they are administered by correctional officers. All of the correctional officers who administer medication have received a 16 hour course of instruction in the medication administration and the detection and referral of adverse drug reactions.

Medications which are not administered are returned to the pharmacy where the records of drug administration are kept. Returned medications are marked "R" on the date of return. This practice does not permit one to distinguish between medications which were refused by the inmate from those which were not administered for some other reason. This has given rise to considerable disagreement between the staff and some of the inmates who allege that prescribed medications are not delivered to them when ordered.

Under a new plan all prescriptions for both institutions will be filled by unit doses at the central pharmacy in Westville. Prescriptions will be filled by pharmacy aides working under continuous direct supervision of a registered pharmacist. Drug profiles and other pharmacy records will be maintained by the registered pharmacist and the profiles will be monitored by the pharmacist for potential drug reactions. The unit dosed drugs will be placed in cassettes and delivered in cassette trays directly to the appropriate site where they will be dispensed by trained medical technicians. The medical technicians will be responsible for keeping the record of administration which will be housed in the pharmacy. The new system will eliminate the administration of medications by correctional officers. Since all medications will be dispensed and administered in unit dosage, there should be fewer errors.

The present system is in accordance with the provisions of the laws relating to pharmacy practice in most states as will be the new system. The new system sounds as if it may be somewhat more efficient than the old one. The only recommendation I can make is that some type of coding system be implemented for recording drug administration whereby each dose is recorded as having been administered (perhaps by record "A" in the approximate space on the medication card), and the reason for failure to administer each dose is also recorded (for example, refusal to accept dose might be recorded as "R", no show might be recorded "N". Suspected adverse reaction might be recorded "A"). Medication refusals and adverse reactions should automatically initiate a referral back to the prescribing physician and a mechanism to guarantee such referral should be created.

## Quality Assurance

There are a number of locally developed quality assurance procedures in place at Indiana State Prison, and in this regard the program is unusual among maximum security correctional health programs. There is a Medical Audit Committee which meets weekly and is attended by the administrator, all three staff physicians, the nurse practitioners and physician's assistants, and the medical technicians. Minutes are kept of each meeting. Because of the small size of the staff, the Medical Audit Committee is used for a multiplicity of purposes:

(a) It reviews "problem cases" referred to it by any one of the health providers, and makes recommendations for management.

(b) It reviews a random sample of the records of cases managed by each of the health providers.

(c) It reviews cases referred to it by the Correctional Grievance Committee.

(d) It reviews all elective surgery cases.

(e) It functions as a Pharmacy and Therapeutics Committee.

(f) It reviews all deaths.

In addition, the work of each of the nurse practitioners and physician assistants is reviewed continuously by the physician to which he or she is assigned. As noted earlier, a physician supposedly signs all prescriptions after reviewing the call with the mid-level practitioner, and all problem patients are referred to the physician.

There is no list of patients with known chronic conditions requiring long term care. I recommend that such a list be created and that the records of such patients be pulled and reviewed at regular intervals by the medical staff in order to insure that requisite followup care is being provided. Such cases should include patients with hypertension, congestive heart failure, insulin dependent diabetes mellitus, manic depressive and schizophrenic psychoses and the like.

There is a small number of treatment protocols used to guide the work of the medical technicians when they see patients at times when a physician or mid-level practitioner is not available. Those presently in force are shown as Appendix C. I recommend that the inventory of standing medical orders be expanded to include other conditions which might be treated safely by a medical technician and also to include most of the conditions managed by mid-level practitioners on weekends and evenings when the physician staff is not available to supervise them directly. Standing medical orders have long been used in public health and industrial medicine settings and are not being used increasingly in correctional health programs where their utility is self-evident.

Finally, it would be useful to have the quality of care audited annually by an outside organization—perhaps with the aid of a structured evaluation protocol such as that shown in Appendix E. The local county medical society or Peer Review Standards Organization might reasonably be asked to conduct such a review. Alternatively, the services of a private consulting firm might be used. The review in any case should be comprehensive and should include specific recommendations for change in relation to any deficiencies which may be discovered.

## Dental Services

Dental services are provided by a staff consisting of two full time dentists and two part-time dentists. The part-time dentists between them provide one and one-half days of dental care.

The list for dental care is usually quite long and it takes from two to three weeks to obtain routine dental care. Since there is no separate emergency dental list, sometimes inmates with pain, infection or bleeding are also delayed in receiving care. Moreover, there are no clerical assistants or chairside assistants or dental hygienists employed in the dental clinic. Hence, all of the work which could be done by a clerk or assistant is now being performed by the dental staff at the cost of efficiency of the dental program. A position for one dental hygienist was created last year but has been impossible to fill.

There is no contract with a dental laboratory, so much of the dental laboratory work is being performed by one of the dentists while bits and pieces of work are sent piece by piece to various dental laboratories at relatively high costs.

The dental program, like the rest of the health services components, has suffered from problems of continuous staff turnover, in part because of a noncompetitive salary structure. I recommend that a position for a dental clerk be created. The clerk might also be trained to double as a chairside assistant if the right person were selected. I also recommend that an emergency list be kept separately from the list of men scheduled for routine dental care and that not more than 24 hours elapse on weekdays before emergencies are seen. I recommend that a single contract be negotiated with a dental laboratory capable of servicing all of the correctional institutions in Indiana at a lower unit cost than it is now possible to obtain by any single institution. Such a contract should be renewable annually based upon satisfactory performance. It should be negotiated by the Department's health services administrator. Finally, I

recommend that the salary levels of dental personnel be reviewed and upgraded to a level which is competitive with the private sector in the area.

*Laboratory and X–Ray*

The laboratory services and equipment at Indiana State Prison is by and large up-to-date and maintained in good operating condition. An inmate clerk is employed in the laboratory. I see nothing wrong with this practice as long as his access to medical information is limited to laboratory values.

*Individual Patient Records*

Total evaluation of an inmate's condition is restricted by the mere reading of his file. There is no substitute for the doctor examining the patient.

*Ernest Brewer*

Mr. Brewer's care was quite thorough and of technically very good quality. He was seen 17 times by a medical technician, 30 times by a physician assistant, 33 times by an M.D., once by the hospital, three times by specialists, and reviewed once by the Medical Audit Committee. The number of visits indicates accessibility to care but does not reflect the quality of care.

His major medical problems were three. The first was diabetes mellitus for which he was seen only eight times of the 85 times. He was also seen repeatedly for anxiety, 23 times for complaints related to nervousness. He was seen for epigastric burning pain nine times and sent to the hospital for an upper G.I. series which proved to be negative. He was also seen for a tumor by a neurological consultant. It was felt the tumor was a familial tumor and did not seem to progress. He was also seen for back pain, sharp chest pains, routine physical exams, respiratory infection, bronchitis and elevated blood pressure.

The third problem for which he was treated was recurrent edema of his feet and legs. The cause for this edema was not apparent from the chart. On one occasion it was thought to be congestive heart failure. In my opinion it doesn't seem to be related to congestive heart failure because there are no other symptoms to substanti-

ate that diagnosis. His heart rates were essentially normal. It is more likely related to long standing diabetes with muscular stasis. One of the late complications of diabetes is frequently meroptosis peripheral which causes the blood vessels to leak into the tissues in the extremities and cause swelling.

Mr. Brewer's insulin administration had been recorded very meticulously. Some 547 occasions were noted. Twenty-six times the dose had not been recorded as having been given. It is unknown whether he received those doses or not. On six occasions of the 547 there were relatively minor errors in the administration of the dose, all of which were recorded. None of the errors were life threatening. I am impressed with the fact that the errors were properly recorded in the patient's log. He was seen 85 times exclusive of those times for injection only. Mr. Brewer's case, while not perfect, appears to be very good.

*Ronald Baurle*

There is some confusion from Mr. Baurle's chart as to his level of medication. To the inexperienced reviewer it might appear that he was receiving 375 milligrams of Dilantin four times a day. This would be a toxic dose which would immediately produce physical symptoms such as a stupor and unsteadiness. Rather, it appears that he received a proprietary preparation put out by Parke-Davis called Dilantin 375. This preparation contains 100 milligrams of Dilantin and a quarter gram of phenobarbital. This dosage four times a day is an entirely appropriate dose.

Eight other inmates and their records were reviewed. All of the other inmates were receiving appropriate and adequate treatment.

*Assessment*

With the exception of on-site psychiatric and psychological services, the health services component at Indiana State Penitentiary is basically well organized and implemented. It is a relatively recently developed program which still requires procedural modifications in medical records mainte-

nance, sick call procedures, and inservice training for correctional officers and dental services.

The system suffers from a rapid staff turnover rate owing to low salary scales which are not competitive with the free world. Staff morale is satisfactory however, as is the volume and overall quality of the services rendered.

The obvious attention and interest that has gone into organizing a systematic and integrated health care program is commendable. It is functioning at an acceptable level at the present time with the exception of on-site psychiatric services. Given additional developmental time and some kind of relief from the inadequate salary structure for health workers, the program within a few years may be exemplary.

This concluded the testimony of Dr. Hastings.

Richard G. Crane

Mr. Crane, called as defendant's tenth expert witness, is currently employed as Chief Legal Counsel and Assistant to the Secretary in the Louisiana Department of Correction. He toured the I.S.P. on January 5 and 6, 1981 and interviewed inmates, staff and administrators.

Mr. Crane's principal responsibility is to insure that the Department of Corrections abides by the court decisions and the state and federal laws pertaining to the operation of correctional facilities. He has held his current position from March 1973 to the present, exclusive of a one year leave of absence which commenced in September 1976. He has lectured and written on the rights of inmates, particularly on constitutional conditions of confinement. Prisons which he has toured which are comparable to the I.S.P. include Huntsville in Texas, Parchman in Mississippi, and San Quentin in California. The following are his observations and conclusions regarding the conditions of confinement at the I.S.P.:

This tour included all of the seclusion units at the I.S.P. and one regular cell house, B cell house. The common areas were very clean and did not seem to be in need of painting. The disciplinary areas were not quite as clean as the other cell houses, but they were acceptable. The lack of hot water within the individual cells was disturbing.

In general, the space allotted to each inmate was found to be adequate. In addition, the use of all single cells (except for the honor unit) contributes greatly to a feeling of privacy and spaciousness. However, cell space may not be adequate for those locked up for lengthy periods in certain areas. While most of the seclusion areas had cells of adequate size, this was not true of the A & O building where many of the self-lockups' were housed. Because they are denied most of the privileges afforded to the general population and are required to remain in their cells for 23½ hours each day, I do not feel that cells of 38–40 square feet are adequate. This is particularly true because of the configuration of the A & O tiers which results in many of the cells facing away from the windows. It seems that either one of two solutions could be implemented to remedy this problem: (1) grant these inmates more time out of the cells, or (2) move them to a different cell house with larger cells. I should note, however, that I don't feel these cells are inadequate for their original intended purpose which is to house newly received inmates for short two or three week periods. Admissions generally spend more time out of their cells because of testing and other orientation. On a long term basis these cells would be adequate if regular inmates were locked in them only for sleeping.

The recreation and education programs were both very adequate. It is noteworthy that education courses are available to inmates in seclusion units. Inmates in general population have sufficient recreation time. However, in the seclusion units the situation varies, some receive only 30 minutes each day out of cell. The thirty minute limitation is satisfactory for short periods of up to 90 days. Inmates held for extended periods in seclusion ought to receive more exercise time.

This concluded the testimony of Mr. Crane.

Jack Raymond Duckworth

Mr. Duckworth is currently employed as the Warden of I.S.P. He has held that post for four and one-half years and been in the D.O.C. for ten years. Prior to becoming warden he was the Assistant Warden at the I.S.P. for two and one-half years.

Mr. Duckworth received a Bachelor's degree from Frankford Pilgrim College, a Master's degree in counseling guidance education from Indiana University and is currently a doctoral candidate at the same university. He is inside the prison on a daily basis. The following are his observations and conclusions on the daily operation of the I.S.P.:

Recreation time varies among the housing units. In N.S.B. inmates receive 30 minutes per day out of cell for recreation and showers. In addition to that they have time out of their cells for hospital and telephone passes and visitation. If the visit occurs in the morning it is part of the 30 minutes, if it is in the afternoon it is in addition. B seclusion and I.D.U. seclusion follow this same schedule. On X-row or death row there are three men out for half a day at a time. In the protective custody or self-lockup units they are allowed out for two hours. On A & O the time has recently been increased to an hour and one-half from 30 minutes a day. The hospital seclusion unit is the same as the A & O unit.

On N.S.B. five men can be out at one time, on I.D.U. it is eight men and on X-row it is three men. B seclusion is also five men out at a time. During the summertime recreation time will be increased because of the capability of placing the same number outside of the unit on recreation areas. In the wintertime if more inmates were out at one time a security problem is created. When more than five inmates are out at a time there is increased difficulty with interaction between individuals. In the wintertime all of the inmates must remain in the range area between the cells which is approximately 12 to 15 feet wide and the length of the housing unit. During warm weather two groups of inmates are out at once and they alternate between indoor and outdoors. More staff people are necessary to supervise outside recreation. If additional staff is not available then outside recreation is eliminated.

The Warden's packet of Billy Ray Adams has been recently reviewed. When the packet was received there was a record of a conduct charge which had been dismissed still in it from 1976. I have removed that report and placed it in my desk. If no one wishes to see it in relation to this hearing it will be destroyed. I was not the warden when this report was written. There has never been any communication, written or otherwise, from Mr. Adams requesting expungement.

During the P.A.C.E. Christmas open house in 1979, which lasted five nights, there were visitors who were strip searched. None of the visitors complained at that time. Complaints were registered with the news media which contacted me. This led to a change in procedures. Visitors coming to open houses are never strip searched and this has been the policy since January 1980. Contraband is checked for by using dogs. If the visitor cannot pass the dog without alerting him after two or three attempts, that visitor is denied admission.

The current makeup of the C.A.B. consist of the Chairman, who is a member of the custodial staff, lieutenant or above, and two non-custody personnel chosen on a rotating basis from a list of employees. This practice of having two non-custody members on the C.A.B. went into effect in July 1980 when the new disciplinary code became effective. A person can be held on investigatory status for fifteen days unless the offense involves criminal charges. If criminal charges are filed by the LaPorte County prosecutor, the inmate is retained in segregation pending the outcome of that particular charge.

There was a cell fire in B Cell House recently during which it was necessary to evacuate the building because of the smoke. The cell house was evacuated without inju-

ry. Cell Houses A, B, C and D all have ventilation equipment which evacuates the smoke from the building. Between 4:00 P.M. and 8:00 A.M. the keys to the cell houses are kept in the Administration Building. They are not kept in the cell houses for security reasons. When keys are retained in housing, our experience is that the threat of compromising security is much higher. It only takes approximately a minute and one-half to get the keys to a cell house once they are requested, three minutes at the maximum.

I have never restricted either orally or in writing administration of medication by medical personnel. At one time the D.O.C. did, however, prohibit a particular substance. I have never attempted to influence the medical staff in the administration of any medication to any particular inmate.

There is currently an open position for one psychiatrist. A board certified or board eligible psychiatrist would be paid a maximum of $61,520.00. The problem with filling this position is that any psychiatrist can earn half again that much in private practice. This position has been vacant approximately two years. Further, D.O.C. procedures prohibit hiring a psychiatrist at the top wage level. If Dr. Menenger walked in today for the position I could only offer a maximum salary of $50,000.00. If a psychiatrist fully board certified right out of medical school applied, I could offer a maximum salary of $40,000.00, at the outside $50,000.00. The inexperienced psychiatrist can make twice that in private practice. The greatest need in terms of additional resources is a psychiatrist. If I could have one thing that would be it. The presence of a psychiatrist would benefit the entire inmate population by treating the inmates who have problems that have a compounding influence on the rest of the population. The salary schedule is fixed by state law and regulation. The D.O.C. has only one psychiatrist in the entire system, which is Dr. Constan at Westville.

This concluded the testimony of Mr. Duckworth.

## V.

### The Witnesses.

*Lokmar Yazid Abdul-Wadood*

Inmate Wadood has been incarcerated at the I.S.P. since June 1975. He has had approximately 40 visits. Beginning in 1977 after visits inmates were required to submit to a strip search including body cavities. There were two altercations between inmate Wadood and the officers conducting the searches.

The record here does not disclose the fact that inmate Wadood was incarcerated under the name of Lincoln Love. However, the testimony of the principals in these incidents concurs as to the dates and basic occurrence, only the officers refer to the individual as Lincoln Love. This Court assumes that inmate Wadood and Lincoln Love are the same individual.

After a visit in September 1979, inmate Wadood refused to submit to an anal cavity search. He refused to bend over and spread his buttocks for a visual inspection. The officer explained that this was a situation he was uncomfortable with but that it was part of the regulation. In Wadood's words Officer Moulton pleaded with him to comply and he refused. Officer Moulton then left and returned shortly with four or five other officers who explained that if he (Wadood) continued to refuse the cavity search, the search would be conducted involuntarily. Wadood refused to comply. At this point, according to Wadood, the officers seized him, turned him upside down, and one of the officers squeezed his testicles hard and then they threw him on his face. Wadood's clothing was then removed and the search conducted. No contraband was found. Wadood sustained no injuries except possibly a scrape or two.

The next incident occurred on December 22, 1979 when Wadood again refused to submit to the anal cavity visual inspection portion of a strip search after a visit. After he twice refused the anal cavity search more officers were summoned to involuntarily conduct this inspection. According to Wadood, Officer Forker was involved in

both these incidents. Wadood contends that he was pushed to the floor, handcuffed behind his back, and the screening officer sprayed a whole can of mace in his face. Wadood cannot remember the name of the screening officer. Then Officer Owens also sprayed mace in his face. Wadood had already taken off all his clothes at this point. The anal cavity inspection was then conducted. The next day all the superfacial skin came off Wadood's face, leaving a pink complexion. Wadood is a black inmate. One of the officers who sprayed the mace, Officer Owens no longer works at the I.S.P. and is not a defendant.

Officer Forker recalls the two altercations he had with inmate Wadood. On one occasion Forker was summoned to the guard hall because Wadood was refusing a strip search after a visit. At least four officers were present. After discussing the proposition with Wadood, he still refused and was seized. The officers then picked him up, stripped him, and conducted the visual anal cavity search. No one was struck and no mace was used.

Officer Forker was not questioned regarding the second incident when inmate Wadood alleges he was involuntarily searched and sprayed with mace.

Officer Moulton was present in September 1979 when Wadood refused a strip search after a visit. Wadood complied with the strip search by removing his clothing but refused the visual anal inspection. After explaining the strip search policy, Wadood still refused the search. Then Officers Forker, Maddox and Wittenberg were summoned. When Wadood still refused he was forcibly placed on his stomach and the visual anal inspection conducted. Officer Moulton did not grab Wadood's testicles nor did he see anyone else grab Wadood's testicles.

In regard to the first incident in September 1979, the only conflicting point is whether or not Wadood was physically abused by the officers. The testimony is that one officer grabbed each of his limbs and picked him up. This Court, having viewed the respective witnesses, concludes that no one did grab Wadood's testicles.

By his own admission Wadood suffered no injuries.

The second search incident stands uncontradicted by the defendants. The Court must therefore accept Wadood's version of the incident. The most troubling aspect is that Wadood was sprayed with mace after he was handcuffed and while he lay on the floor and that the amount of mace was such as to make his facial skin peel.

### Edward Broadus

Inmate Broadus has been incarcerated at the I.S.P. since November 1976. On July 7, 1978 he refused to submit to a body cavity search. On that date a confrontation developed between Broadus and Officer Galinis in the P.D.R. Officer Galinis ordered Broadus to wear his shirt jacket in his pants. Broadus ignored two such requests. He then was ordered to follow Galinis and another officer. Broadus obeyed and was taken to a room where he was told to strip. He stripped but refused to bend over for the visual rectal inspection. Galinis then got three or four other officers who informed Broadus that he would be involuntarily searched. Broadus still refused. The officers then picked Broadus up, turned him upside down, and Officer Galinis conducted the visual rectal inspection. Broadus was then put back on the ground and told to dress. This testimony is without contradiction and is accepted.

### Harold Brown

Inmate Brown has been incarcerated at the I.S.P. since February 1977. On four occasions he claims to have witnessed an officer or staff member assault an inmate.

In October 1979 there was an incident between inmate Tony Taylor and Officer McFadden. Upon entering the P.D.R. Brown saw McFadden order inmate Taylor to the back of the serving line. As Taylor and McFadden approached the back of the serving line, inmate Taylor ducked the rail and got back in the serving line. McFadden then approached Taylor, told him he had not done as instructed and that he should go to the very end of the line. An argument ensued during which McFadden

grabbed Taylor by his collar and attempted to pull him across the serving line rail. Taylor ducked under the rail, McFadden grabbed him, and they both fell to the floor struggling. McFadden had his hands on Taylor's neck and was choking him. Brown and several officers then broke up the fight. McFadden was using profanity and calling Taylor racial names.

McFadden contends that Taylor cut into the serving line at the P.D.R. and he ordered him to the rear. Taylor didn't go to the end of the line so McFadden told him to accompany him to see the Sergeant. At which point Taylor ducked under the rail and tried to get away. McFadden grabbed him by his coat lapel and Taylor hit him with his fist. McFadden went down, that is the last he remembers. McFadden suffered a black eye and a concussion from hitting the floor.

The versions of this incident related by Brown and McFadden are complimentary. The portion of McFadden's testimony regarding the striking by Taylor explains why he fell down and the extent of his injuries. McFadden's version of the story more completely represents the facts of the incident.

Inmate Brown also witnessed an altercation inmate Giller and Gary Morton, the food supervisor in the P.D.R. during the evening meal.

Morton was serving cake in the P.D.R. when Brown approached he told Morton he did not want any cake. Morton told Brown to take the cake and he refused. Morton then demanded Brown's identification card, saying that he was going to write a conduct report. Brown proceeded down the serving line. Morton came around the serving line and demanded Brown's card. Brown went to a table and sat down. Morton followed continuing to demand the card. Another food supervisor, Godsey, then interceded on behalf of Brown and Morton got angry and returned to the serving line. An argument immediately commenced between Morton and inmate Giller who was working in the kitchen. Morton started using profanity and racial slurs and then shoved Giller in the face. Giller grabbed Morton's hand but

an officer immediately broke them up. Giller was put on lockup for assault.

Mr. Morton is currently employed at the I.S.P. as a Cook II. He recalls having an altercation with inmate Golard while on the serving line in the P.D.R. An inmate coming through the serving line was unhappy with his serving of cake and refused it. Golard started making a commotion about the way the supervisors were handling things and Morton told him to keep his mouth shut. After this exchange Golard shoved Morton in the face and bent his glasses. Morton contends he never went around the serving line into the dining area. After that Morton wrote a conduct report on Golard for assaulting him.

Morton further recalled that he may have asked Brown for his identification card so he could write him up for creating a disturbance. Golard became involved right after Morton finished talking to Brown. He recalls no racial slurs being used.

Inmate Brown also witnessed an altercation between inmate Morriss and Officer Schnick. Morriss was leaving C Cell House and as he left Officer Schnick ran out of the adjacent education building shouting that Morriss had run out of the education building. Schnick approached Morriss from behind, grabbed him, and threw him on the ground. Schnick was using racial slurs and took Morriss to the lockup. No other testimony was heard on this matter.

The final incident inmate Brown witnessed was in June 1978 on the I.D.U. Lockup unit. The laceration was between inmate Lawerence and Officer Forker. There was a shakedown of that detention area being conducted. At that time Brown was three cells down from Lawerence. Forker and Lawerence got into an argument at which point all the other inmates in that section were returned to their cells. Brown could still hear the argument but could not see it. So Brown used a small piece of a broken mirror to look down the range from his cell. Present at Lawerence's cell were Officers Forker, Worthington and Ford. The argument continued even when Lawerence was returned to his

cell. Forker ordered Lawerence's cell door unlocked and ran in. Scuffling and curse words could be heard from the cell. Inmate Lawerence could be heard saying that the officer was choking him, somebody get him off me. Officer Ford had also gone into the cell. When the two officers came out Lawerence complained that he was hurt. A general cry was raised to get a doctor for Lawerence and in about a half hour Lawerence was removed to the hospital. The entire incident lasted between 15 and 20 minutes.

Officer Forker recalls having an altercation with inmate Lawerence at which Officer Worthington and another officer were present. During the shakedown of Lawerence's cell he was outside his cell standing in the range. Officer Kerns found a homemade weapon in Lawerence's cell and took it to the lieutenant. As Kerns was returning to the cell Lawerence started to jump on him from behind. Forker then tackled Lawerence and subdued him. Mace was used on this occasion by the lieutenant who was present. Lawerence was then returned to his cell.

Fusing these versions of events together it becomes clear that there was indeed an altercation in the range area involving a sharp exchange of words during a shakedown. What Brown omitted was the fact that Lawerence assaulted Officer Kerns and had to be subdued and returned to his cell. Here an inmate was not handcuffed, did in fact assault an officer, and mace was used to subdue him. There is no other evidence in regard to what degree of force was used or what injuries Lawerence suffered, if any.

*Charles Finken*

Inmate Finken has been incarcerated at the I.S.P. since September 1979. He has suffered from epilepsy since birth. This condition requires that he take medication three times a day. When taken into the R.D.C. he was not given his medication even though he complained of symptoms. He subsequently suffered a grand mal seizure at the R.D.C. After that his medication was commenced.

Upon arriving at the I.S.P. he had a problem with receiving his medication. While he was housed on I.D.U. he failed to receive his medication the whole month of October 1980.

On October 30, 1980 inmate Finken was involved in an altercation on the I.D.U. unit. Finken contends he was hit in the face by two black inmates on the unit. The officer on duty, Sabovick, allegedly only laughed at the incident. Finken contends this aggravated him so that he assaulted inmate Anderson. Sabovick then ordered the inmates to their cells. Finken proceeded toward his cell but lingered to talk to another inmate in his cell. Sabovick approached Finken and again told him to return to his cell or be sprayed with mace. When Finken got to his cell Sabovick pushed him in while another officer was closing the sliding door. As the door was closing Finken spit at Sabovick and threw a half cup of water at him. During this time Finken was clad only in underwear and had a blanket wrapped around him because his clothes were being laundered. The officer operating the cell door opened it and Sabovick entered. Sabovick sprayed Finken in the face with mace. Finken was pushed on the bed and he pushed Sabovick in the chest with his feet, knocking off Sabovick's glasses. Finken then got his blanket over his head to prevent any further macing. At that point Sabovick started hitting Finken and was joined by Officer Konkey whose voice Finken recognized. Konkey also allegedly hit Finken. Then Finken was ordered off the bed. He saw that Sabovick had a cut by his left eye and a broken knuckle. After the officers left he complained about pain in his side for one week. A week and a day later x-rays were taken and two broken ribs were discovered. Nonprescription medication was provided for pain.

Officer Sabovick recalls an altercation with inmate Finken. It occurred after an incident in the I.D.U. area, which caused Sabovick to order the inmates into their cells. Finken went upstairs but was talking to another inmate. After Finken went in

his cell he was verbally harassing Sabovick, spit on him, and threw something on him. Before the cell door could close Finken swung at Sabovick and hit him on the left side of the face breaking his glasses which cut his eyelid. Sabovick then went inside the cell and swung at him to keep him in the cell at which time he slipped on the wet floor. Sabovick is uncertain whether he hit Finken or not but did suffer two broken bones in his right hand from hitting something. Officer Konkey came into the cell and helped Sabovick find his glasses and leave. The confrontation occurred with Finken in his cell, Sabovick outside the cell, with the cell door not yet closed.

Officer Konkey was also involved in the incident between inmate Finken and Officer Sabovick. Finken was not going to his cell. He was talking to another inmate. Sabovick went to escort him to his cell and Finken went quietly. Konkey was viewing this from an area outside the unit but only approximately three cells away. Finken went into his cell and threw something on Sabovick. The door was not yet closed and Sabovick stepped into the cell. Finken then struck Sabovick in the face. Konkey then went into the cell area knowing that Sabovick couldn't see without his glasses. Sabovick swung at Finken but hit his hand on the bars and injured it. Finken was on top of Sabovick when Konkey arrived so Konkey threw Finken on his bed. Finken was kicking and swinging all the while. Finally Finken quit, the pieces to Sabovick's glasses were recovered and Konkey escorted Sabovick from the cell. Konkey did not see any mace used on Finken and Sabovick was not questioned on this point. Officer Forker testified that Finken did request a sick call pass because he was injured in a fight with an officer.

Inmate Finken's medical records from the R.D.C. verify his epileptic condition. No medical records from the period of this incident were submitted to the Court. It is undisputed that Finken antagonized Sabovick. However, the version told by Sabovick and Konkey does not explain how Finken suffered broken ribs in this incident. This failure to explain the extent of the injuries leads the Court to credit inmate Finken's version of these events.

### Michael Hoelscher

Inmate Hoelscher has been incarcerated at the I.S.P. since June 1980. He was committed to the D.O.C. on October 16, 1979.

On September 8, 1980 Hoelscher was taken to a dentist outside of the institution. He was to have all of his teeth removed. Hoelscher was given a general anesthetic and all his teeth were removed. He was moved to a recovery room where Officers Neary and Jones were present. He was still very heavily under the effects of the anesthetic when the guards tried to get him up and to the car. The next thing he recalls is finding himself on the floor. He received a conduct report as a result of this incident in the dentist's office. The sentence was one year on disciplinary lockup. As of January 5, 1981 Hoelscher had not received his false teeth, nor had he seen a dentist or have an appointment to see a dentist. He had been told by a doctor that his case was referred to a dentist.

Hoelscher was residing in the A & O unit prior to his trip to the dentist. He spent 23½ hours a day in the cell. When the bed is pushed against the wall the room to move about in is approximately 6½ feet by 2 and ½ feet. With the bed pushed against the wall there is approximately two feet between the edge of the bed and the opposite wall.

Officer Jones was the trip officer assigned to take inmate Hoelscher to the dentist on September 8, 1980. After the dentist finished with him he was taken to a small recovery room. Officer Neary was also present. Hoelscher was in the recovery room a good 30 minutes. The officers were trying to arouse him from the anesthetic to walk to the car. It was unusual for an inmate to remain unconscious so long. On approximately ten previous trips it had never happened before with other inmates. Jones and Neary raised Hoelscher up to try to get him to the car. Jones alleges Hoelscher lunged at him in an attempt to get his weapon. Jones brought up his arm

which made Hoelscher go down on the floor. Hoelscher was handcuffed in front and had leg irons on at the time.

The testimony of inmate Hoelscher and Officer Jones is not conflicting. Their versions of these incidents are complimentary and are both accepted by the Court.

*Mike Covington*

Inmate Covington was first incarcerated at the I.S.P. in 1974. He was at the I.S.P. in December 1977 when he lost some property.

Covington was living in C Cell House on December 12, 1977. At approximately 10:00 P.M. that night Officers Domkowski, Spradlin and Williams came to Covington's cell. They ordered him out of his cell and handcuffed him behind his back. Officers Domkowski and Spradlin then began to shake down his cell. Domkowski reached up to remove a box which had several quarts of dye in it from a shelf. Domkowski appeared to lose his balance with the box. It was apparently too heavy for him so he dropped it over in the corner, breaking several of the jars of dye. The dye was authorized as part of Covington's leather craft hobby. The dye splashed on some finished leather goods, some hides, on his bed and on his clothing. Covington questioned the officer about the damage to his property and the officer told him to "shut up." An argument ensued and Covington was sent to the desk with Officer Williams. Domkowski and Spradlin remained in the cell. After 45 minutes at the desk in C Cell House Domkowski and Spradlin came down and sent Covington back to his cell with Officer Williams. Domkowski followed. When Covington returned to his cell he saw the quart jars of dye were empty. Dye had been dumped on the desk, the bed, the wash basin, on the walls, and some had run out into the hall approximately four feet down the range to the left of his cell. Dye had also been dumped on his tape recorder and on his clothing. Officer Williams locked Covington in his cell and Domkowski told him he had better clean it up immediately. Rather than clean it up Covington stood up by the commode all night leaving every-

thing as it was and then reported the incident in the morning to the shift officer. The officer contacted the Warden and Assistant Warden who instructed him to write up a report, which was done. Covington then filed a grievance as to this incident which was investigated by a counselor at the institution. The grievance committee recommended full reimbursement. However, no reimbursement was ever received.

Sergeant Dillman was the officer who looked over Covington's cell the next morning and wrote a report on its condition. His report states that the shelf had been torn from the wall and was destroyed, all his books, including two Bibles, were thrown on the floor, leather working tools were dumped on the floor and leather dye has been dumped on the clothing and personal effects. The cell was literally torn up.

Officer Spradlin is one of the officers who conducted the shakedown of Covington's cell. The cell as Spradlin recalls was wall-to-wall with personal effects. There were so many things in the cell that the officers had trouble shaking it down. There were a number of homemade shelves, constructed of one by six and coat hangers, hanging from the ceiling. When Officer Domkowski reached to remove something from the shelf above the door the entire shelf came down. There was a quart jar of dye on that shelf with approximately six ounces in it which broke. There were other jars of leather dye in a box in the cell which Spradlin contends they did not disturb. All this shelving was illegal so it was confiscated. The dye splattered on a couple pair of pants and some books, one of which was a Bible. Only four or five books got dye on them. Spradlin has no recollection of Covington being taken to the officers' desk. The officers tried to dump out everything in the cell. All the illegal shelving was confiscated and the books put on the floor. Spradlin doesn't recall not returning any of the items to the containers they were in.

Central to this incident is what happened while Covington was at the officers' desk in C Cell House. Spradlin does not recall Covington's absence but does not contend Cov-

ington was present the entire time. Spradlin also admitted there were substantial quantities of dye in the cell. Officer Dillman who viewed the mess the next day reported that two Bibles were "ruined" and that dye had been "dumped" on clothing and personal effects. This report indicates a volume of dye significantly higher than the six ounces Spradlin recalls being spilled. For these reasons the Court must credit the testimony of inmate Covington.

### Frank Roberts

Inmate Roberts has been incarcerated at the I.S.P. since January 1976. He has worked in the tag shop continuously since arriving at the prison. During his employment there he has been an operator of a stamping machine. It is around the operation of that stamping machine that this evidence revolves.

On April 17, 1978 Roberts had his finger cut off by this machine while he was operating it. Prior to that time he was never given any safety instructions on the operation of that machine. The machine is activated by depressing two palm buttons. When this accident occurred these palm buttons had metal "C" clamps on them. This made the machine operate automatically once the dye was fed into the machine. When the buttons are not clamped the operator must push both of the buttons with his hands to activate the machine. Thus, the operator's hands are safely out of the way. The foreman told Roberts to take the clamps off of the machine. Roberts took the clamps off but replaced them after the foreman left. Roberts was taught to operate the machine by another inmate. No safety instructions are currently provided to inmates working in the tag shop.

James Wheeler is currently the Superintendent of Industries at the Westville Correctional Center. Prior to December 15, 1980 he held the same position at the I.S.P. for 12 years. He was aware that operators were putting "C" clamps on the palm buttons. He does not know Frank Roberts. Two types of gloves are available in the tag shop for inmates to wear. The operators of the machine should be instructed orally by the foreman concerning safety prior to using the machine.

### Michael R. Milsap

Mr. Milsap is one of the attorneys for the plaintiffs in this action. He is currently employed by the Legal Services Organization of Indianapolis.

Mr. Milsap was contacted by inmate Chattman in October 1979 in regard to some problems he was having at the I.S.P. Chattman's principal complaint was that during a shakedown of his cell personal and legal mail was taken. Chattman alleges 17 letters were seized, 14 of which were returned, and three letters of a legal nature were not returned. Neither of the individuals who took the letters are defendants here. Chattman then contended that he had filed a pro se 42 U.S.C. § 1983 suit in the United States District Court for the Northern District of Indiana, Fort Wayne Division, regarding this incident by giving his complaint to one of the counselors to be mailed out. The Clerk of that court had no record of any complaint filed by Mr. Chattman. Mr. Milsap then mailed some new forms for filing 1983's to inmate Chattman by first class mail in an envelope bearing the Indiana Legal Services Organization name which identified this as legal material. At a subsequent meeting Mr. Milsap was informed by Chattman that he had not received this letter dated June 11, 1980, which was sent with the 1983 forms. Then on August 20, 1980 Mr. Milsap sent another copy of the 1983 forms and a cover letter dated August 20, 1980 and a copy of the June 11, 1980 letter which was first sent. This was sent in a Legal Services Organization envelope by certified mail, return receipt requested. The return receipt was signed by Correction Officer Zanyk and returned to Mr. Milsap. Mr. Chattman again reported that he did not receive these documents. Next on September 30, 1980 Mr. Milsap mailed Chattman two copies of a letter concerning him not receiving his mail. One letter was sent for first class mail, the other was sent by certified mail, return receipt requested. Both were in Legal Services Organization envelopes. The re-

turn receipt was signed by Officer Zanyk and returned to Mr. Milsap. In a subsequent conversation Chattman informed Milsap that he did not receive the certified letter but did receive the letter sent by first class mail. Chattman was able to identify the two letters he did receive from Mr. Milsap. No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

### Shorobbie Carter

Inmate Carter has been incarcerated at the I.S.P. since approximately May 1979. Carter contends there are rats at the prison. Carter works in the kitchen at I.S.P., specifically he delivers food to the lockup units. On June 2, 1979 he was removing the food cart from the A & O elevator when he saw rodents on it. Carter shook the cart and one fell on him. He saw several rats in the elevator and around the cart. Carter then took the cart to the kitchen to clean it. While cleaning the cart, Carter stuck his hand in the cart and felt a sharp pain. He jumped back and a rat ran out of the cart. Carter's hand was bleeding from a bite. He then went to the prison hospital seeking treatment. A medical technician administered a tetanus shot. However, Carter says that the expiration date on the medication was January 9, 1978 and protested that the medication was out of date. Carter accepted the injection on June 2, 1979 as it was the only treatment available. Inmate Khalid Ali Pasha relates a similar occurrence while housed on I.D.U. in 1977. It was common to see mice and rats running in and out of his cell. He killed two rodents about six inches long. In November 1977 he was bitten by a rodent at night while on I.D.U. and received medical treatment for it. No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

### Christopher Brown

Inmate Brown has been incarcerated at the I.S.P. since February 1979. Since that time he has been the victim of an assault by another inmate.

On July 29, 1980, Brown contends inmate Anderson attacked him while in the P.D.R. Brown alleges Anderson stabbed him and Brown fled. Brown ran for the back door with Anderson in pursuit. At the door three officers grabbed him and held him. Brown does not know the names of the officers. After the officers seized him, Anderson stabbed Brown once more. The officers made no attempt to prevent Anderson's action. No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

### Bobbie Barnett

Inmate Barnett has been incarcerated at the I.S.P. since November 1974. He has been employed at the prison legal services department, better known as the inmate writ room since October 23, 1978. His duty is to assist inmates in preparation of legal matters, civil and criminal, and before the Conduct Adjustment Board. Currently there are seven inmates employed in the position. Barnett contends 20 such lay assistants are necessary to provide services to all of the inmates at the institution. He has personally appeared before the C.A.B. as a lay advocate in over 300 cases. In respect to punishment given inmates by the C.A.B. pursuant to a conduct report he has personally been involved in cases where there was a significant disparity in sentences. In one case, Inmate Hewitt beat another inmate with a hammer in early 1980 and received a one year sentence. In February 1980 when several inmates stabbed another inmate, Barnett represented inmate Cole who received two years. Then in March 1980, inmates Bryan, Williams and Walker slapped another inmate and Barnett represented two of them. The assaulted inmate did not go to the hospital or see a doctor. The two inmates received three year sentences. Barnett recounted at least four other instances as examples of disparate treatment by the C.A.B. Barnett did not personally witness these incidents.

When an inmate on a lockup unit receives a conduct report, the C.A.B. is held on that unit. However, some of the lay assistants and witnesses refuse to go up to the lockup units because they are subjected to a complete strip search. A written statement can

be submitted for the witness who refuses to go into a lockup unit.

No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

### Sam James

Inmate James has been incarcerated at the I.S.P. since March 1974. He was employed in the dental clinic in 1977 and 1978. In June 1978 he saw inmate Jackson Dean for the purpose of cleaning his teeth. James asked the dentist on duty to examine Dean's teeth. Dr. Price, the dentist who was present, determined that three of Dean's teeth should be extracted. The doctor administered the anesthetic and ordered James to pull the teeth. This was not the first time James had been told to pull another inmate's teeth. Two of the teeth were extracted without incident. The third tooth broke off. After that Dr. Price and Dr. Higgins worked on Dean about two hours to remove the remainder. The testimony of inmate Dean further corroborates this account. At this time, Dr. Price is deceased and Dr. Higgins is no longer employed at the I.S.P. No further evidence was heard on this matter. Accordingly, these allegations are accepted as true.

### James Odis Hendrix

Inmate Hendrix has been incarcerated at the I.S.P. since November 1973. He is a named plaintiff in this cause. Hendrix had a medical disorder of the stomach prior to his incarceration. Hendrix contends he was unable to see any medical personnel for this problem from 1974 through 1976 even though he applied for sick call. In 1976 Hendrix was seen by Dr. Saylors, a physician, who prescribed an antacid for his condition. In June 1977, Hendrix again saw Saylors and told him that the antacid was not helping. Saylors then had x-rays taken of Hendrix at an outside hospital. Since the x-rays were taken Hendrix has been receiving a prescribed antacid. However, Hendrix's medication packet bears no instructions on when to take it. Dr. Saylors is no longer employed at the I.S.P. and was not there when this suit commenced. No other evidence was presented on this mat-

ter. Accordingly, these allegations must be accepted as true.

### Mellon Carroll

Inmate Carroll has been incarcerated at the I.S.P. since January 1974. He is a named plaintiff in this cause. He has developed medical problems during the course of his incarceration.

In early 1975 Carroll developed an abscess on his buttock. He put in for sick call and received a pass. Carroll was seen by a physician's assistant who instructed him to take a sitz bath. He was never seen by a physician. Further sick call requests only resulted in a three day supply of antibiotic being provided by a physician's assistant. The condition still persists. Carroll's description is that the abscess is as large as a golf ball and makes it painful to sit or walk. No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

### Grady Thomas Bobbit

Inmate Bobbit has been incarcerated at the I.S.P. since August 1975. He is a named plaintiff in this case. In 1975 Bobbit developed a dental problem. He signed up for sick call and was sent to the dentist. The dentist, Dr. Higgins, told Bobbit that it would be two weeks before he could see him and that his name would be added to the waiting list. Bobbit continued to regularly seek treatment. He was finally seen again by a dentist in 1977. At that time the tooth required extraction. No other evidence was presented in this matter. Accordingly, these allegations must be accepted as true.

### Donald Ray Sceifers

Inmate Sceifers has been incarcerated at the I.S.P. since May 1976. He is a named plaintiff in this cause. His principal complaint is the condition of the cells in which he has been housed.

When he arrived on A & O in 1976 the cell had no light and he was not given any items for personal hygiene, such as towels, soap, etc. Nor did he have any eating utensils and was forced to eat with his fingers for seven days.

Sceifers was then moved to B Cell House. In his cell there the paint was flaking from the walls, the bed was without springs, the mattress was soiled, and the cell was filthy. No cleaning materials were available from the cell house officer when requested. Sceifers painted the cell himself with paint he purchased with cigarettes from another inmate.

No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

*James Edwin Blackburn*

Inmate Blackburn has been incarcerated at the I.S.P. since November 1969. He is a named plaintiff in this cause. Blackburn has developed a medical problem while incarcerated.

In November 1978, specifically Thanksgiving weekend, Blackburn experienced chest pains and difficulty breathing. He immediately put in a sick call request. Two days later the symptoms reoccurred and he was taken to the hospital. He remained in the infirmary seven days but was never seen by a physician. A physician's assistant ordered blood tests and an EKG. The EKG machine was in disrepair. However, Blackburn repaired the machine and an EKG was taken. He received medication four times a day while in the infirmary. Upon being released from the infirmary there was a two day delay in the medication catching up to him. The physician's assistant instructed Blackburn to take the medication upon receipt for two weeks. That concluded his treatment. No other evidence was presented on this matter. Accordingly, these allegations must be accepted as true.

The master plan of the D.O.C. was submitted as an exhibit in this case. It states that there are 1615 individual cells at the prison. This is no longer current in light of the fact that G & H Cell House has since been demolished. This figure does include all other currently existing housing with the exception of approximately 68 cells in the A & O unit and the second floor of the prison hospital which has been converted to house approximately 100 inmates.

IV.

## CONCLUSIONS OF LAW

■ Some class members who are not named plaintiffs may have stated individual claims against specific individuals. However, those individuals are not defendants here. Nor is it the theory of the plaintiffs' case to try these individual incidents as separate claims. Therefore, those individual witnesses' claims are not properly before the Court and are not ruled on here.

A major element in this case is the delivery of medical services to the inmates. The Supreme Court of the United States has recognized that the Eighth Amendment establishes a state's obligation to provide medical care for those whom it has incarcerated. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). In *Estelle v. Gamble*, the court defined the standard for Eighth Amendment review of prisoner's complaints concerning their medical treatment. To state a cognizable claim the court said "A prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106, 97 S.Ct. at 292. The required indifference could be manifested, it said "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." 429 U.S. at 104–105, 97 S.Ct. at 291 (footnotes omitted).

There are both individual and class challenges to the medical treatment rendered at the I.S.P. Plaintiffs Hendrix, Carroll, Bobbit and Blackburn make individual claims for medical treatment. The plaintiffs as a class are challenging the system of health care provided by the Indiana Department of Correction.

■ In several cases individual allegations of callous failure or refusal to render treatment have been held to meet the *Estelle* standard: *Hurst v. Phelps*, 579 F.2d 940 (5th Cir. 1978) (allegations that prison officials refused to transport inmate to

medical appointments); *West v. Keve*, 571 F.2d 158 (3d Cir. 1978) (allegations of denial of recommended post-operative treatment or of denial of access to a physician capable of evaluating need for post-operative treatment); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir. 1978), *cert. den.*, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980) (allegations of deliberate 11 hour delay in treatment of broken arm). In summary, to prove an individual claim of unconstitutional denial of medical care it is necessary to show either denial or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment. *Todaro v. Ward*, 431 F.Supp. 1129, 1133 (S.D.N.Y.1977), aff'd, 565 F.2d 48 (2d Cir. 1977). In *Todaro*, the district court found numerous instances where inmates were denied access to a physician for substantial periods of time despite repeated requests for treatment. Here plaintiffs Hendrix and Bobbit had registered medical complaints for as long as two years before receiving treatment. Plaintiff Carroll's condition has existed approximately five years without treatment. While none of these ailments appear to be life-threatening, each involved considerable discomfort. These were routine medical complaints which were exacerbated by the delay in treatment and the inmates discomfort was prolonged. These individual claims of denial of medical care are fully supported by the evidence and meet the standard of *Estelle* for constitutional violations. The case of plaintiff Blackburn, however, is one of lesser degree. Blackburn's claim rests only on a delay of two days in treatment for chest pain. He was taken to the prison hospital, given an EKG and had blood tests done. While he never saw a physician, there is no evidence as to who interpreted these tests, if anyone. Regardless, this instance is not of the magnitude of the three previously mentioned plaintiffs. Accordingly, this delay in treatment does not rise to the level of a constitutional violation as determined under *Estelle*.

▪ In regard to the class challenge to the system of health care, several courts have expounded upon the types of evidence necessary to prove deliberate indifference on a systemwide basis. *Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. den.*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I. 1977); *Lightfoot v. Walker*, 486 F.Supp. 504 (S.D.Ill.1980). These and other cases make it clear that systemwide deliberate indifference can be demonstrated by at least two methods: (1) by a showing of a pattern of individual incidents of medical care; or (2) by pointing to systemic deficiencies in the delivery of medical care which make unnecessary suffering inevitable.

The evidence here is of the latter nature. The parties have relied upon expert testimony to assess the quality of the health care delivery system. The plaintiffs have highlighted their claim of systemwide deficiencies with individual incidents of alleged mistreatment. If anything is apparent from the testimony of these experts it is the lack of agreement on what is proper care. It appears that medicine is still less than an exact science and as one doctor noted, examining medical record is an inadequate substitute for examining the patient, and may in fact, be misleading as shown here.

*Newman v. Alabama, supra*, although decided prior to *Estelle*, was cited by the Supreme Court as representing basic conformity with the deliberate indifference standard. 429 U.S. 97, 106, n. 14, 97 S.Ct. 285, 292, n. 14, 50 L.Ed.2d 251. *Newman* provides a seminal standard for comparing other prisons. The Alabama penal system's medical care system suffered from a host of infirmities: use of inmates and unlicensed medical technical assistants to provide medical treatment; limited availability of qualified personnel; non-attention to ill or injured inmates; delays in treatment; shortages in drug supplies; employment of obsolete medical equipment and techniques; and unhygienic conditions.

More recently in *Ramos v. Lamm*, the Tenth Circuit Court of Appeals examined the medical care delivery system of the Colorado State Penitentiary and found it constitutionally inadequate. In *Ramos* the court found numerous deficiencies: less than ten hours a week of on-site physician coverage; no on-site coverage from a general internist, surgeon, ear, nose and throat specialist, and orthopedic surgeon; the staff included only three physician's assistants, three registered nurses, one licensed practical nurse and one nurse practitioner, due to lack of physician coverage these physician substitutes were forced to make decisions and perform services for which they were neither trained nor qualified; on-site dental care was only 12 hours a week; and no on-site psychiatric coverage was provided. The prison in *Ramos* housed approximately 1400 inmates and came into being in the 1860's as a territorial prison before Colorado became a state.

The I.S.P. provides a level of services far greater than those found unconstitutional in *Newman* and *Ramos*. The I.S.P. provides three full time licensed physicians, and five medical technicians with positions available for four more; the medical equipment and supplies were current; a full compliment of medical specialists visit the prison; space is available at a nearby hospital security ward for serious medical cases; inmates receive a comprehensive intake physical; 96 hours of on-site dental coverage a week is provided; and one Ph.D. psychologist and two part-time behaviorable clinicians are on-site. There is no on-site psychiatrist available though there is a position for one which has not been filled.

■ Included in the general Eighth Amendment principles relating to the provision of minimally adequate medical care is the right of mentally disturbed inmates to receive appropriate psychiatric care. Many courts have recognized that the Eighth Amendment includes treatment for mental as well as physical disorders. *Ramos, supra,* at 578; *Pugh v. Locke*, 406 F.Supp. 318, 331–332 (M.D.Ala.1976), *aff'd, Newman v. Alabama, supra; Battle v. Anderson*, 376 F.Supp. 402, 415 (E.D.Okl.1974), *aff'd*, 564 F.2d 388 (10th Cir. 1977); *Finney v. Hutto*, 410 F.Supp. 251, 252, 258 (E.D.Ark.1976), *aff'd* 548 F.2d 740 (7th Cir. 1977), *aff'd*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Both medical experts agreed that the failure to provide on-site psychiatric care was a problem. However, the D.O.C. has recognized the need for such a service and provided a position, though the salary is woefully inadequate. No grossly disturbed inmates were housed in the confinement areas and a regular referral system is in place to transfer mentally disturbed inmates to the psychiatric unit at Westville Correctional Center.

The Westville Correctional Center is approximately a 30 minute automobile ride from the I.S.P. There is a 62 bed psychiatric unit which is a department of the D.O.C. The staff at Westville consisted of a full time psychiatrist, a full time psychologist, two full time therapists and approximately 62 other staff members. The psychiatrist at Westville was of the opinion that this unit was able to provide adequate treatment for all of the inmates requiring psychiatric care.

There is an intake program for screening and evaluating inmates in order to identify those who require mental health care. The director of classification and the staff psychologist are forwarded these reports and they monitor the inmates with problems. Then if that inmate requires more specialized care he is transferred to the psychiatric unit at Westville.

Undoubtedly, on-site psychiatric care is desirable for administering to the serious psychiatric incident and monitoring the continued treatment of inmates with psychiatric problems. The D.O.C. has recognized that and is currently searching for a psychiatrist who wishes to work in a correctional setting. This position was not created after the filing of this suit, and in fact, the I.S.P. did have a full time psychiatrist until approximately two years ago. Since that time the position has remained vacant.

■ Therefore, in light of all these considerations, this Court must conclude that

the I.S.P. provides inmates with a minimally adequate level of health care so as to be constitutional. The program of health care is not so deficient as to show a deliberate indifference to serious medical needs.

A number of recent cases have found unconstitutional violations which, in whole or in part, were the product of overcrowding. *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980); *Ramos, supra; Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Capps v. Atiyeh*, 495 F.Supp. 802 (D.Ore.1980). Though separate considerations prevail, any analysis of overcrowding must keep in mind the impact on recreation and time out of cell it imposes on the inmates.

Indeed every standard for prison living conditions requires more distinct, severable room for individual inmates than is available at the I.S.P. The prison is currently straining its housing capacity, as indicated by conversion of one floor of the hospital to inmate housing. According to the Executive Director of the Adult Authority of the D.O.C. the capacity of the I.S.P. is 1750 inmates. This is compatible with a total number of cells of approximately 1615 because I Cell House is currently housing two inmates per cell. The Executive Director admitted the prison was over its capacity. The current inmate population hovers around 1950 inmates. Therefore, assuming a single inmate to a cell due to the minimal size of the cells, the I.S.P. is approximately 20% over its design capacity. *Battle v. Anderson* found a constitutional violation where the institution was 91% over capacity. *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D. Tex.1980), found a constitutional violation where the prisons were 100% over design capacity.

Although recommended standards alone may not be said to establish constitutional minima, *Bell v. Wolfish*, 441 U.S. 520, 543–544, n. 27, 99 S.Ct. 1861, 1876, n. 27, 60 L.Ed.2d 447 (1979), many courts have used such standards as one of the factors to analyze the adequacy of housing facilities. *Battle, supra; Newman, supra; Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975), aff'd, 525 F.2d 965 (5th Cir. 1976). In *Gates*, the district court found that the generally accepted correctional standard required 50 square feet of living area for every inmate. 390 F.Supp. at 486. The Fifth Circuit continues to cite the *Gates* standard with approval, *Jones v. Diamond*, 594 F.2d 997, 1012 (5th Cir. 1979), reh. granted, 636 F.2d 1364 (5 Cir., 1981). However, the Fifth Circuit has also warned that a simple mathematical calculation of total square feet per man may not necessarily be appropriate. *Williams*, 547 F.2d at 1215. The Fifth Circuit has further cautioned that design standards without more, do not amount to a *per se* constitutional limitation on the number of prisoners which may be housed in a particular facility. *Newman*, 559 F.2d at 288.

The Seventh Circuit recently addressed the issue of cell size at this very institution in *Lock v. Jenkins*, 641 F.2d 488 (7th Cir. 1981). The court therein addressed the confinement of pretrial detainees in the A & O unit where the cells are approximately 37 square feet in size. In *Lock* those inmates were allowed out of their cells two hours a day for recreation, though security needs frequently limited that recreation time to less. The Court of Appeals instructed that:

It seems to us that a minimum requirement as to cell area should be imposed and this minimum should be determined flexibly in relation to the amount of time individuals are to be kept in the cell. In *Wolfish*, the Supreme Court found no constitutional bar to keeping two detainees in a seventy-five square foot cell for seven or eight hours daily. 441 U.S. at 543, 99 S.Ct. at 1876. The Court recognized that the same space might be unconstitutional if used for many more hours of confinement. Recognizing that institutional determinations as to the detainees' and the prison's needs will result in differing programs and amounts of time out of cell for safekeepers, it will be appropriate for more space to be allotted to the detainees who are required to spend more time in cells. 641 F.2d at 494–95.

Thus the court in *Lock* went on to find that the conditions imposed on these pretrial detainees housed in A & O amounted to punishment in violation of their due process rights because of the great length of time each safekeeper was required to spend in the cell. 641 F.2d at 494.

In *Ramos v. Lamm*, 485 F.Supp. 122 (N.D. Col.1979), *aff'd*, 639 F.2d 559 (10th Cir. 1980), the district court found the conditions of confinement to be unconstitutional and ordered that "no prisoner ... may be housed in less than 80 square feet for 20 or more hours a day. If the confining space decreased from 80 square feet, the hours of confinement therein must be reduced proportionately." 485 F.Supp. at 170. The Eighth Circuit has also recognized that the size of the cell must be related to the time out of cell. *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980).

These opinions, read together with the guidance from the Supreme Court of the United States, provide useful criteria for evaluation whether the amount of individual space in inmate living areas is constitutionally sufficient. It is clear that confinement of inmates in less than 50 square feet should occasion careful judicial scrutiny. However, no fixed rule is appropriate, the court must consider all the circumstances.

■ The evidence indicates that the housing area which is substantially below 50 square feet is A & O. The cells in A & O range from 37.3 to 38.3 square feet in size. Inmates housed in A & O are confined there 23 and ½ hours a day, though there is evidence to suggest this was lowered to 22 hours a day during the pendency of this case. As the court noted in *Lock* and the evidence indicates here when the space taken up by the fixtures in the cell is subtracted there is only 17 square feet remaining for the inmate to move around in. This is an aisle roughly 2 feet by 8 feet long. Defendants' own expert testified that these cells were so small and poorly situated that they should only be used for inmates to sleep in at night. All of the relevant factors being considered, it is clear that the size of the cells in A & O and the minimal

time allowed out contravenes the Eighth Amendment. Contributing to the limited time out of cell by the admission of the prison administrators is the sheer number of inmates. There is testimony that some inmates have not had outside recreation in five months. The only time out of their cells has been in the corridor area between the cells. The prison officials contend that there is no place to let these people out to where a security problem would not develop. So the reality is that those inmates in A & O only exercise in the corridor between the cells. The conclusion is inescapable based on defendants' admission and common sense reasoning from observable facts that overcrowding is a primary reason for the extended time inmates must spend in their cells.

An inmate's right to sufficient exercise has been recognized in a number of recent cases. *Campbell, supra; Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979); *McGruder v. Phelps*, 608 F.2d 1023 (5th Cir. 1979); *Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978). The expert testimony here was unanimous that long periods without adequate exercise led to both physical and mental deterioration. In *Campbell*, the court ordered that each inmate who is confined to his cell for more than 16 hours per day shall be given the opportunity to exercise for at least one hour per day outside the cell. The determination of the type of exercise was left in the discretion of the jail officials subject to court approval. However, merely allowing the inmates to walk around in the corridor between the cells would not be adequate exercise.

In *Jordan v. Wolke*, 615 F.2d 749 (7th Cir. 1980), the Seventh Circuit Court of Appeals reversed a district court's injunction which prohibited the housing of four pretrial detainees in a 90 square foot cell. However, there the inmates were allowed in the corridor or dayroom 16 hours a day. The detainees were required to spend only the sleeping hours in their cells. The factual situation in this case is clearly distinguishable from that in *Jordan* because here the small cell is not merely a sleeping room but rather the

only place the inmate will be for the major portion of waking and sleeping hours. In light of these circumstances the failure to provide proper physical exercise and recreation to those inmates housed on A & O violates the Eighth Amendment.

Finally, mention must be made of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In *Wolfish* the Supreme Court refused to find unconstitutional the housing of two pretrial detainees in 75 square foot cells designed for one person. The jail involved was a short term facility from which virtually all inmates were released in 60 days. Detainees generally were locked in their rooms from 11:00 at night until 6:00 in the morning and for brief periods during the morning and afternoon head counts. During the rest of the day, they were free to move about between their rooms and the common areas. In addition, the *Wolfish* jail was designed according to the most contemporary and architectural standards and complied with all fire and safety codes. Also, the cells were equipped with direct access to sunlight. The court stated that was no "one man, one cell principle lurking in the Due Process Clause," 441 U.S. at 542, 99 S.Ct. at 1875, the court specifically reserved judgment in cases presenting different facts. 441 U.S. at 544, n. 27, 99 S.Ct. at 1876, n. 27. In *Rhodes* the Supreme Court reversed the finding of the district court that the practice of double celling in cells designed for single occupancy violated the Eighth Amendment. The prison in question was Ohio's maximum security facility built in the early 1970's. It has 1620 cells, gymnasiums, workshops, schoolrooms, dayrooms, two chapels, a hospital ward, commissary, barber shop, and library. Outdoors it has a recreation field, visitation area, and garden. The district court found this to be "a top flight, first class facility," essentially state of the art in prison construction. *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977). The prison was 38% over its design capacity in the number of inmates. Further, 75% of the double celled inmates were free to move about the facili-

ty 14 hours a day, only being locked in their cells from 9:00 P.M. to 6:30 A.M. Each cell measured approximately 63 square feet in size.

■ The facilities at issue in *Wolfish* and *Rhodes* present quite a different perspective to the prisoners confined there than does the prospect faced daily by the inmates on A & O. The inmates on A & O at the I.S.P. are in much smaller cells and are not free to move about. The evidence shows that confinement in the A & O unit subjects the inmate to genuine privations and hardships. This conclusion is fully supported by both the facts and the prior case law. Therefore, it will be part of the relief accorded the plaintiff class that the defendants take immediate action to ameliorate these conditions.

Many courts confronted by prison cases have determined the issues, not by looking at each individual area of prison life separately, but by viewing them collectively and deciding whether the totality of prison conditions is such as to violate the Constitution. This is the plaintiffs' proffered approach here. It finds its beginnings in *Hutto v. Finney*, 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978), where the Supreme Court wrote:

> The court was entitled to consider the severity of those violations in assessing the constitutionality of conditions in the isolation cells. The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the "lack of professionalism and good judgment on the part of maximum security personnel." 410 F.Supp., at 277 and 278. The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the court's conclusion that, *taken as a whole*, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment. (emphasis added)

This approach was further substantiated in *Rhodes v. Chapman, supra*, where the Supreme Court wrote:

In *Estelle v. Gamble, supra*, we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. 429 U.S., at 103 [97 S.Ct., at 290]. In *Hutto, supra*, the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto, alone or in combination*, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel. (emphasis added) 101 S.Ct. at 2399

Further, the concurring opinion of Justice Brennan, joined in by Justices Blackmun and Stevens buttresses this approach, stating:

> The first aspect of judicial decisionmaking in this area is scrutiny of the actual conditions under challenge. It is important to recognize that various deficiencies in prison conditions "must be considered together." *Holt v. Sarver, supra*, at 373. The individual conditions "exist in combination; each affects the other; and taken together they [may] have a cumulative impact on the inmates." *Ibid.* Thus a court considering an Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. Even if no single condition of confinement would be unconstitutional in itself, "exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Laaman v. Helgemoe*, 437 F.Supp. 269, 322, 323 (N.H.1977). (footnote omitted)

These Justices go on to conclude that "the court today adopts the totality of the circumstances test." *Rhodes*, 101 S.Ct. at 2407, n. 10 (Brennan, J., concurring). Though the Court asked the parties herein to brief the Rhodes case which was decided after this cause was taken under advisement, they failed to make these observations. The ambient circumstances affecting inmates, considered as a whole, were found unconstitutional in numerous cases. See *Ramos v. Lamm, supra; Battle v. Anderson, supra; William v. Edwards, supra; Pugh v. Locke, supra; Gates v. Collier, supra; Jones v. Diamond*, 594 F.2d 997 (10th Cir. 1979); *Capps v. Atiyeh, supra.*

Based on a review of the exhaustive evidence and applicable law, separate constitutional violations have been found in regard to some individual plaintiffs, and in the areas of overcrowding generally and the size of the cells and time out of cell on the A & O unit. However, now the Court must consider the aggregate effects of all the conditions of confinement to determine if the totality of those conditions violate the Eighth Amendment. For even if the conditions in any one area were not considered sufficiently egregious to constitute an independent violation the aggregate effects could contravene the Constitution.

First, consider the evidence regarding shelter and sanitation. It is incumbent on the incarcerating body to provide the individual with a healthy environment. A necessary corollary to this is that a state must provide within such living space reasonably adequate ventilation, sanitation, bedding, hygienic materials and utilities (i. e., water, light, heat, plumbing) *Battle*, 564 F.2d at 394–395, 403; see also *Ramos, supra; Bono v. Saxbe*, 620 F.2d 609, 613 (7th Cir. 1980); *Hite v. Leeke*, 564 F.2d 670, 674 (4th Cir. 1977); *Palmigiano*, 443 F.Supp. at 979; *Laaman*, 437 F.Supp. at 308–309, 323. In short the shelter must be such that it does not cause an inmate's degeneration or threaten his mental and physical well being.

Considering the record in light of this standard the evidence showed these facts. The I.S.P. is over 100 years old. However, when the specific cell houses were built is not indicated. The cells in B, C, and D Cell Houses range in size from 54 to 59.2 square feet. Single celling is the current status in these buildings. However, there is no evidence to indicate how much time these inmates are locked in their cells. The N.S.B. segregation unit has cells which measure 48.8 square feet and inmates spend 23½ hours a day in their cells. Inmates on the

I.D.U. and B Seclusion lockup units also spend 23½ hours a day in their cells.

Leaking pipes and defective plumbing are not an uncommon problem. However, a significant portion of this problem is inmate created. The finding of blankets and items of clothing in sewer lines is common.

In addition there is a problem with rodent and insect infestation. Trash, food and other material litter the cells and corridors in some places, conditions which are the product of the inmates own actions. Some shower drains were similarly obstructed, providing areas for mold and slime to build up. Exposed electrical wiring did pose some hazards but again the evidence is that the inmates take the covers off the junction boxes. There is evidence that in some instances inmates are not provided with enough cleaning supplies to clean their own cells. Finally, the mattresses seem to suffer from irregular maintenance.

▮ Second, consider the evidence regarding the food service. The state's obligation to provide a healthy environment includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it. *Ramos*, 639 F.2d at 571 and cases cited therein. Here the conditions in the main food service area show a deficiency in routine maintenance and cleaning procedure. The kitchen equipment is in good repair and reasonably modern. The food products are served to the inmate via serving trays and carts which maintain the proper temperature. The food prepared at the meals inspected by the plaintiffs' dietician was adequate in quantity but the preparation probably led to excessive waste. The menus as served provided a nutritionally balanced and adequate diet.

Third, consider the evidence regarding the provision of health care services. The Court here incorporates by reference its previous analysis of the health care system at the I.S.P. Suffice it to say that the medical facilities, equipment, and staff are sufficient to deliver adequate medical care to the prison population.

The Court here incorporates its previous conclusions on overcrowding.

▮ The Eighth Amendment imposes the constitutional limitation upon punishments in only three words: they cannot be "cruel and unusual." This phrase has been interpreted in a flexible and dynamic manner. *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion). Accordingly, no static test exists by which courts determine whether conditions of confinement are cruel and unusual. The Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of society. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1957) (plurality opinion). In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries spring from the Constitution and that judicial answers must reflect that fact rather than a court's idea of how best to operate a prison. *Bell v. Wolfish*, 441 U.S. at 539, 99 S.Ct. at 1874. Having first scrutinized the actual conditions under challenge the Court must determine their effect upon the imprisoned. The Constitution does not mandate comfortable prisons, and prisons which house persons convicted of serious crimes, cannot be free of discomfort. Here the cumulative impact of the conditions of incarceration do not threaten the physical, mental and emotional health of the inmates. The prisoners are adequately sheltered, fed, protected and opportunities for education are available. Plaintiff Sceifer's individual claim challenging the conditions of his cell does not rise to a constitutional level. Therefore, the Court concludes that the totality of conditions do not violate the Eighth Amendment.

## VI.

▮ The prison administration at the I.S.P. continues to make dedicated good faith efforts to improve the conditions at the prison. This Court is well aware of the financial restraints placed on the defendants but the good will shown by them cannot serve as a defense. Nor is the lack of financing a defense to a failure to provide minimum constitutional standards. If the

State of Indiana wishes to hold the inmates in institutions, it must provide the funds to maintain the inmates in a constitutional manner. *Battle*, 447 F.Supp. at 526. These considerations properly are weighed by the legislature and prison administration rather than a court.

Warden Duckworth did not build the prison nor invite all its numerous inmates to be his guests in its cramped confines. The Warden has done a most admirable job with the limited resources at hand. He is doing the best he can with what he has. He did not build this prison but must deal with the many problems of its physical plant on a day to day basis. Neither can the Warden control the number of prisoners that the criminal justice system of Indiana sends to him. Most laudable is the fact that the long range improvements which are currently being implemented originated with the prison administration. This suit and this order deal with public—not private—problems.

### ORDER

Plaintiffs Hendrix and Bobbit shall recover damages from the defendants in their official capacity in the amount of Five Hundred Dollars ($500.00) each. Plaintiff Carroll shall recover damages from the defendants in their official capacity in the amount of One Thousand Dollars ($1000.00).

The most serious problem at the prison is simple overcrowding. Given the nature and age of the physical plant it is pervasive and cuts across all other issues here. Given the most generous application of judicial restraint it raises serious Eighth Amendment problems. In the context of the physical plant and the limits on staffing this overcrowding constitutes a violation of the Eighth Amendment of the Constitution of the United States. This Court reaches this conclusion with greatest reluctance but the facts compel the conclusion.

Therefore, the defendants are ordered to begin a staged reduction of the inmate population at the I.S.P. That reduction must commence now and be concluded on the schedule here ordered. The inmate population at the I.S.P. must be reduced so as to not exceed a total of 1750 inmates by December 31, 1982. By December 31, 1983, additional reduction must be made so that the total inmate population shall not exceed 1615. Based on the evidence there should be and hereby is placed a ceiling on inmate population. On and after January 1, 1984 no more than 1615 inmates shall be confined at the I.S.P. The facts of this case and the Eighth Amendment compel this result. Further, all inmates housed in the A & O unit shall receive three hours a day of time out of cell. Outdoor exercise must be available at the option of the inmates for one of those three hours every day. Obviously, inclement weather may limit this time outdoors but such time shall be available at the inmates' option.

This Court shall retain jurisdiction of this cause. This opinion shall constitute the necessary findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. The defendants shall file timely reports to the Court indicating their compliance with this order. Each party will bear its own cost. The question of the award of attorney fees to plaintiffs' counsel under 42 U.S.C. § 1988 is reserved for further proceedings.